B 10 (Official Form 10) (12/07)

| UNITED STATES BANKRUPTCY COURT | District of Delaware | PROOF OF CLAIM |
|---|---|---|

| Name of Debtor: ALLIANCE BANCORP | Case Number: 07-10942 (CSS) |
|---|---|

NOTE: *This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.*

| | |
|---|---|
| Name of Creditor (the person or other entity to whom the debtor owes money or property): COUNTRYWIDE HOME LOANS, INC. | ☐ Check this box to indicate that this claim amends a previously filed claim. |
| Name and address where notices should be sent: <br><br> c/o Robert Trodella, Esq., Heller Ehrman LLP <br> 333 Bush Street, San Francisco, CA 94104 (w/copies to others listed on the attached) <br><br> Telephone number: <br> (415) 772-6000 | Court Claim Number:_____ <br> (If known) <br><br><br> Filed on: _____ |
| Name and address where payment should be sent (if different from above): <br><br><br><br> Telephone number: | ☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars. <br><br> ☐ Check this box if you are the debtor or trustee in this case. |

| | |
|---|---|
| **1. Amount of Claim as of Date Case Filed:** $ **at least $20,000,000** <br><br> If all or part of your claim is secured, complete item 4 below; however, if all of your claim is unsecured, do not complete item 4. <br><br> If all or part of your claim is entitled to priority, complete item 5. <br><br> ☐ Check this box if claim includes interest or other charges in addition to the principal amount of claim. Attach itemized statement of interest or charges. | **5. Amount of Claim Entitled to Priority under 11 U.S.C. §507(a). If any portion of your claim falls in one of the following categories, check the box and state the amount.** <br><br> Specify the priority of the claim. |
| **2. Basis for Claim:** **Breach of Contract** <br> (See instruction #2 on reverse side.) | ☐ Domestic support obligations under 11 U.S.C. §507(a)(1)(A) or (a)(1)(B). |
| **3. Last four digits of any number by which creditor identifies debtor:** _____ <br><br>      **3a.** Debtor may have scheduled account as: _____ <br>      (See instruction #3a on reverse side.) | ☐ Wages, salaries, or commissions (up to $10,950*) earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier – 11 U.S.C. §507 (a)(4). |
| **4. Secured Claim (See instruction #4 on reverse side.)** <br> Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information. <br><br> **Nature of property or right of setoff:** ☐ Real Estate   ☐ Motor Vehicle   ☐ Other <br> Describe: <br><br> **Value of Property:** $_____   **Annual Interest Rate** ___% <br><br> **Amount of arrearage and other charges as of time case filed included in secured claim,** <br><br> **if any:** $_____   **Basis for perfection:** _____ <br><br> **Amount of Secured Claim:** $_____   **Amount Unsecured;** $_____ | ☐ Contributions to an employee benefit plan – 11 U.S.C. §507 (a)(5). <br><br> ☐ Up to $2,425* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. §507 (a)(7). <br><br> ☐ Taxes or penalties owed to governmental units – 11 U.S.C. §507 (a)(8). |
| **6. Credits:** The amount of all payments on this claim has been credited for the purpose of making this proof of claim. | ☐ Other – Specify applicable paragraph of 11 U.S.C. §507 (a)(__). |
| **7. Documents:** Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. You may also attach a summary. Attach redacted copies of documents providing evidence of perfection of a security interest. You may also attach a summary. (*See definition of "redacted" on reverse side.*) <br><br> DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING. <br><br> If the documents are not available, please explain: | **Amount entitled to priority:** <br><br> $_____ <br><br> *Amounts are subject to adjustment on 4/1/10 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.* |

| | | |
|---|---|---|
| Date: 4/4/0 | **Signature:** The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any. <br><br> David Sobul <br> EVP & Deputy General Counsel | FOR COURT USE ONLY <br><br>     |

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

## ATTACHMENT TO PROOF OF CLAIM

Court:      United States Bankruptcy Court for District of Delaware
Case No.:   07-10942
Debtor:     Alliance Bancorp ("**Alliance**")
Creditor:   Countrywide Home Loans, Inc. ("**Countrywide**")[1]

**NOTICES -**   In addition to counsel as set forth in the Proof of Claim, send notices to:
**PLEASE**
**COPY**

       Countrywide Home Loans, Inc.
       John D. Guerry, Senior Vice President and Assistant General Counsel
       5220 Las Virgenes Road, MS AC-11
       Calabasas, California 91302

    AND

       Countrywide Home Loans
       David Sobul, Executive Vice President and Deputy General Counsel
       4500 Park Granada
       MS CH-11
       Calabasas, CA 91302

1.      **General Bases for Claim**.  This proof of claim stems from Alliance's failure to satisfy certain of its prepetition obligations under (1) the Mortgage Loan Purchase and Interim Servicing Agreement dated as of June 22, 2005 by and between Alliance and Countrywide ("Alliance MLPA") and (2) the Loan Purchase Agreement dated as of February 7, 2001 by and between Countrywide, United Financial Mortgage Corporation (n/k/a Alliance Bancorp, Inc. ("Alliance Inc.")) (collectively, with all Commitments, Addenda and Assignments related thereto, the "Loan Purchase Agreements"), to which Alliance agreed to be bound pursuant to the Addendum to Loan Purchase Agreement for Related Seller dated as of November 6, 2006 and the Addendum to Loan Purchase Agreement for Related Seller dated as of November 2, 2006, respectively (the "Related Seller Agreements").  The Alliance MLPA, the Loan Purchase Agreements and the Related Seller Agreements are listed in Part 5 below and attached hereto as Exhibits 1 through 11.

2.      **Claim Summary**.  Countrywide's total claim in an amount not less than $20,000,000[2] (subject to amendment) is comprised of components A and B below.

---

[1]      Reference to "Countrywide" includes reference to affiliates thereof and who together have claims against Alliance.

[2]      This claim is, and is filed as, a claim in an amount yet to be determined for additional liabilities, losses, damages, fees, costs and other amounts and claims payable under the Alliance MLPA, the Loan Purchase Agreements and the Related Seller Agreements, and is based on a preliminary reconciliation and analysis of amounts owed by Alliance, and Countrywide reserves all rights to amend this Proof of Claim to include additional amounts based upon its further investigation.

A.      Under the Alliance MLPA, Countrywide seeks the following from Alliance:

  a.  Losses sustained by Countrywide in connection with Alliance's failure to remit principal, interest and other funds collected on account of mortgage loans sold by Alliance to Countrywide. *See* Alliance MLPA, § 5.3.

  b.  Losses sustained by Countrywide in connection with Alliance's failure to repurchase loans after its breaches of certain representations and warranties with respect to mortgage loans sold to Countrywide, including those based upon early payment defaults, fraud or misrepresentation in the origination of mortgage loans and/or pair-off fees for failed sales. *See* Alliance MLPA, §§ 3.1, 3.2, 3.3 and 3.6.

  c.  Amounts owed to Countrywide by Alliance related to prepayment of mortgage loans sold to Countrywide, either through premium recapture or prepayment penalties. *See* Alliance MLPA, § 3.5.

  d.  Costs and attorney's fees incurred by Countrywide in connection with enforcement of parties' agreements.  *See* Alliance MLPA, §§ 6.10 and 6.11.

  e.  Indemnification obligations of Alliance in favor of Countrywide.  *See* Alliance MLPA, § 3.4

**Total Claim under Alliance MLPA**:  Not less than $10,000,00[3] (subject to amendment).

B.      Under the Loan Purchase Agreements, *vis a vis* the Related Seller Agreements, Countrywide seeks the following from Alliance:

  a.  Losses sustained by Countrywide in connection with Alliance's contractual obligations related to mortgage loans that experienced default after sale to Countrywide.

  b.  Losses sustained by Countrywide in connection with Alliance's contractual obligations related to Alliance's breach of representations and warranties with respect to mortgage loans sold to Countrywide.

  c.  Amounts owed to Countrywide by Alliance related to prepayment of mortgage loans sold to Countrywide.

  d.  Costs and attorney's fees incurred by Countrywide in connection with enforcement of parties' agreements in an amount to be determined.

---

[3]      Upon request, Countrywide will provide the Chapter 7 trustee with supporting documentation for the amounts comprising this portion of the Proof of Claim, including all additional amounts to be sought in connection with Countrywide's further analysis and reconciliation of this claim.

5.     **Supporting Documents**

**Exhibits**

Exhibit 1:  April 19, 1993 Loan Purchase Agreement between United Financial Mortgage Corp. (n/k/a Alliance Bancorp, Inc.) and Countrywide.

Exhibit 2:  January 16, 1995 Loan Purchase Agreement between United Financial Mortgage Corp. (n/k/a Alliance Bancorp, Inc.) and Countrywide.

Exhibit 3:  February 7, 2001 Loan Purchase Agreement between United Financial Mortgage Corp. (n/k/a Alliance Bancorp, Inc.) and Countrywide.

Exhibit 4:  February 2002 Subscriber Agreement.

Exhibit 5:  August 8, 2002 Terms Sheet.

Exhibit 6:  February 14, 2003 Terms Sheet.

Exhibit 7:  Miscellaneous Addenda and Amendments to Loan Purchase Agreements.

Exhibit 8:  Addendum To Loan Purchase Agreement for Related Seller dated November 6, 2006, which modifies the Loan Purchase Agreement dated as of February 27, 2001 and Addendum To Loan Purchase Agreement for Related Seller dated November 6, 2006, which modifies the Loan Purchase Agreement dated as of February 7, 2001.

Exhibit 9:  Limited Power of Attorney.

Exhibit 10:  Home Equity Lines of Credit Purchase Price Premium Option Form.

Exhibit 11:  Mortgage Loan Purchase and Interim Servicing Agreement dated as of June 22, 2005 by and between Alliance and Countrywide.

SF 1416503 v2

# EXHIBIT 1

     e.  Indemnification obligations of Alliance in favor of Countrywide.

**Total Claim under Loan Purchase Agreements:**  Not less than $10,000,000[4] (subject to amendment).

3.     **Date Debts Were Incurred**:  Various.

4.     **Reservation of Rights**.  This Proof of Claim is based on a preliminary reconciliation and analysis of amounts owed by Alliance.  Countrywide reserves the right to continue to reconcile and to amend this Proof of Claim in any manner whatsoever. Countrywide further reserves the right to amend and/or supplement this Proof of Claim for any additional claims that may be based on information not yet known, or the same or additional documents or grounds of liability, including, but not limited to, costs and expenses arising after Alliance's bankruptcy petition date, and indemnity obligations. Countrywide may also hold postpetition claims against the Alliance estate and reserves the right to amend or otherwise supplement this Proof of Claim or to take any other action in connection therewith.  Countrywide also reserves its right to assert that the Proof of Claim may be subject to a right or rights of set off.  Countrywide specifically reserves its right to file a claim or request for payment pursuant to Section 503(b) or Section 507(a) of the Bankruptcy Code, and generally to make requests for payment of administrative expenses.

     This Proof of Claim is filed to protect Countrywide from forfeiture of any claim that it may have.  Filing of this Proof of Claim is not (a) a waiver or release of Countrywide's rights, claims or defenses against any person or property, including but not limited to its right to any security held by it or for its benefit or any right to claim specific assets or any right to setoff, recoupment, counterclaim or similar right Countrywide may have against Alliance; (b) a waiver or release of Countrywide's right to have any and all final orders in any and all non-core matters entered only after *de novo* review by a United States District Court judge; (c) a consent by Countrywide to the jurisdiction of the bankruptcy court overseeing Alliance's bankruptcy case for any purpose other than with respect to this Proof of Claim; (d) an election of remedy; (e) a waiver or release of any rights that Countrywide may have to a jury trial; or (f) a waiver of the right to move to withdraw reference with respect to the subject matter of this Proof of Claim, any objection thereto or any other proceedings that may be commenced in this bankruptcy case against or otherwise involving Countrywide.

---

[4]     Upon request, Countrywide will provide the Chapter 7 trustee with supporting documentation for the amounts comprising this portion of the Proof of Claim, including all additional amounts to be sought in connection with Countrywide's further analysis and reconciliation of this claim.

# Loan Purchase Agreement

*Countrywide Funding Corporation*
*Correspondent Lending Division*

This Agreement, dated as of _____ April 19, 1993 _____ , is made by and between Countrywide Funding Corporation, a New York corporation ("Countrywide"), and __ United Financial Mortgage Corp. _____ , a __ n Illinois _____ corporation ("Seller"), for mutual considerations herein evidenced.

Countrywide agrees to purchase certain loans, together with servicing thereof (the "Loans"), from Seller under Countrywide's mortgage loan programs, and Seller agrees to sell to Countrywide certain such Loans pursuant to the terms and conditions set forth herein and in Countrywide's Correspondent Lending Division Loan Purchase Program Seller's Manual, as amended from time to time (the "Manual"). In connection therewith, the parties agree as follows:

**1. Eligible Loans**

A. Only those Loans fully complying with the standards for Conforming Conventional, Jumbo Conventional, Government and Second Mortgage Loan Programs set forth in the **Mortgage Programs** section of the Manual are eligible for purchase under this Agreement.

B. Each Loan purchased pursuant to the Agreement shall be underwritten by Seller in accordance with the Underwriting Guidelines and Lending Requirements set forth in the Manual.

C. Seller shall be responsible for assuring that Loans submitted to Countrywide comply with all terms and conditions of this Agreement and the Manual.

D. Countrywide shall only be obligated to purchase hereunder an aggregate principal amount of Loans not to exceed $ _____ per month and $ _____ in total.

**2. Commitment to Purchase Loans**

The procedure pursuant to which Seller may commit to sell a Loan to Countrywide is detailed in the **Loan Registration** section of the Manual. Countrywide will confirm the conditions of the sale of the Loan to Countrywide by delivering a Lock-in Agreement to Seller setting forth the terms of the transaction, the price Countrywide will pay for each Loan, as determined pursuant to the **Pricing** standards set forth in the Manual, as well as the term of the Lock-in Agreement (the "Lock-in Period").

**3. Underwriting**

Countrywide shall have the right, but not the obligation, to underwrite any Loan submitted for purchase pursuant to this Agreement, or otherwise insure that any Loan submitted for purchase complies with all terms and conditions of this Agreement and the Manual; provided that the existence of this right shall not affect in any way Seller's obligations hereunder, including without limitation, Seller's repurchase obligations under Section 7 hereof and Seller's hold harmless obligations under Section 9 hereof. The applicable procedures are set forth in the **Prior Approval** section of the Manual.

**4. Delivery of Loan Documentation**

A Loan shall be deemed delivered to Countrywide if received by Countrywide within the Lock-in Period and is in compliance with the **Delivery of Closed Loans** and **Funding Documentation** requirements set forth in the Manual.

**5. Payment of Purchase Price and Seller's Wire Instructions**

Countrywide shall, after receipt of a loan documentation package which fully complies with the requirements of the Manual, deliver the amount set forth in the appropriate Lock-in Agreement to Seller in accordance with Seller's wire instructions attached hereto as Exhibit A or in accordance with any bailee letter or trust receipt submitted with the Loan, as determined by Countrywide.

**6. Seller's Obligations, Representations and Warranties**

A. Seller represents and warrants to Countrywide as to each Loan offered for sale under this Agreement that, as of the date of Countrywide's purchase of such Loan:

1. The loan documents have been duly executed by the trustor/mortgagor, acknowledged and recorded; each Loan is valid and complies with all criteria contained in the Manual; the note and deed of trust/mortgage constitute the entire Agreement between the trustor/mortgagor and the note and beneficiary/mortgagee, and there is no verbal understanding or written modification which would affect the terms of the note or the deed of trust/mortgage except by written instrument delivered and expressly made known to the beneficiary/mortgagee which has been recorded if necessary to protect the interests of the beneficiary/mortgagee.

2. Seller is the sole owner of the Loan and has authority to sell, transfer and assign the same on the terms set forth herein and in the Manual. There has been no assignment, sale or hypothecation thereof by Seller, except the usual hypothecation of the documents in connection with Seller's normal banking transactions in the conduct of its business.

...e full principal amount of the Loan has been a[...]ced to the trustor/mortgagor, either by payment directly to such person or by payment made on such person's request or approval. The unpaid balance is as represented by Seller. All costs, fees and expenses incurred in making, closing and recording the Loan have been paid. No part of the mortgaged property has been released from the lien of the Loan, the terms of the Loan have in no way been changed or modified, and the Loan is current and not in default.

4. Each Loan is a valid first or second lien on the mortgaged property, and the mortgaged property is free and clear of all encumbrances and liens having priority over the lien of such Loan, except for the first lien, if applicable, and liens for real estate taxes and special assessments not yet due and payable and those exceptions allowed in connection with Government Loans and other exceptions set forth in the Manual.

5. The mortgaged property is free and clear of all mechanics' and materialmen's liens or liens in the nature thereof, and no rights are outstanding that under law could give rise to any such lien, nor is Seller aware of any facts which could give rise to any such lien.

6. Each Loan which Seller represents to be insured or guaranteed is, or will within 90 days from the date of delivery of such Loan to Countrywide be, so insured or guaranteed, and no action has been taken or failed to be taken which has resulted or will result in an exclusion from, denial of, or defense to, coverage under such insurance or guarantee.

7. Seller shall deliver to Countrywide an appraisal of the real estate security for each such Loan signed by a qualified appraiser, as defined in the Manual, prior to Countrywide's approval to purchase such Loan. In the case of insured or guaranteed Loans, Seller shall deliver to Countrywide a certification, or a copy thereof, by the insuring or guaranteeing agency of its acceptance of the valuation assigned to the real estate security by the appraiser.

8. All federal and state laws, rules and regulations applicable to the mortgage loans have been complied with, including but not limited to:  The Real Estate Settlement Procedures Act; the Flood Disaster Protection Act; the Federal Consumer Credit Protection Act including the Truth-in-Lending and Equal Credit Opportunity Acts; statutes or regulations governing fraud, lack of consideration, unconscionability, consumer credit transactions or interest charges; and all conditions within the control of Seller as to the validity of the insurance or guaranty as required by the National Housing Act of 1934, and the rules and regulations thereunder, or as required by the Servicemen's Readjustment Act of 1944, and the rules and regulations thereunder, or imposed by the mortgage insurance companies or other insurers, have been properly satisfied, and said insurance or guaranty is valid and enforceable.

9. No Loan is the subject of litigation which could affect Countrywide's ability to enforce the terms of the obligation or its rights under the mortgage documents.

10. There is in force for each loan either (i) a paid-up title insurance policy on the Loan issued by a Countrywide approved title company in the amount at least equal to the outstanding principal balance of the Loan or (ii) an attorney's mortgage lien opinion.  (Negatively amortizing loans require additional coverage.)

11. There is in force for each Loan a hazard insurance policy and flood insurance policy, where applicable, meeting the requirements of Countrywide.

12. Seller will record the corporate assignment in the name of Countrywide Funding Corporation at the time the deed of trust/mortgage is recorded, and the assignment of the Loan from Seller to Countrywide is valid and enforceable.

13. The borrower has no rights of rescission, set-offs, counter-claims or defenses to the note or deed of trust/mortgage securing the note arising from the acts and/or omissions of Seller in the origination of the Loan.

14. Seller has no knowledge that any improvement located on or being part of the mortgaged property is in violation of any applicable zoning law or regulation.

15. All improvements included for the purpose of determining the appraised value of the mortgaged property lie wholly within the boundaries and building restriction lines of such property, and no improvements on adjoining properties encroach upon the mortgaged property.

16. There is no proceeding pending for total or partial condemnation of any mortgaged property and said property is free of substantial damage (including but not limited to, any damage by fire, windstorm, vandalism or other casualty) and in good repair.

17. Seller has no knowledge of any circumstances or conditions with respect to any Loan, mortgaged property, trustor/mortgagor or trustor's/mortgagor's credit standing that reasonably could be expected to cause private institutional investors to regard any Loan as an unacceptable investment, cause any Loan to become delinquent or adversely affect the value or marketability of the Loan.

18. All documents submitted are genuine. All other representations as to each such Loan are true and correct and meet the requirements and specifications of all parts of this Agreement and the Manual.

B. Seller         esents and warrants to Countrywide that, as of         late first set forth above and as of the date of Countrywide's purchase of each Loan hereunder.

1. Seller is duly organized, validly existing and in good standing under the laws of its state of incorporation and is qualified to transact business and is in good standing in each state where the property securing a Loan is located;

2. Seller has the full power and authority to hold and sell each Loan; and neither the execution and delivery of this Agreement, the acquisition or origination of the Loans, the sale of the Loans, the consummation of the transactions contemplated herein, nor the fulfillment of or compliance with the terms and conditions of this Agreement will conflict or result in a breach of any term, condition or provision of Seller's certificate of incorporation or by-laws or any agreement to which Seller is a party or by which Seller is bound, or constitute a material default or result in an acceleration under any of the foregoing.

3. No consent, approval, authorization or order of any court, governmental body or any other person or entity is required for the execution, delivery and performance by Seller of this Agreement, including but not limited to, the sale of the Loans to Countrywide.

4. Neither Seller nor its agents know of any suit, action, arbitration or legal or administrative or other proceeding pending or threatened against Seller which would affect its ability to perform its obligations under this Agreement.

**7. Seller's Repurchase Obligations**

Seller shall repurchase any Loan sold to Countrywide pursuant to this Agreement within ten business days of receipt of written notice from Countrywide of any of the following circumstances:

A. Failure by Seller to deliver to Countrywide within 90 days from the date each Loan was purchased the original documents specified in the **Delivery of Closed Loans** section of the Manual;

B. Countrywide's audit procedure reveals any evidence of fraud in the origination of the Loan or in the sale of the Loan to Countrywide or that any matter in the mortgage loan file is not true and correct;

C. Within 60 days from the date each Loan was purchased, if Countrywide determines the Loan is not eligible for GNMA, FNMA or FHLMC pool participation or whole loan purchase;

D. Within one year from the date each Loan was purchased, if Countrywide sells an interest, in whole or in part, in a Loan purchased from Seller to GNMA, FNMA, FHLMC or a private investor and GNMA, FNMA, FHLMC or the private investor requires Countrywide to repurchase said interest;

E. A Loan becomes two or more monthly payments past due (delinquent) within six months from the date of Countrywide's purchase of such Loan from Seller. Funds deducted by Countrywide at time of purchase which represent payments due, including the next payment due following the purchase, will not constitute payments made by the borrower for purposes of calculating delinquency under this provision. A Loan with two monthly payments past due is a Loan with respect to which borrower failed to pay monthly payments, including all sums due per the contract, and two payments remain unpaid on the second day of the second month;

F. Seller fails to observe or perform or breaches in any material respect any of the representations, warranties or agreements contained in this Agreement or the Manual with respect to a particular Loan.

The option to request or accept repurchase of any Loan is at the sole discretion of Countrywide.

**8. Repurchase Price**

Repurchases pursuant to Section 7 hereof shall be priced as follows:

A. The original purchase price, but not less than par, less principal reduction after original purchase by Countrywide;

B. Plus all interest accrued but unpaid on the principal balance of the Loan from the date of sale to Countrywide through and including the first day of the month following the month the repurchase is made;

C. Plus all expenses, including, but not limited to reasonable fees and expenses of counsel incurred by Countrywide in enforcing Seller's obligation to repurchase such Loan;

D. Plus a 2% servicing release premium.

Upon any such repurchase of Loans by Seller, Countrywide shall endorse the promissory note(s) (without recourse) and shall assign any security interest (without recourse and in recordable form) to Seller.

**9. Hold Harmless**

A. Seller shall hold Countrywide harmless and shall indemnify Countrywide from and against any and all suits, costs, damages, fees or claims including without limitation reasonable attorney's fees arising out of or in connection with claims made by borrowers or third parties against Countrywide arising from negligence, fraud or a material omission on the part of Seller in receiving, processing or funding any Loan committed to Countrywide for sale under

...aragraph 2 above, for the origination period and Lock-in Period up to the purchase date. Seller's obligation to Countrywide in this regard shall remain effective after Countrywide's purchase of the loan if the suit, cost, damage, fee or claim arose prior to purchase but was undetected at time of purchase.  This paragraph shall not modify Seller's obligations contained elsewhere in this Agreement.

B. Seller shall also hold Countrywide harmless and shall indemnify Countrywide from and against any and all suits, costs, damages, fees or claims, including without limitation reasonable attorneys' fees, arising out of or in connection with any one or more of the items set forth in paragraphs A-F, inclusive, of Section 7 hereof.

**10. No Solicitation**

Loans sold to Countrywide cannot be solicited by Seller for refinance for a period of 12 months from the date the loan is purchased by Countrywide.  Borrowers requesting a refinance from Seller within the 12 month period must be referred to Countrywide.  In the event Seller breaches this covenant, Seller shall pay to Countrywide within two days of Seller's receipt of notice from Countrywide an amount equal to .0_____% of the then outstanding principal balance of the Loan.

**11. Term**

This Agreement may be terminated, as to future commitments for sale of Loans, by either party at any time, but such termination shall not in any respect change or modify the obligation of Seller with respect to Loans already subject to a Lock-in Agreement.  The effective time of termination shall be the earlier of the time written notice is actually received by the other party or five days after written notice is posted in the United States Postal Service by the canceling party.

**12. Exhibits**

All exhibits attached hereto or referred to in this Agreement are incorporated by reference into this Agreement.

**13. Entire Agreement**

The entire agreement between the parties is contained in this Agreement and in the Manual and cannot be modified in any respect except by an amendment in writing signed by both parties. The invalidity of any portion of this Agreement shall in no way affect the balance thereof.

**14. Assignment**

Seller may not assign its rights or obligations under this Agreement without the prior written consent of Countrywide.  This Agreement shall be binding and inure to the benefit of the permitted successors and assigns of the parties hereto.

**15. Attorneys' Fees and Expenses; Choice of Law and Forum**

If any party hereto shall bring suit or other proceeding against the other as a result of any alleged breach or failure by the other party to fulfill or perform any covenants or obligations under this Agreement, then the prevailing party obtaining final judgment in such action shall be entitled to receive from the non-prevailing party reasonable attorneys' fees incurred by reason of such action and all costs of suit and preparation thereof at both trial and appellate levels.  This Agreement shall be governed by, and construed and enforced in accordance with applicable federal law and the laws of the State of California.  In addition, any such suit or proceeding shall be brought in the federal or state courts located in Los Angeles County, California, which courts shall have sole and exclusive in personam, subject matter and other jurisdiction in connection with such suit or proceedings, and venue shall be appropriate for all purposes in such courts.

**16. No Remedy Exclusive; Waiver**

No remedy under this Agreement is exclusive of any other available remedy, but each remedy shall be cumulative and shall be in addition to other remedies given under this Agreement or existing at law or in equity.

Any forbearance by a party to this Agreement in exercising any right or remedy under this Agreement or otherwise afforded by applicable law shall not be a waiver or preclude the exercise of that or any other right or remedy.

**17. Notice**

All notices under this Agreement shall be in writing, deemed effective upon receipt and addressed as indicated below.

To:  Countrywide Funding Corporation
Correspondent Lending
155 North Lake Avenue
Pasadena, California 91101

To Lender/Seller:
United Financial Mortgage Corp.
600 Enterprise Drive, Suite 204
Oak Brook, Illinois 60521
Attention:  Joseph Khoshabe

Countrywide
Correspondent Lending
155 North Lake Avenue
Pasadena, California 91101
(800) 669-6680

Seller: United Financial Mortgage

By: _____

Title: Joseph Khoshabe, President

Dated: April 19, 1993

Agreed to and accepted by Countrywide
Funding Corporation

By: _____

Title: _____

Dated: 5-19-93

**COUNTRYWIDE**
CORRESPONDENT LENDING

CL-009-791

# EXHIBIT 2

804-095

## Loan Purchase Agreement 1

This Agreement, dated as of ___1-16-95___, is made by and between Countrywide Funding Corporation, a New York corporation ("Countrywide"), and _United Financial Mortgage Corp. Illinois_ corporation ("Seller"), for mutual considerations set forth herein.

Countrywide agrees to purchase certain loans secured by real property, together with the servicing thereof (the "Loans"), from Seller under Countrywide's mortgage loan programs, and Seller agrees to sell to Countrywide certain such Loans pursuant to the terms and conditions set forth herein and in Countrywide's Correspondent Lending Division Loan Purchase Program Seller's Manual, as amended from time to time (the "Manual"). In connection therewith, the parties agree as follows:

1. **ELIGIBLE LOANS**

   A. Only those Loans fully complying with the standards for Conforming Conventional, Jumbo Conventional, Government and Second Mortgage Loan Programs set forth in the **Mortgage Programs** section of the Manual are eligible for purchase under this Agreement. Seller must be approved, qualified and/or licensed to originate such Loans.

   B. Seller shall fully underwrite each Loan prior to submission to Countrywide in accordance with the **Underwriting Guidelines and Lending Requirements** sections of the Manual, or, if available, use a Countrywide-approved automated underwriting system for underwriting the Loan.

   C. Seller shall be responsible for assuring that Loans submitted to Countrywide comply with all terms and conditions of this Agreement and the Manual.

2. **COMMITMENT TO PURCHASE LOANS**

   The procedure pursuant to which Seller may commit to sell a Loan to Countrywide is detailed in the **Loan Registration** section of the Manual. For purposes of this Agreement, Countrywide and seller define a best effort commitment to be a mandatory commitment if the loan closes. Countrywide will confirm the conditions of the sale of the Loan to Countrywide by delivering a confirmation ("Commitment") to Seller which sets forth the terms of the transaction, including the price Countrywide will pay for each Loan, as determined pursuant to the Pricing standards set forth in the Manual (the "Purchase Price"). The terms of the Commitment, including the Purchase Price, shall be in effect for the period of time requested by Seller and approved by Countrywide (the "Commitment Period"). If Seller is approved by Countrywide to sell Loans to Countrywide on a bulk sale basis, Countrywide and Seller shall execute the Addendum to Loan Purchase Agreement (Bulk Sales) which shall be attached to and incorporated into this Agreement by reference.

3. **UNDERWRITING AND PROPERTY APPRAISAL**

   A. Countrywide shall have the right, but not the obligation, to underwrite any Loan submitted for purchase pursuant to this Agreement, or otherwise insure that any Loan submitted for purchase complies with all terms and conditions of this Agreement and the Manual; provided that neither the existence nor the exercise of this right shall affect in any way Seller's obligations hereunder, including without limitation, Seller's repurchase obligations under Section 7 hereof and Seller's hold harmless obligations under Section 9 hereof. The applicable procedures are set forth in the **Prior Approval** section of the Manual.

   B. Seller shall deliver to Countrywide an appraisal of the real estate security for each such Loan, signed by a qualified appraiser, as defined in the Manual, prior to Countrywide's approval to purchase such Loan.

4. **DELIVERY OF LOAN DOCUMENTATION**

   A Loan shall be deemed delivered to Countrywide if: (A) it is received by Countrywide within the Commitment Period; (B) it is in compliance with the requirements set forth in the **Delivery of Closed Loans and Funding Documentation** sections of the Manual; and (C) there are no outstanding conditions which would prevent Countrywide from funding the purchase of the Loan. Failure by Seller to deliver to Countrywide within 120 days from the date a Loan was purchased one or more of the original documents specified in the **Delivery of Closed Loans** section of the Manual shall result in assessment by Countrywide of a fee of $50 per month for each month, after the initial 120 day period, during which one or more of such documents is outstanding, i.e., has not been delivered to Countrywide for any period of time during the month. Such fee shall be $50 regardless of the number of such documents. Failure by Seller to deliver to Countrywide one or more of the original documents specified in the **Delivery of Closed Loans** section of the Manual within 270 days from the date the Loan was purchased by Countrywide shall obligate Seller to repurchase the Loan pursuant to the provisions of Section 7 of this Agreement.

**COUNTRYWIDE**
CORRESPONDENT LENDING

Equal Housing Lender. ©1994 Countrywide Funding Corporation.
All rights reserved. Countrywide is a registered service mark of
Countrywide Credit Industries, Inc.

## Loan Purchase Agreement   2

5. **PAYMENT OF PURCHASE PRICE AND SELLER'S WIRE INSTRUCTIONS**

Countrywide shall, after receipt of a Loan documentation package which fully complies with the requirements of the Manual, deliver the Purchase Price (less any fees or discounts due to Countrywide) set forth in the applicable Commitment to Seller in accordance with Seller's wire instructions or in accordance with any bailee letter or trust receipt submitted with the Loan, as determined in the sole and absolute discretion of Countrywide.

6. **SELLER'S OBLIGATIONS, REPRESENTATIONS AND WARRANTIES**

A. Seller represents and warrants to Countrywide as to each Loan offered for sale under this Agreement that as of the date of Countrywide's purchase of such Loan:

(1) The Loan documents have been duly executed by the trustor/mortgagor, acknowledged and recorded; each Loan is valid and complies with all criteria contained in the Manual; the note and deed of trust/mortgage constitute the entire Agreement between the trustor/mortgagor and the beneficiary/mortgagee, and there is no verbal understanding or written modification which would affect the terms of the note or the deed of trust/mortgage except by written instrument delivered and expressly made known to the beneficiary/mortgagee and recorded if recording is necessary to protect the interests of the beneficiary/mortgagee.

(2) Seller is the sole owner of the Loan and has authority to sell, transfer and assign the same on the terms set forth herein and in the Manual. There has been no assignment, sale or hypothecation thereof by Seller, except the usual hypothecation of the documents in connection with Seller's normal banking transactions in the conduct of its business.

(3) The full principal amount of the Loan has been advanced to the trustor/mortgagor, either by payment directly to such person or by payment made on such person's request or approval. The unpaid principal balance of the Loan is as represented by Seller. All costs, fees and expenses incurred in making, closing and recording the Loan have been paid. No part of the mortgaged property has been released from the lien of the Loan, the terms of the Loan have in no way been changed or modified, and the Loan is current and not in default.

(4) Each Loan is a valid first lien or, if specifically approved by Countrywide, a valid second lien on the mortgaged property, and the mortgaged property is free and clear of all encumbrances and liens having priority over the lien of such Loan, except for the first lien, if applicable, and liens for real estate taxes and special assessments not yet due and payable and those exceptions allowed in connection with Government Loans and other exceptions set forth in the Manual.

(5) The mortgaged property is free and clear of all mechanics' and materialmen's liens or liens in the nature thereof, and no rights are outstanding that under law could give rise to any such lien, nor is Seller aware of any facts which could give rise to any such lien.

(6) Each Loan which Seller represents to be insured or guaranteed is, or will within 120 days from the date of delivery of such Loan to Countrywide be, so insured or guaranteed. No action has been taken or failed to have been taken which has resulted or will result in an exclusion from, denial of, or defense to, coverage under such insurance or guarantee; and all conditions within the control of Seller as to the validity of the insurance or guaranty as required by the National Housing Act of 1934 and the rules and regulations thereunder, or as required by the Servicemen's Readjustment Act of 1944 and the rules and regulations thereunder, or imposed by the mortgage insurance companies or other insurers have been properly satisfied, and said insurance or guaranty is valid and enforceable.

(7) All federal and state laws, rules and regulations applicable to the mortgage Loans have been complied with, including but not limited to: the Real Estate Settlement Procedures Act, the Flood Disaster Protection Act, the Federal Consumer Credit Protection Act including the Truth-in-Lending and Equal Credit Opportunity Acts, and all applicable statutes or regulations governing fraud, lack of consideration, unconscionability, consumer credit transactions or interest charges.

(8) No Loan is the subject of, and Seller is not aware of any facts which could give rise to, litigation which could affect Countrywide's ability to enforce the terms of the obligation or its rights under the mortgage documents.

(9) There is in force for each loan either (a) a paid-up title insurance policy on the Loan issued by a Countrywide approved title company in an amount at least equal to the outstanding principal balance of the Loan or (b) an attorney's mortgage lien opinion. (Negatively amortizing loans require additional coverage.)

(10) There is in force for each Loan valid hazard insurance policy coverage and, where applicable, valid flood insurance policy coverage, and such coverages meet the requirements of Countrywide specified in the Manual.

# Loan Purchase Agreement 3

(11) Seller will record the corporate assignment in the name of Countrywide Funding Corporation at the time the deed of trust/mortgage is recorded, and the assignment of the Loan from Seller to Countrywide shall be valid and enforceable.

(12) The borrower has no rights of rescission, set-offs, counter-claims or defenses to the note or deed of trust/mortgage securing the note arising from the acts and/or omissions of Seller.

(13) Seller has no knowledge that any improvement located on or being part of the mortgaged property is in violation of any applicable zoning law or regulation.

(14) All improvements included for the purpose of determining the appraised value of the mortgaged property lie wholly within the boundaries and building restriction lines of such property, and no improvements on adjoining properties encroach upon the mortgaged property.

(15) There is no proceeding pending for total or partial condemnation of any mortgaged property and said property is free of substantial damage (including, but not limited to, any damage by fire, earthquake, windstorm, vandalism or other casualty) and in good repair.

(16) Seller has no knowledge of any circumstances or conditions with respect to any Loan, mortgaged property, trustor/mortgagor or trustor's/mortgagor's credit standing that reasonably could be expected to cause private institutional investors to regard any Loan as an unacceptable investment, cause any Loan to become delinquent or adversely affect the value or marketability of the Loan.

(17) All documents submitted are genuine. All other representations as to each such Loan are true and correct and meet the requirements and specifications of all parts of this Agreement and the Manual.

B. Seller represents and warrants to Countrywide that as of the date first set forth above and as of the date of Countrywide's purchase of each Loan hereunder:

(1) Seller is duly organized, validly existing and in good standing under the laws of its state of incorporation and is qualified and/or licensed as necessary to transact business, including the originating and selling of mortgage loans, and is in good standing in each state where the property securing a Loan is located.

(2) Seller has the full power and authority to hold and sell each Loan; and neither the execution and delivery of this Agreement, nor the acquisition or origination of the Loans, nor the sale of the Loans, nor the consummation of the transactions contemplated herein, nor the fulfillment of or compliance with the terms and conditions of this Agreement will conflict with, or result in a breach of any term, condition or provision of, Seller's certificate of incorporation or by-laws, any license held by Seller or governing Seller's activities or any agreement to which Seller is a party or by which Seller is bound, or constitute a material default or result in an acceleration under any of the foregoing.

(3) No consent, approval, authorization or order of any court, governmental body or any other person or entity is required for the execution, delivery and performance by Seller of this Agreement, including but not limited to, the sale of the Loans to Countrywide.

(4) Neither Seller nor its agents know of any suit, action, arbitration or legal or administrative or other proceeding pending or threatened against Seller which would affect its ability to perform its obligations under this Agreement.

(5) Seller is not a party to, bound by or in breach or violation of any agreement or instrument, or subject to or in violation of any statute, order or regulation of any court, regulatory body, administrative agency or governmental body having jurisdiction over it, which materially and adversely affects, or may in the future materially and adversely affect, the ability of Seller to perform its obligations under this Agreement or the Manual, including, without limitation, Seller's repurchase and indemnification obligations pursuant to Sections 7, 8 and 9 of this Agreement.

# 7. SELLER'S REPURCHASE OBLIGATIONS

A. Seller shall repurchase any Loan sold to Countrywide pursuant to this Agreement within twenty business days of receipt of written notice from Countrywide of any of the following circumstances (the "Repurchase Obligation"):

(1) Seller fails to deliver to Countrywide within 270 days from the date each Loan was purchased the original documents specified in the Delivery of Closed Loans section of the Manual.

(2) Countrywide determines that there is any evidence of fraud in the origination of the Loan or in the sale of the Loan to Countrywide or that any matter in the mortgage loan file is not true and correct.



**COUNTRYWIDE**
CORRESPONDENT LENDING

Equal Housing Lender. ©1994 Countrywide Funding Corporation.
All rights reserved. Countrywide is a registered service mark of
Countrywide Credit Industries, Inc.

## Loan Purchase Agreement 4

(3) If Countrywide determines the Loan is not eligible for GNMA, FNMA or FHLMC pool participation or whole loan purchase or purchase by a private investor, or, if Countrywide has sold such Loan in whole or in part to GNMA, FNMA, FHLMC or a private investor, and GNMA, FNMA, FHLMC or the private investor requires Countrywide to repurchase said interest or reimburse it for losses, or the mortgage insurer denies coverage on the Loan; provided the reason for such ineligibility, repurchase, reimbursement or denial shall be due to a failure of the Loan to meet requirements specified in the Manual at the time of Countrywide's purchase of the Loan from Seller.

(4) Two or more monthly payments of the first six monthly payments due from the borrower after Countrywide's purchase of such Loan from Seller become delinquent (past due) (hereinafter sometimes referred to as a "two-payment delinquent Loan"); provided, however, that Seller's Repurchase Obligation pursuant to this subsection (4) shall terminate if the borrower reinstates the Loan and remains current with respect to twelve consecutive monthly payments out of the first eighteen monthly payments due from the borrower after Countrywide's purchase of the Loan, or if Countrywide has not demanded repurchase of the Loan within the 18-month period following the first monthly payment due from the borrower following Countrywide's purchase of the Loan. For purposes of this provision, the following shall apply: (i) a loan with two monthly payments delinquent is a Loan with respect to which two payments, including all sums due per the contract, remain unpaid on the 16th day of the second month; (ii) the phrase "monthly payment(s) due from the borrower" shall be the monthly payment(s) due from the Borrower following Countrywide's purchase of the Loan and excluding any payment for which Countrywide deducted funds at the time it purchased the Loan from Seller; and (iii) a borrower shall be deemed current with respect to a payment if the payment is made by the 16th day of the month in which it is due.

(5) Seller fails to observe or perform or breaches in any material respect any of the representations, warranties or agreements contained in this Agreement or the Manual with respect to a particular Loan.

(6) The Loan is a VA Loan which goes into foreclosure within 24 months from the date of sale of the Loan to Countrywide as to those Loans with full guarantees from the VA and 18 months from the date of sale of the Loan to Countrywide as to those Loans with partial guarantees from the VA and as to which the VA gives Countrywide a no-bid instruction in conjunction with the foreclosure sale on such Loan.

**B.** The option to request or accept repurchase of any Loan is at the sole discretion of Countrywide. Notwithstanding that a Seller may be obligated pursuant to the terms of this Section 7 to repurchase a Loan, if such Loan is in compliance with all requirements of this Agreement and the Manual at the time of its purchase by Countrywide and if there is no evidence of fraud or misrepresentation in connection with the Loan, Countrywide, in its sole discretion and on terms determined solely by Countrywide, may consider permitting Seller to indemnify Countrywide against all suits, costs, damages, losses, fees or claims, including without limitation reasonable attorneys' fees, which may be incurred by Countrywide in connection with such Loan. Such indemnification shall be substantially in the form of the applicable Indemnification Agreement, the provisions of which shall include, without limitation, the requirement that the Seller shall pay to Countrywide, at the time that the Indemnification Agreement is executed, the amount specified by Countrywide as the amount necessary to cover its projected and potential costs and losses, and including the service release premium paid by Countrywide to the Seller with respect to the Loan.

**C.** It is agreed by the parties that Seller's Repurchase Obligation with respect to a Loan shall not be obviated by the fact that the property securing the Loan has been foreclosed upon and said property has been acquired by Countrywide or a third party, it being understood that the term Repurchase Obligation encompasses within its meaning the repurchase of the property from Countrywide if Countrywide has acquired the property, or, if a third party has acquired the property, reimbursing Countrywide in the amount specified in Section 8.C. of this Agreement.

**D.** It is further agreed by the parties that if Countrywide has made demand on Seller to repurchase a Loan pursuant to Section 7 of this Agreement, Countrywide shall have the right to withhold any moneys due Seller in connection with the Loan(s) subject to the Repurchase Obligation or any other Loans until the parties have agreed that the Repurchase Obligation is satisfied.

**8.    REPURCHASE PRICE**

**A.** The repurchase price for Loans subject to a Repurchase Obligation pursuant to Section 7 hereof shall be as follows:

(1) The original purchase price, but not less than par, less principal reduction since the original purchase of the Loan by Countrywide; plus

(2) All interest accrued but unpaid on the principal balance of the Loan from the paid-to-date of the loan through and including the last day of the month in which the repurchase is made; plus

## Loan Purchase Agreement 5

(3) All expenses, including but not limited to reasonable fees and expenses of counsel, incurred by Countrywide in enforcing Seller's obligation to repurchase such Loan; plus

(4) The original servicing release premium paid by Countrywide with respect to such Loan; plus

(5) Any unreimbursed advances of taxes or insurance made by Countrywide with regard to such Loan as of the date of repurchase; less

(6) Any proceeds of mortgage insurance with respect to the Loan collected by Countrywide.

Upon any such repurchase of Loans by Seller, Countrywide shall endorse the promissory note (without recourse) and shall assign any security interest (without recourse and in recordable form) to Seller.

B. If the real property security for the Loan has been foreclosed upon and purchased by Countrywide at the foreclosure sale, then the repurchase price pursuant to Section 7 hereof, notwithstanding the amount of Countrywide's credit bid, shall be:

(1) The original Purchase Price, but not less than par, less principal reduction since the original purchase of the Loan by Countrywide; plus

(2) All interest accrued but unpaid on the principal balance of the Loan from the paid-to-date of the loan through and including the last day of the month in which the foreclosure sale occurs; plus

(3) All costs and expenses, including but not limited to reasonable fees and expenses of counsel, incurred by Countrywide in connection with the foreclosure and in enforcing Seller's Repurchase Obligations hereunder; plus

(4) The original servicing release premium paid by Countrywide with regard to such Loan; plus

(5) Any unreimbursed advances of taxes or insurance made by Countrywide with regard to such Loan as of the date of repurchase; plus

(6) Interest on the amounts set forth in paragraphs (1) through (5) above at the Loan rate from the second day of the month following the month in which the foreclosure sale occurred until and including the date of repurchase by Seller; less

(7) Any proceeds of mortgage insurance collected by Countrywide with respect to the Loan.

Upon payment of the repurchase price, Countrywide shall transfer title to the property securing such Loan to Seller.

C. If the real property security for the Loan has been sold at foreclosure and purchased by a third party, the amount Seller shall pay Countrywide to fulfill its Repurchase Obligation pursuant to Section 7 of this Agreement shall be as follows:

(1) The original Purchase Price, but not less than par, less principal reduction since the original purchase of the Loan by Countrywide; plus

(2) All interest accrued but unpaid on the principal balance of the Loan from the paid-to-date of the Loan through and including the last day of the month following the month in which the foreclosure sale occurs; plus

(3) All costs and expenses, including but not limited to reasonable fees and expenses of counsel, incurred by Countrywide in enforcing Seller's Repurchase Obligations hereunder; plus

(4) The original servicing release premium paid by Countrywide with regard to such Loan; plus

(5) Any unreimbursed advances of taxes or insurance made by Countrywide with regard to such Loan as of the date of repurchase; plus

(6) Interest on the amounts set forth in paragraphs (1) through (5) above at the Loan rate from the second day of the month following the month in which the foreclosure sale occurred until and including the date of repurchase; less

(7) The net proceeds of the foreclosure sale (sale price minus costs and expenses, including but not limited to reasonable fees and expenses of counsel, incurred by Countrywide in connection with the foreclosure sale); less

(8) Any proceeds of mortgage insurance collected by Countrywide in connection with the Loan.



COUNTRYWIDE
CORRESPONDENT LENDING

Equal Housing Lender. ©1994 Countrywide Funding Corporation. All rights reserved. Countrywide is a registered service mark of Countrywide Credit Industries, Inc.

*Loan Purchase Agreement 6*

9. **HOLD HARMLESS**

   A. Seller shall hold Countrywide harmless and shall indemnify Countrywide from and against any and all suits, costs, damages, losses, fees or claims, including without limitation reasonable attorney's fees ("Loss"), arising out of or in connection with any negligence, fraud or a material omission on the part of Seller in receiving, processing or funding any Loan committed to Countrywide for sale under Section 2 above, during the origination period and Commitment Period up to and including the date the Loan is purchased by Countrywide. Seller's obligation to Countrywide in this regard shall remain effective after Countrywide's purchase of the Loan if the Loss arose prior to purchase but was undetected at time of purchase. This paragraph shall not modify Seller's obligations contained elsewhere in this Agreement.

   B. Seller shall also hold Countrywide harmless and shall indemnify Countrywide from and against any and all suits, costs, damages, fees or claims, including without limitation reasonable attorneys' fees, arising out of or in connection with any one or more of the items set forth in paragraphs (1) through (6) of Section 7.A. of this Agreement.

10. **NO SOLICITATION**

    Loans sold to Countrywide cannot be solicited by Seller for refinance for a period of 12 months from the date the loan is purchased by Countrywide. Borrowers requesting a refinance from Seller within the 12 month period must be referred to Countrywide or, provided the refinanced loan meets all Countrywide requirements as specified in the Manual, may be processed by the Seller and sold to Countrywide for a service release premium, if any, to be negotiated by the parties.

11. **PROHIBITION AGAINST USE OF NAME OR AFFILIATION**

    Seller shall not hold itself out as a joint venturer, partner, representative, employee or agent of Countrywide. Nor shall it use Countrywide's name in any advertising or written or broadcast material without Countrywide's express prior written consent. This prohibition shall not prevent Seller from using any advertising media provided to it by Countrywide for use by Seller and containing any copyrighted Countrywide name or logo. Such copyrighted name or logo shall remain in place.

12. **TERMINATION– SUSPENSION**

    A. This Agreement may be terminated as to future commitments for sale of Loans by either party at any time, but such termination shall not in any respect change or modify the obligation of Seller with respect to Loans already subject to a Commitment. The effective time of termination shall be the earlier of the time written notice is actually received by the other party or five days after written notice is posted in the United States Postal Service by the can-celing party. Termination of this Agreement shall not in any way affect either Seller's or Countrywide's obligations, representations, warranties or indemnifications with respect to Loans already purchased by Countrywide; provided, however, that Countrywide may immediately terminate its obligations hereunder without notice and immediately return to Seller any Loans subject to a Commitment, and Seller shall accept such loans if Countrywide reasonably determines that there has been any deception, fraud, concealment or material misrepresentation by Seller in per-forming any of its duties, obligations, responsibilities or actions undertaken in connection with this Agreement or in connection with any Loan sold to Countrywide pursuant to this Agreement.

    B. In addition to the termination rights set forth in Paragraph A. above, in the event that Countrywide believes in good faith that Seller has breached an obligation (including a Repurchase Obligation under Section 7), representation, warranty or covenant under the Agreement, or will be unable to fulfill any of its obligations under the Agreement or the Manual (including a Repurchase Obligation under Section 7), Countrywide may, in its sole and absolute discretion, suspend this Agreement as to future Commitments for the sale of Loans by Seller. Such suspension shall be effective immediately upon Seller's receiving written notice of same from Countrywide and shall last until Countrywide, in its sole discretion, determines to reactive or terminate this Agreement.

13. **EXHIBITS**

    All exhibits attached hereto or material referred to in this Agreement, including the Manual, are incorporated by reference into this Agreement. To the extent there are differences between requirements as stated in the Manual and as stated in this Agreement, the provisions of this Agreement shall govern.

14. **ENTIRE AGREEMENT**

    The entire agreement between the parties is contained in this Agreement and in the Manual and cannot be modified in any respect except by an amendment in writing signed by both parties. The invalidity of any portion of this Agreement shall in no way affect the balance thereof.

## *Loan Purchase Agreement 7*

15. **ASSIGNMENT**

Seller may not assign its rights or delegate its duties or obligations under this Agreement without the prior written consent of Countrywide. This Agreement shall be binding on and inure to the benefit of the permitted successors and assigns of the parties hereto.

16. **ATTORNEYS' FEES AND EXPENSES–CHOICE OF LAW AND FORUM**

If any party hereto shall bring suit or other proceeding against the other as a result of any alleged breach or failure by the other party to fulfill or perform any covenants or obligations under this Agreement, then the prevailing party obtaining final judgment in such action shall be entitled to receive from the non-prevailing party reasonable attorneys' fees incurred by reason of such action and all costs of suit and preparation thereof at both trial and appellate levels. This Agreement shall be governed by and construed and enforced in accordance with applicable federal law and the laws of the State of California. In addition, any such suit or proceeding shall be brought in the federal or state courts located in Los Angeles County, California, which courts shall have sole and exclusive in personam, subject matter and other jurisdiction in connection with such suit or proceedings, and venue shall be appropriate for all purposes in such courts.

17. **NO REMEDY EXCLUSIVE–WAIVER**

No remedy under this Agreement is exclusive of any other available remedy, but each remedy shall be cumulative and shall be in addition to other remedies given under this Agreement or existing at law or in equity.

Any forbearance by a party to this Agreement in exercising any right or remedy under this Agreement or otherwise afforded by applicable law shall not be a waiver or preclude the exercise of that or any other right or remedy.

18. **NOTICE**

Unless otherwise provided in this Agreement, all notices under this Agreement shall be in writing, deemed effective upon receipt and addressed as indicated below.

To: Countrywide Funding Corporation
Correspondent Lending Division
155 North Lake Avenue
Mail Stop No. 5-53
Pasadena, California 91101
Attention: Vice President of Finance

To Lender/Seller:

*United Financial Mortgage Corp.*
*600 Enterprise Drive Suite 206*
*Oak Brook, IL 60521*

**AGREED TO AND ACCEPTED BY:**

Seller: *United Financial Mortg. Corp.*

By: _[signature]_
      Signature

Name: *Joseph Khoshabe*

Title: *President*

Dated: *1-16-95*

Countrywide Funding Corporation

By: _[signature]_
      Signature

Name: *Bradley T. Cadaru*

Title: *Vice President C*

Dated: *2/2/95*

**COUNTRYWIDE FC.**
**CORRESPONDENT LENDING**   Equal Housing Lender. ©1994 Countrywide Funding Corporation.
All rights reserved. Countrywide is a registered service mark of
Countrywide Credit Industries, Inc.

# EXHIBIT 3

# Loan Purchase Agreement

This Agreement, dated as of **February 7, 2001**, is made by and between **Countrywide Home Loans, Inc.**, a New York corporation ("**Countrywide**"), and **United Financial**, a**n Illinois** corporation ("**Seller**"), for mutual considerations set forth herein.

Countrywide agrees to purchase certain loans secured by real property, together with the servicing thereof (the "Loans"), from Seller under Countrywide's mortgage loan programs, and Seller agrees to sell to Countrywide certain such Loans pursuant to the terms and conditions set forth herein and in Countrywide's Correspondent Lending Division Loan Purchase Program Seller's Manual, as amended from time to time (the "Manual"). In connection therewith, the parties agree as follows:

## 1. ELIGIBLE LOANS

A. Only those Loans fully complying with the standards for Conforming Conventional, Jumbo Conventional, Government and Second Mortgage Loan Programs set forth in the Mortgage Programs section of the Manual are eligible for purchase under this Agreement. Seller must be approved, qualified and/or licensed to originate such Loans.

B. Seller shall fully underwrite each Loan prior to submission to Countrywide in accordance with Underwriting Guidelines and Lending Requirements sections of the Manual, or, if available, use a Countrywide-approved automated underwriting system for underwriting the Loan.

C. Seller shall be responsible for assuring that Loans submitted to Countrywide comply with all terms and conditions of this Agreement and the Manual.

## 2. COMMITMENT TO PURCHASE LOANS

The procedure pursuant to which Seller may commit to sell a Loan to Countrywide is detailed in the Loan Registration section of the Manual. For purposes of this Agreement, Countrywide and Seller define a best effort commitment to be a mandatory commitment if the Loan closes. Countrywide will confirm the conditions of the sale of the Loan to Countrywide by delivering a confirmation ("Commitment") to Seller which sets forth the terms of the transaction, including the price Countrywide will pay for each Loan, as determined pursuant to the Pricing standards set forth in the Manual (the "Purchase Price"). The terms of the Commitment, including the Purchase Price, shall be in effect for the period of time requested by Seller and approved by Countrywide (the "Commitment Period"). If Seller is approved by Countrywide to sell Loans to Countrywide on a bulk sale basis, Countrywide and Seller shall execute the Addendum to Loan Purchase Agreement (Bulk Sales) which shall be attached to and incorporated into this Agreement by reference.

## 3. UNDERWRITING AND PROPERTY APPRAISAL

A. Countrywide shall have the right, but not the obligation, to underwrite any Loan submitted for purchase pursuant to this Agreement, or otherwise insure that any Loan submitted for purchase complies with all terms and conditions of this Agreement and the Manual; provided that neither the existence nor the exercise of this right shall affect in any way Seller's obligations hereunder, including without limitation. Seller's repurchase obligations under Section 7 hereof and Seller's hold harmless obligations under Section 9 hereof. The applicable procedures are set forth in the Prior Approval section of the Manual.

B. Seller shall deliver to Countrywide an appraisal of the real estate security for each such Loan, signed by a qualified appraiser, as defined in the Manual, prior to Countrywide's approval to purchase such Loan.

## 4. DELIVERY OF LOAN DOCUMENTATION

A Loan shall be deemed delivered to Countrywide if: (A) it is received by Countrywide within the Commitment Period; (B) it is in compliance with the requirements set forth in the Delivery of Closed Loans and Funding Documentation sections of the Manual; and (C) there are no outstanding conditions which would prevent Countrywide from funding the purchase of the Loan. Failure by Seller to deliver to Countrywide within 120 days from the date a Loan was purchased one or more of the original documents specified in the Delivery of Closed Loans section of the Manual shall result in assessment by Countrywide of a fee of $50 per month for each month, after the initial 120 day period, during which one or more of such documents is outstanding, i.e., has not been delivered to Countrywide for any period of time during the month. Such fee shall be $50 regardless of the number of such documents. Failure by Seller to deliver to Countrywide one or more of the original documents specified in the Delivery of Closed Loans section of the Manual within 270 days from the date the Loan was purchased by Countrywide shall obligate Seller to repurchase the Loan pursuant to the provisions of Section 7 of this Agreement.

## 5. PAYMENT OF PURCHASE PRICE AND SELLER'S WIRE INSTRUCTIONS

Countrywide shall, after receipt of a Loan documentation package which fully complies with the requirements of the Manual, deliver the Purchase Price (less any fees or discounts due to Countrywide) set forth in the applicable Commitment to Seller in accordance with Seller's wire instructions or in accordance with any bailee letter or trust receipt submitted with the Loan, as determined in the sole and absolute discretion of Countrywide.



**Countrywide**
CORRESPONDENT LENDING

## Loan Purchase Agreement

## 6. SELLER'S OBLIGATIONS, REPRESENTATIONS AND WARRANTIES

A.  Seller represents and warrants to Countrywide as to each loan offered for sale under this Agreement that as of the date of Countrywide's purchase of such Loan:

(1)  The Loan documents have been duly executed by the trustor/mortgagor, acknowledged and recorded; each Loan is valid and complies with all criteria contained in the Manual; the note and deed of trust/mortgage constitute the entire Agreement between the trustor/mortgagor and the beneficiary/mortgagee, and there is no verbal understanding or written modification which would affect the terms of the note or the deed of trust/mortgage except by written instrument delivered and expressly made known to the beneficiary/mortgagee and recorded if recording is necessary to protect the interests of the beneficiary/mortgagee.

(2)  Seller is the sole owner of the Loan and has authority to sell, transfer and assign the same on the terms set forth herein and in the Manual. There has been no assignment, sale or hypothecation thereof by Seller, except the usual hypothecation of the documents in connection with Seller's normal banking transactions in the conduct of its business.

(3)  The full principal amount of the Loan has been advanced to the trustor/mortgagor, either by payment directly to such person or by payment made on such person's request or approval. The unpaid principal balance of the Loan is as represented by Seller. All costs, fees and expenses incurred in making, closing and recording the Loan have been paid. No part of the mortgaged property has been released from the lien of the Loan, the terms of the Loan have in no way been changed or modified, and the Loan is current and not in default.

(4)  Each Loan is a valid first lien or, if specifically approved by Countrywide, a valid second lien on the mortgaged property, and the mortgaged property is free and clear of all encumbrances and liens having priority over the lien of such Loan, except for the first lien, if applicable, and liens for real estate taxes and special assessments not yet due and payable and those exceptions allowed in connection with Government Loans and other exceptions set forth in the Manual.

(5)  The mortgaged property is free and clear of all mechanics' and materialmen's liens or liens in the nature thereof, and no rights are outstanding that under law could give rise to any such lien, nor is Seller aware of any facts which could give rise to any such lien.

(6)  Each Loan which Seller represents to be insured or guaranteed is, or will within 120 days from the date of delivery of such Loan to Countrywide be, so insured or guaranteed. No action has been taken or failed to have been taken which has resulted or will result in an exclusion from, denial of, or defense to, coverage under such insurance or guarantee; and all conditions within the control of Seller as to the validity of the insurance or guaranty as required by the National Housing Act of 1934 and the rules and regulations thereunder, or as required by the Servicemen's Readjustment Act of 1944 and the rules and regulations thereunder, or imposed by the mortgage insurance companies or other insurers have been properly satisfied, and said insurance or guaranty is valid and enforceable.

(7)  All federal and state laws, rules and regulations applicable to the mortgage Loans have been complied with, including but not limited to: the Real Estate Settlement Procedures Act, the Flood Disaster Protection Act, the Federal Consumer Credit Protection Act including the Truth-in-Lending and Equal Credit Opportunity Acts, and all applicable statutes or regulations governing fraud, lack of consideration, unconscionability, consumer credit transactions or interest charges.

(8)  No Loan is the subject of, and Seller is not aware of any facts which could give rise to, litigation which could affect Countrywide's ability to enforce the terms of the obligation or its rights under the mortgage documents.

(9)  There is in force for each Loan either (a) a paid-up title insurance policy on the Loan issued by a Countrywide approved title company in an amount at least equal to the outstanding principal balance of the Loan or (b) an attorney's mortgage lien opinion. (Negatively amortizing loans require additional coverage.)

(10)  There is in force for each Loan valid hazard insurance policy coverage and, where applicable, valid flood insurance policy coverage, and such coverages meet the requirements of Countrywide specified in the Manual.

(11)  Seller will record the corporate assignment in the name of Countrywide Home Loans, Inc. at the time the deed of trust/mortgage is recorded, and the assignment of the Loan from Seller to Countrywide shall be valid and enforceable.

(12)  The borrower has no rights of rescission, set-offs, counter-claims or defenses to the note or deed of trust/mortgage securing the note arising from the acts and/or omissions of Seller.

(13)  Seller has no knowledge that any improvement located on or being part of the mortgaged property is in violation of any applicable zoning law or regulation.

(14)  All improvements included for the purpose of determining the appraised value of the mortgaged property lie wholly within the boundaries and building restriction lines of such property, and no improvements on adjoining properties encroach upon the mortgaged property.

(15)  There is no proceeding pending for total or partial condemnation of any mortgaged property and said property is free of substantial damage (including, but not limited to, any damage by fire, earthquake, windstorm, vandalism or other casualty) and in good repair.



# *Loan Purchase Agreement*

(16) Seller has no knowledge of any circumstances or conditions with respect to any Loan, mortgaged property, trustor/mortgagor or trustor's/mortgagor's credit standing that reasonably could be expected to cause private institutional investors to regard any Loan as an unacceptable investment, cause any Loan to become delinquent or adversely affect the value or marketability of the Loan.

(17) All documents submitted are genuine. All other representations as to each such Loan are true and correct and meet the requirements and specifications of all parts of this Agreement and the Manual.

B. Seller represents and warrants to Countrywide that as of the date first set forth above and as of the date of Countrywide's purchase of each Loan hereunder:

(1) Seller is duly organized, validly existing and in good standing under the laws of its state of incorporation and is qualified and/or licensed as necessary to transact business, including the originating and selling of mortgage loans, and is in good standing in each state where the property securing a Loan is located.

(2) Seller has the full power and authority to hold and sell each Loan; and neither the execution and delivery of this Agreement, nor the acquisition or origination of the Loans, nor the sale of the Loans, nor the consummation of the transactions contemplated herein, nor the fulfillment of or compliance with the terms and conditions of this Agreement will conflict with, or result in a breach of any term, condition or provision of, Seller's certificate of incorporation or by-laws, any license held by Seller or governing Seller's activities or any agreement to which Seller is a party or by which Seller is bound, or constitute a material default or result in an acceleration under any of the foregoing.

(3) No consent, approval, authorization or order of any court, governmental body or any other person or entity is required for the execution, delivery and performance by Seller of this Agreement, including but not limited to, the sale of the Loans to Countrywide.

(4) Neither Seller nor its agents know of any suit, action, arbitration or legal or administrative or other proceeding pending or threatened against Seller which would affect its ability to perform its obligations under this Agreement.

(5) Seller is not a party to, bound by or in breach or violation of any agreement or instrument, or subject to or in violation of any statute, order or regulation of any court, regulatory body, administrative agency or governmental body having jurisdiction over it, which materially and adversely affects, or may in the future materially and adversely affect, the ability of Seller to perform its obligations under this Agreement or the Manual, including, without limitation, Seller's repurchase and indemnification obligations pursuant to Sections 7, 8 and 9 of this Agreement.

# 7. SELLER'S REPURCHASE OBLIGATIONS

A. Seller shall repurchase any Loan sold to Countrywide pursuant to this Agreement within twenty business days of receipt of written notice from Countrywide of any of the following circumstances (the "Repurchase Obligation"):

(1) Seller fails to deliver to Countrywide within 270 days from the date each Loan was purchased the original documents specified in the Delivery of Closed Loans section of the Manual.

(2) Countrywide determines that there is any evidence of fraud in the origination of the Loan or in the sale of the Loan to Countrywide or that any matter in the mortgage loan file is not true and correct.

(3) If Countrywide determines the Loan is not eligible for GNMA, FNMA or FHLMC pool participation or whole loan purchase or purchase by a private investor, or, if Countrywide has sold such Loan in whole or in part to GNMA, FNMA, FHLMC or a private investor, and GNMA, FNMA, FHLMC or the private investor requires Countrywide to repurchase said interest or reimburse it for losses, or the mortgage insurer denies coverage on the Loan; provided the reason for such ineligibility, repurchase, reimbursement or denial shall be due to a failure of the Loan to meet requirements specified in the Manual at the time of Countrywide's purchase of the Loan from Seller.

(4) If the first payment due Countrywide is not received by Countrywide, whether from the borrower directly or forwarded by Seller if the Borrower has submitted the payment to Seller, by the last day of the month in which it is due, and, in addition, at any time within the first twelve months after the Loan has been purchased by Countrywide, the Borrower is 90 days delinquent with respect to a monthly payment. For this purpose a Borrower shall be considered to be 90 days delinquent on a monthly payment if it is not received by Countrywide by the last day of the third month, regardless of the number of days payments are in the month. For example, if the Borrower has not made his/her January payment by the last day of March, the Borrower shall be considered 90 days delinquent with respect to the January payment. Seller shall not have the right to advance funds for or on behalf of a Borrower for any delinquent payment or to otherwise make funds available to any Borrower to avoid or cure a default by the Borrower. A payment for which Countrywide deducted funds at the time it purchased the Loan from Seller shall not be considered the first payment due Countrywide.

(5) Seller fails to observe or perform or breaches in any material respect any of the representations, warranties or agreements contained in this Agreement or the Manual with respect to a particular Loan.

(6) With respect solely to VA Loans purchased by Countrywide pursuant to an Assignment of Trade Addendum to this Agreement or on a Direct Trade basis pursuant to a Direct Trade Addendum to this Agreement, if the Loan goes into foreclosure within 24 months from the date of sale of the Loan to Countrywide as to those Loans with full guarantees from the VA and 48 months from the date of sale of the Loan to Countrywide as to those Loans with partial guarantees from the VA and as to which the VA gives Countrywide a no-bid instruction in conjunction with the foreclosure sale on such Loan.



## Loan Purchase Agreement

B. The option to request or accept repurchase of any Loan is at the sole discretion of Countrywide. Notwithstanding that a Seller may be obligated pursuant to the terms of this Section 7 to repurchase a Loan, if such Loan is in compliance with all requirements of this Agreement and the Manual at the time of its purchase by Countrywide and if there is no evidence of fraud or misrepresentation in connection with the Loan, Countrywide, in its sole discretion and on terms determined solely by Countrywide, may consider permitting Seller to indemnify Countrywide against all suits, costs, damages, losses, fees or claims, including without limitation reasonable attorneys' fees, which may be incurred by Countrywide in connection with such Loan. Such indemnification shall be substantially in the form of the applicable Indemnification Agreement, the provisions of which shall include, without limitation, the requirement that the Seller shall pay to Countrywide, at the time that the Indemnification Agreement is executed, the amount specified by Countrywide as the amount necessary to cover its projected and potential costs and losses, and including the service release premium paid by Countrywide to the Seller with respect to the Loan.

C. It is agreed by the parties that Seller's Repurchase Obligation with respect to a Loan shall not be obviated by the fact that the property securing the Loan has been foreclosed upon and said property has been acquired by Countrywide or a third party, it being understood that the term Repurchase Obligation encompasses within its meaning the repurchase of the property from Countrywide if Countrywide has acquired the property, or, if a third party has acquired the property, reimbursing Countrywide in the amount specified in Section 8.C. of this Agreement.

D. It is further agreed by the parties that if Countrywide has made demand on Seller to repurchase a Loan pursuant to Section 7 of this Agreement, Countrywide shall have the right to withhold any monies due Seller in connection with the Loan(s) subject to the Repurchase Obligation or any other Loans until the parties have agreed that the Repurchase Obligation is satisfied.

## 8. REPURCHASE PRICE

A. The repurchase price for Loans subject to a Repurchase Obligation pursuant to Section 7 hereof shall be as follows:

(1) The current unpaid principal balance of such Loan if it has been pooled or resold. If such loan has not been pooled or resold by Countrywide, the repurchase price shall be at the original price, less principal reduction since the original purchase of the Loan by Countrywide; plus

(2) All interest accrued but unpaid on the principal balance of the Loan from the paid-to-date of the loan through and including the last day of the month in which the repurchase is made; plus

(3) All expenses, including but not limited to reasonable fees and expenses of counsel, incurred by Countrywide in enforcing Seller's obligation to repurchase such Loan; plus

(4) The original servicing release premium paid by Countrywide with respect to such Loan; plus

(5) Any unreimbursed advances of taxes or insurance made by Countrywide with regard to such Loan as of the date of repurchase; less

(6) Any proceeds of mortgage insurance with respect to the Loan collected by Countrywide.

Upon any such repurchase of Loans by Seller, Countrywide shall endorse the promissory note (without recourse) and shall assign any security interest (without recourse and in recordable form) to Seller.

B. If the real property security for the Loan has been foreclosed upon and purchased by Countrywide at the foreclosure sale, then the repurchase price pursuant to Section 7 hereof, notwithstanding the amount of Countrywide's credit bid, shall be:

(1) The current unpaid principal balance of such Loan if it has been pooled or resold. If such loan has not been pooled or resold by Countrywide, the repurchase price shall be at the original price, less principal reduction since the original purchase of the Loan by Countrywide; plus

(2) All interest accrued but unpaid on the principal balance of the Loan from the paid-to-date of the loan through and including the last day of the month in which the foreclosure sale occurs; plus

(3) All costs and expenses, including but not limited to reasonable fees and expenses of counsel, incurred by Countrywide in connection with the foreclosure and in enforcing Seller's Repurchase Obligations hereunder; plus

(4) The original servicing release premium paid by Countrywide with regard to such Loan; plus

(5) Any unreimbursed advances of taxes or insurance made by Countrywide with regard to such Loan as of the date of repurchase; plus

(6) Interest on the amounts set forth in paragraphs (1) through (5) above at the Loan rate from the end of the month in which the foreclosure sale occurred until and including the date of repurchase by Seller; less

(7) Any proceeds of mortgage insurance collected by Countrywide with respect to the Loan.

Upon payment of the repurchase price, Countrywide shall transfer title to the property securing such Loan to Seller.

C. If the real property security for the Loan has been sold at foreclosure and purchased by a third party, the amount Seller shall pay Countrywide to fulfill its Repurchase Obligation pursuant to Section 7 of this Agreement shall be as follows:

(1) The current unpaid principal balance of such Loan if it has been pooled or resold. If such loan has not been pooled or resold by Countrywide, the repurchase price shall be at the original price, less principal reduction since the original purchase of the Loan by Countrywide; plus


**Countrywide**
CORRESPONDENT LENDING

## Loan Purchase Agreement

(2) All interest accrued but unpaid on the principal balance of the Loan from the paid-to-date of the loan through and including the last day of the month in which the foreclosure sale occurs; plus

(3) All costs and expenses, including but not limited to reasonable fees and expenses of counsel, incurred by Countrywide in enforcing Seller's Repurchase Obligations hereunder; plus

(4) The original servicing release premium paid by Countrywide with regard to such Loan; plus

(5) Any unreimbursed advances of taxes or insurance made by Countrywide with regard to such Loan as of the date of repurchase; plus

(6) Interest on the amounts set forth in paragraphs (1) through (5) above at the Loan rate from the end of the month in which the foreclosure sale occurred until and including the date of repurchase by Seller; less

(7) The net proceeds of the foreclosure sale (sale price minus costs and expenses, including but not limited to reasonable fees and expenses of counsel, incurred by Countrywide in connection with the foreclosure sale); less

(8) Any proceeds of mortgage insurance collected by Countrywide in connection with the Loan.

## 9. HOLD HARMLESS

A. Seller shall hold Countrywide harmless and shall indemnify Countrywide from and against any and all suits, costs, damages, losses, fees or claims, including without limitation reasonable attorney's fees ("Loss"), arising out of or in connection with any negligence, fraud or a material omission on the part of Seller in receiving, processing or funding any Loan committed to Countrywide for sale under Section 2 above, during the origination period and Commitment Period up to and including the date the Loan is purchased by Countrywide. Seller's obligation to Countrywide in this regard shall remain effective after Countrywide's purchase of the Loan if the Loss arose prior to purchase but was undetected at time of purchase. This paragraph shall not modify Seller's obligations contained elsewhere in this Agreement.

B. Seller shall also hold Countrywide harmless and shall indemnify Countrywide from and against any and all suits, costs, damages, fees or claims, including without limitation reasonable attorneys' fees, arising out of or in connection with any one or more of the items set forth in paragraphs (1) through (6) of Section 7A. of this Agreement.

## 10. NO SOLICITATION

Loans sold to Countrywide cannot be solicited by Seller for refinance for a period of 12 months from the date the Loan is purchased by Countrywide. Borrowers requesting a refinance from Seller within the 12 month period must be referred to Countrywide or, provided the refinanced loan meets all Countrywide requirements as specified in the Manual, may be processed by the Seller and sold to Countrywide for a service release premium, if any, to be negotiated by the parties.

## 11. PROHIBITION AGAINST USE OF NAME OR AFFILIATION

Seller shall not hold itself out as a joint venturer, partner, representative, employee or agent of Countrywide. Nor shall it use Countrywide's name in any advertising or written or broadcast material without Countrywide's express prior written consent. This prohibition shall not prevent Seller from using any advertising media provided to it by Countrywide for use by Seller and containing any copyrighted Countrywide name or logo. Such copyrighted name or logo shall remain in place.

## 12. TERMINATION – SUSPENSION

A. This Agreement may be terminated as to future commitments for sale of Loans by either party at any time, but such termination shall not in any respect change or modify the obligation of Seller with respect to Loans already subject to a Commitment. The effective time of termination shall be the earlier of the time written notice is actually received by the other party or five days after written notice is posted in the United States Postal Service by the canceling party. Termination of this Agreement shall not in any way affect either Seller's or Countrywide's obligations, representations, warranties or indemnifications with respect to Loans already purchased by Countrywide; provided, however, that Countrywide may immediately terminate its obligations hereunder without notice and immediately return to Seller any Loans subject to a Commitment, and Seller shall accept such loans if Countrywide reasonably determines that there has been any deception, fraud, concealment or material misrepresentation by Seller in performing any of its duties, obligations, responsibilities or actions undertaken in connection with this Agreement or in connection with any Loan sold to Countrywide pursuant to this Agreement.

B. In addition to the termination rights set forth in Paragraph A. above, in the event that Countrywide believes in good faith that Seller has breached an obligation (including a Repurchase Obligation under Section 7), representation, warranty or covenant under the Agreement, or will be unable to fulfill any of its obligations under the Agreement or the Manual (including a Repurchase Obligation under Section 7), Countrywide may, in its sole and absolute discretion, suspend this Agreement as to future Commitments for the sale of Loans by Seller. Such suspension shall be effective immediately upon Seller's receiving written notice of same from Countrywide and shall last until Countrywide, in its sole discretion, determines to reactivate or terminate this Agreement.

## 13. EXHIBITS

All exhibits attached hereto or material referred to in this Agreement, including the Manual, are incorporated by reference into this Agreement. To the extent there are differences between requirements as stated in the Manual and as stated in this Agreement, the provisions of this Agreement shall govern.


**Countrywide**
CORRESPONDENT LENDING
v. 2.9 00

## Loan Purchase Agreement

### 14. ENTIRE AGREEMENT

The entire agreement between the parties is contained in this Agreement and in the Manual and cannot be modified in any respect except by an amendment in writing signed by both parties. The invalidity of any portion of this Agreement shall in no way affect the balance thereof.

### 15. ASSIGNMENT

Seller may not assign its rights or delegate its duties or obligations under this Agreement without the prior written consent of Countrywide. This Agreement shall be binding on and inure to the benefit of the permitted successors and assigns of the parties hereto.

### 16. ATTORNEYS' FEES AND EXPENSES-CHOICE OF LAW AND FORUM

If any party hereto shall bring suit or other proceeding against the other as a result of any alleged breach or failure by the other party to fulfill or perform any covenants or obligations under this Agreement, then the prevailing party obtaining final judgment in such action shall be entitled to receive from the non-prevailing party reasonable attorneys' fees incurred by reason of such action and all costs of suit and preparation thereof at both trial and appellate levels. This Agreement shall be governed by and construed and enforced in accordance with applicable federal law and the laws of the State of California. In addition, any such suit or proceeding shall be brought in the federal or state courts located in Los Angeles County, California, which courts shall have sole and exclusive in personam, subject matter and other jurisdiction in connection with such suit or proceedings, and venue shall be appropriate for all purposes in such courts.

### 17. NO REMEDY EXCLUSIVE-WAIVER

No remedy under this Agreement is exclusive of any other available remedy, but each remedy shall be cumulative and shall be in addition to other remedies given under this Agreement or existing at law or in equity.

Any forbearance by a party to this Agreement in exercising any right or remedy under this Agreement or otherwise afforded by applicable law shall not be a waiver or preclude the exercise of that or any other right or remedy.

### 18. NOTICE

Unless otherwise provided in this Agreement, all notices under this Agreement shall be in writing, deemed effective upon receipt and addressed as indicated below.

TO: Countrywide Home Loans, Inc.

    Correspondent Lending Division

    450 American Street

    Mail Stop No. SV3-51

    Simi Valley, California 93065

    Attention: Vice President of Production

TO: Lender/Seller

United Financial Mortgage Corp.

600 Enterprise Dr., Suite 206

Oak Brook, IL  60523

ACCEPTED BY:

COUNTRYWIDE HOME LOANS, INC.

By: _____
    SIGNATURE

Name: Paul Szymanski

Title: SVP & CFO, CLD

Dated: _____

SELLER: United Financial Mortgage Corp.

By: _____
    SIGNATURE

Name: Steve Khoshabe

Title: Executive Vice President/CFO

Dated: 2/7/01



**Countrywide**
CORRESPONDENT LENDING

PAGE 6

# EXHIBIT 4

# SUBSCRIBER AGREEMENT

This Subscriber Agreement ("Agreement") is entered into between you, as subscriber ("Subscriber") and Countrywide Home Loans, Inc. ("Countrywide") effective as of ___Feb 5___, 2002 (the "Effective Date"). Subscriber and Countrywide agree as follows:

1. From time to time as requested by Subscriber, Countrywide shall provide residential mortgage credit reports, together with such additional services as may be requested by the Subscriber and agreed to be furnished by Countrywide to Subscriber.

2. All services and reports provided to the Subscriber are subject to the following conditions:

   a. Subscriber is an entity who has permissible purposes to purchase credit reports in connection with credit applications. Subscriber certifies that consumer reports, as defined by the Fair Credit Reporting Act ("FCRA"), will be ordered only when intended to be used as a factor in establishing a consumer's eligibility for new or continued credit, collection of an account, insurance, licensing, employment purposes. Otherwise in connection with a legitimate business transaction involving the consumer.

   b. Subscriber's execution and delivery of an Officer's Certificate substantially in <u>Exhibit A</u> hereto.

   c. Subscriber agrees that all services and reports ordered and received by Subscriber under this Agreement shall be ordered, received and used in compliance with applicable federal, state and local laws, regulations and ordinances.

   d. All reports, whether oral or written or transmitted via the internet/e-mail, will be kept strictly confidential. No information will be requested for the use of any other person except with the written permission of Countrywide. Subscriber will put into place, and maintain during the term of this Agreement, procedures to ensure the security of transmissions via the internet of consumer credit reports and access to such reports at Subscriber's location(s).

   e. This Agreement covers all locations of Subscriber located within the United States. This Agreement covers Subscriber's requests for credit reports ordered through whatever means are available to Subscriber, including, but not limited to, telephone, writing, internet or e-mail. Subscriber agrees that the provisions of this Agreement apply to all services and reports however delivered to Subscriber by Countrywide.

   f. Subscriber agrees to hold Countrywide and its affiliated companies, and their officers, agents, employees and independent contractors harmless on account of any expense or damage resulting from (a) the publishing by Subscriber, or its employees or agents, of report information contrary to these conditions or (b) the illegal use of information.

   g. Subscriber understands that Countrywide cannot be an insurer of the accuracy of the information provided to Subscriber under this Agreement. Subscriber understands and agrees that Countrywide does not guarantee the accuracy of any information provided. Subscriber releases Countrywide and its affiliated companies and their officers, agents, employees and independent contractors from liability for any negligence in connection with the preparation of such reports and from any loss or expense suffered by Subscriber resulting directly or indirectly from Countrywide's reports or those of its affiliated companies. Subscriber releases Countrywide and its affiliated companies and their officers, agent, employees and independent contractors from any liability for negligence in connection with the preparation of reports and from any loss or expense suffered by Subscriber as a result of any intentional or unintentional failure to disclose all relevant personal, public record and credit history information by Subscriber, its officers, agents, employees, independent contractors or the consumer.

3. This Service Agreement shall be in effect for one (1) year from the Effective Date and thereafter shall be automatically renewed for additional one (1) year periods. Unless either party notifies the other in

writing at least thirty (30) days prior to a current expiration date that the party does not wish to continue the Agreement.

4.  Any party shall bring no action, regardless of form, arising out of the transactions occurring or contemplated under this Agreement, more than two (2) years after delivery of the service and/or report-giving rise to such cause of action.

5   Subscriber may not assign its rights under this Agreement except with the prior written consent of Countrywide.

6.  Schedule I hereto, sets forth the charges for the services and reports to be provided to Subscriber by Countrywide hereunder.

7.  Subscriber shall pay Countrywide promptly upon receipt of an invoice from Countrywide for the services and reports provided. If payment has not been received within thirty (30) days from the date of invoice, amounts outstanding will accrue interest at a rate of 1.5% per month on the outstanding balance more than thirty (30) days past due. If necessary to employ an attorney to collect outstanding invoices, the Subscriber agrees to pay reasonable attorneys' fees and costs of suit. Without limiting the generality of the foregoing, Countrywide shall have the right to offset any moneys Countrywide owes to Subscriber against any moneys due to Countrywide from Subscriber under this Agreement.

8.  Employees of Subscriber are forbidden to attempt to obtain reports on themselves, or any other person except as provided herein.

9.  Countrywide will process the credit reports purchased, during the term hereof with credit scores on all requests. Countrywide will identify on the credit reports the source of the score and the type of score model.

a. A statistical credit score evaluates the credit history on an individual consumer in a given bureau's database and provides a score which rank orders the consumer with respect to likely credit performance.

b. The organizations that have created the credit scores have warranted that these scores are empirically derived and statistically sound and that no scoring algorithm used to create these scores uses a "prohibited basis", as each of these terms have been defined in the Equal Credit Opportunity Act and Regulation B ("Reg B"). Credit scores appear on a credit report for convenience only, but are not parts of the credit report, nor do they add to the information in the report on which it is based. In addition to the score, Countrywide will provide up to four (4) factors from the credit report, which most significantly influenced the score.

c. Subscriber recognizes that factors other than credit scores must be considered in making a mortgage credit decision, including the credit report, the individual credit application and economic factors. The factors that are provided by Countrywide as significantly contributing to the score may be disclosed to consumers as the reason for taking adverse action, as required by Reg. B. However, unless the Subscriber receives written approval from the companies which provide the scores, the score itself shall be considered to be proprietary, and may not be used as the reason for adverse action under Reg. B and, accordingly, shall not be disclosed to credit applicants.

10. This Agreement states the entire understanding of the parties with respect to the subjects covered in this Agreement, supersedes all prior correspondence, documentation or representations and may not be amended except by written agreement signed by both.

11. Agreement to Arbitrate Claims. Upon written request by either party that is submitted according to the applicable rules for arbitration, any claim, demand or cause of action, which arises out of or is related to this Agreement, (collectively "Claims"), shall be resolved by binding arbitration in the County of Los Angeles, California, in accordance with (i) the Federal Arbitration Act; (ii) the Code of Procedure ("Code") of the National Arbitration Forum ("Administrator" or "NAF") and (iii) this Agreement, which

2

shall control any inconsistency between it and the Code. The decision of an arbitrator on any Claims submitted to arbitration shall follow applicable substantive law and be in writing setting forth the findings of fact and law and the reasons supporting the decision. Such decision shall be final and binding upon the parties, subject to the right of appeal described below. Judgment upon any arbitration award may be entered in any court having jurisdiction. The arbitrator has exclusive authority to resolve any dispute relating to the applicability or enforceability of this Agreement, including the provisions of this section. Either party shall have the right to appeal to the appropriate court any errors of law in the decision rendered by the arbitrator. After a demand for arbitration is made, each party may conduct a limited number of depositions (including the production of documents) by mutual agreement or as permitted by the arbitrator.

IN WITNESS WHEREOF, Subscriber and Countrywide have caused their names to be signed hereto by their respective officers thereunto duly authorized.

UNITED FINANCIAL MORTGAGE CORP
as Subscriber

By: _____
Its: _____
     EVP

COUNTRYWIDE HOME LOANS, INC.,
as Countrywide

By: _____
Its: _____
     First Vice President

3

Jan-30-02  09:00am  From-COUNTRYWIDE          6266664976           T-801  P.05/07  F-176

## Schedule I

The following sets forth the charges for the services and reports to be provided to Subscriber by Countrywide under the Agreement. Loans may be submitted up to 15 times without an additional charge. The Clues and DU pricing structures include one merged credit report (or a joint credit report, if requested). There will be an additional $15 charge for each additional credit report requested. If a previously ordered LandSafe or Credco credit report is used, $15 will be reduced from the charges listed below.

| Product Type | Underwriting System | | |
| --- | --- | --- | --- |
| | Clues | LP | DU |
| Conforming (fixed and ARMs) | $20 | $25 | $45 |
| Jumbo (fixed and ARMs) | $20 | N/A | N/A |
| Expanded Criteria (conforming and non-conforming loan balance) | $20 | N/A | N/A |
| Government (FHA) | N/A | $25 | N/A |
| Government (VA) | $20 | $25 | N/A |
| Subprime | $20 | N/A | N/A |
| Grade Only | $15 | N/A | N/A |
| Credit Report Only | $15 | N/A | N/A |

4

## EXHIBIT A

### FORM OF OFFICER'S CERTIFICATE

I, _Steve Khoshabe_ _____ , hereby certify that I am a duly elected or appointed
_OFFICER_ _____ of _United Financial Mortgage_ _Illinois_ ("Subscriber"), and further certify on
behalf of Subscriber as follows: _Corporation_

Set forth below is the name, title and specimen signature of the person(s) who is (are) authorized to
execute on behalf of Subscriber, the Subscription Agreement dated _____, 2001 by and
between Subscriber and Countrywide Home Loans, Inc.:

| Name | Title | Signature |
|------|-------|-----------|
| _Steve Khoshabe_ | _Executive Vice President_ | |
| | | |
| | | |

and the signatures of such persons appearing on such documents are their genuine signatures.

IN WITNESS WHEREOF, I have hereunto signed my name and affixed the seal of Subscriber.

Dated: ___2/5_____, 2002

By: _____

Its: ___EVP___

5

# EXHIBIT 5



**CORRESPONDENT LENDING**

*Individual Needs. Individual Solutions.* ℠

August 8, 2002

Mr. Steve Khoshabe
Executive Vice President
**United Financial Mortgage Corp.**
600 Enterprise Dr. Suite 206
Oak Brook, IL 60521

RE:    "AOT" and "Direct Trade" Programs - Terms Sheet

Dear Mr. Khoshabe:

I am writing to confirm the terms under which Countrywide Home Loans, Inc. (fka Countrywide Funding Corporation) ("Countrywide" or "Buyer") would enter into an agreement for the purchase of Loans from **United Financial Mortgage Corp.** ("United Financial Mortgage Corp." or "Seller") under Countrywide's "Assignment of Trade Program" ("AOT Program") or "Direct Trade Program" as described below:

1.   GENERAL

This Terms Sheet forms a part of the Assignment of Trade Terms Sheet Addendum and Direct Trade Terms Sheet Addendum, executed by the parties on ~8/30~ , 2002.

Under the AOT Program or Direct Trade Program, Seller shall deliver qualifying mortgage loans to Countrywide in groups rather than on an individual basis. Each such delivery of a group of loans shall hereinafter be referred to as a "Delivery". The required minimum aggregate principal balance of a Delivery, as discussed below, shall hereinafter be referred to as the "Minimum Delivery Amount".

2.   PROGRAM DESCRIPTION/DELIVERY OPTIONS:

a.   Assignment of Trade Program

Under the AOT Program, promptly after receipt by Countrywide of each Delivery from Seller and prior to Countrywide's purchase of the loans comprising such Delivery, Seller shall assign to Countrywide a corresponding trade (a "Third Party Trade") for the forward sale of a mortgage backed security, entered into by Seller with a Countrywide authorized securities dealer. The individual mortgage loans comprising a Delivery related to a particular Third Party Trade, shall in every way qualify for inclusion into the mortgage backed security which is the subject of the Third Party Trade. The minimum face amount of each Third Party Trade assigned to Countrywide and the corresponding Minimum Delivery Amount shall be $500,000 for Third Party Trades covering GNMA I, and GNMA II securities. After Countrywide accepts assignment of a Third Party Trade, Countrywide shall purchase each mortgage loan comprising the related Delivery at a purchase price equal to the price to be paid Countrywide for the security as specified on the Third Party Trade, and Countrywide shall further pay Seller the servicing released premiums specified below.

b.   Direct Trade Program

Under the Direct Trade Program, Seller shall enter into a trade directly with Countrywide, (a "Direct Trade") rather than assigning a Third Party Trade. Under this delivery option, loans shall be delivered in a manner similar to the AOT Program, except as discussed below:

i)    The Minimum Delivery Amount applicable to each Direct Trade shall be $500,000.

ii)   Individual loans comprising a Delivery and which are the subject of a Direct Trade may be of different loan types (e.g. government, 30 Year and 15 Year, etc.) and may have note rates that would not otherwise qualify all such loans for inclusion in the same mortgage backed security.

*United Financial - Terms Sheet*
*Page 2*

*August 8, 2002*

iii) All loans comprising a Delivery shall be delivered to and received by Countrywide within the Delivery Period for the related Direct Trade. Upon entering into a Direct Trade, Seller shall have a mandatory obligation to deliver all loans comprising the Delivery within such Delivery Period, such that any portion of the Delivery which is not filled within such time frame shall be subject to a mark to market pair-off fee which Seller shall pay to Countrywide, if due.

iv) Countrywide shall price each individual loan which is the subject of a Direct Trade separately at a price equal to the bid price obtainable by Countrywide at the time of the Direct Trade, for the forward sale of the mortgage backed security. The issue date and related forward settlement date of the applicable security on which the loan price shall be based, will be determined by reference to that date during the month on which the corresponding Delivery is to be received by Countrywide pursuant to the provisions of paragraph 14 below.

3. **Term of Contract:**

The term of this commitment shall commence September 1, 2002 and end February 28, 2003.

4. **Loan types:**

Loans qualifying for delivery hereunder shall be FHA insured fixed rate and ARM loans and VA guaranteed fixed rate mortgage loans underwritten, closed, and delivered pursuant to the guidelines in Countrywide's Correspondent Lending Division's Seller Manual (the "Guide").

5. **Delivery volume:**

A minimum of $5 million and a maximum of $20 million aggregate principal balance per month.

Seller agrees to deliver a minimum of $75 million principal balance over the life of this contract. Should Seller fail to meet this requirement Seller agrees to pay Buyer a shortfall penalty of 1.00% (100 basis points) on the amount of the shortfall.

If Seller delivers at least 90% of their GNMA eligible loan originations each month, the shortfall penalty will be waived.

Seller agrees to not deliver more than 15% of the total monthly delivery volume for purchase on any one business day.

By entering into this agreement, Seller is no longer eligible to deliver Negotiated commitments to Buyer.

6. **Types of trades which may be assigned (under AOT Program) or on which Direct Trade prices will be based:**

GNMA I          GNMA II

Trades assigned under this contract must have settlement months from October 31, 2002 through March 31, 2003.

7. **Servicing Pricing Definitions:**

"Delivery": the group of loans to be delivered for purchase associated with a particular trade.

"Countrywide Par Note Rate": the 30 day average of Countrywide's daily par interest rate.

"Gross Spread": the difference between the note rate on a loan and the security coupon on its associated trade.

"Net Spread": the difference between the Gross Spread and the Adjusted Guarantee Fee.

"Base Guarantee Fee": shall be the following as applicable:
   GNMA I & II    =    0.060%

"Base Spread": 0.44% (44 basis points) for government loans.

"Excess Spread": the excess of Net Spread over the Base Spread.

"Excess Margin": on FHA ARM loans, the amount of the mortgagor's margin in excess of 2.0%.

"Trade Assignment Date": the date Seller assigns a Trade to Countrywide.

"Loan Premium Pricing": Security prices in excess of 100%, including any adjustments for buyups or buydowns of the Guarantee Fee.

"Service Release Premium": the premium paid for the servicing rights of loans purchased hereunder, including adjustments for excess spread, excess margin and note rate.

8.   **Servicing Release Premium (SRP):**

a) SRP Percentages - <u>Government Loans</u>

| State Tier | States | 30 Yr * | 15 Yr * |
|---|---|---|---|
| 1 | Arkansas, Florida, Illinois, New Jersey, New York, Oklahoma, Pennsylvania, Texas, Wisconsin | 2.700% | 2.300% |
| 2 | Alaska, Connecticut, DC, Delaware, Georgia, Kentucky, Louisiana, Maryland, Nebraska, North Carolina, North Dakota, Tennessee, Virginia | 2.500% | 2.100% |
| 3 | Alabama, Hawaii, Iowa, Kansas, Missouri, Montana, Nevada, New Mexico, Ohio, Oregon, South Carolina, Vermont, Washington | 2.400% | 2.000% |
| 4 | Arizona, California, Idaho, Mississippi, South Dakota, West Virginia, Wyoming | 2.350% | 1.950% |
| 5 | Colorado, Indiana, Maine, Massachusetts, Michigan, Minnesota, New Hampshire, Rhode Island, Utah | 2.250% | 1.850% |

\* Reduce all VA loans by 0.375% (375 basis points)

d) SRP Percentages – <u>Government ARMS</u>

| | |
|---|---|
| Base Price for Non-California FHA ARM Loans | 1.525% |
| Base Price for California FHA ARM Loans | 1.400% |

**Obligations to Repurchase VA Loans pursuant to Section 7(A)(6) of Loan Purchase Agreement:**

With respect to each VA Loan delivered to Countrywide hereunder, Seller may amend its obligation to repurchase such loan in the event that a repurchase obligation arises under Section 7(A)(6) of that certain Loan Purchase Agreement by and between Seller and Countrywide, dated February 7, 2001 (the "Loan Purchase Agreement") as follows:

*United Financial - Terms Sheet*
*Page 4*                                                              *August 8, 2002*

Seller has elected to receive the Servicing Release Premiums set forth in Section 9(c) above, with respect to FHA and VA fixed rate loans and will have no obligation to repurchase the related VA loan in the event the circumstances described in Section 7(A)(6) of the Loan Purchase Agreement should arise.

9. Note Rate Price Adjustments:

Countrywide shall adjust the price paid on each Government Fixed Rate 20 and 30 Yr Mortgage Loan based on its note rate in relation to the Countrywide Par Note Rate at the time the trade is assigned to Countrywide. The Countrywide Par Note Rate on the assignment date will be the 30 day average of Countrywide's daily par rate.

The note rate price adjustments associated with the par rate will only be locked for 14 days. Loans must be delivered against AOT and DT positions within 14 days of the assignment date or the par rate/note rate price adjustments will be subject to change. If a loan is delivered after the 14 day requirement, the note rate price adjustment that will be associated with the delivered loan will be the worst of note rate price adjustment as of the initial assignment date or Delivery date.

Countrywide reserves the right to change the Countrywide Par Note Rate or Note Rate Price Adjustments without notice.

### Note Rate Price Adjustments

| Note Rate Price Adjustments | | |
|---|---|---|
| Par Rate | GN1 30/20<br>6.500 | GN2 30/20<br>6.500 |
| Change from Par | GN1 30 | GN2 30 |
| -1.375 | 0.250 | |
| -1.250 | 0.250 | 0.250 |
| -1.125 | 0.200 | 0.250 |
| -1.000 | 0.200 | 0.250 |
| -0.875 | 0.200 | 0.250 |
| -0.750 | 0.150 | 0.250 |
| -0.625 | 0.150 | 0.200 |
| -0.500 | 0.125 | 0.150 |
| -0.375 | 0.100 | 0.150 |
| -0.250 | 0.070 | 0.100 |
| -0.125 | 0.031 | 0.050 |
| **0.000** | **0.000** | **0.000** |
| 0.125 | -0.031 | -0.050 |
| 0.250 | -0.125 | -0.150 |
| 0.375 | -0.250 | -0.300 |
| 0.500 | -0.350 | -0.400 |
| 0.625 | -0.450 | -0.600 |
| 0.750 | -0.600 | -0.850 |
| 0.875 | -0.750 | -0.950 |
| 1.000 | -0.850 | -1.125 |
| 1.125 | -0.950 | -1.300 |
| 1.250 | -1.000 | -1.375 |
| 1.375 | -1.000 | -1.375 |
| 1.500 | -1.000 | -1.375 |
| 1.625 | -1.000 | -1.375 |
| 1.750 | -1.125 | -1.625 |
| 1.875 | -1.250 | -1.625 |

United Financial - Terms Sheet
Page 5

August 8, 2002

10. Early Payoff:

Should any eligible mortgage loan delivered hereunder pay off prior to the receipt of the first payment due Countrywide, Loan Premium Pricing if applicable, and the Service Release Premium shall be fully refunded to Countrywide.

Should any Eligible Mortgage Loan delivered hereunder pay off after the receipt of the first payment due Countrywide and within one hundred and twenty (120) days of the date of purchase by Countrywide, the Servicing Released Premium shall be fully refunded to Countrywide.

11. Premiums for Excess Spread:

Countrywide shall pay the following additional premiums for Excess Spread:

| Loan Type | Premium | Max. Excess Spread |
|---|---|---|
| Gov't 30 year | 4.00 to 1 | 0.375%* |
| Gov't 15 year | 3.50 to 1 | 0.375%* |
| FHA ARM-30 year | 0.85 to 1* | 0.375%* |

*Countrywide shall price each loan to be pooled in a GNMA II security at a price equal to the bid price obtainable by Countrywide, at the time of the Direct Trade, for the forward sale of the mortgage backed security with the highest coupon (the "Applicable Security") into which such loan can be pooled by Countrywide.

12. Premiums for Excess Margin:

Countrywide shall pay the following additional premium for Excess Margin:

| Loan Type | Excess Premium | Margin |
|---|---|---|
| FHA ARM-30 year | 0.50 to 1 | 0.01%-0.75%* |

* Maximum margin for which Countrywide shall pay a premium is 2.75%.

Buyer, at its sole discretion, may upon thirty (30) days advance notice to the Seller change or rescind this paragraph 13 relative to payment for Excess Margin on FHA ARM loans.

13. Delivery Deadlines/ Window Period Deliveries:

Generally, the last day on which loans may be delivered in relation to particular trades ("Delivery Deadline") is as follows:

| Security | Business days prior to the applicable PSA Settlement Dates * |
|---|---|
| GNMA I | 17 |
| GNMA II | approx. 24 |

* See the Correspondent Lending Division's delivery schedule for deadlines applicable to specific settlement months, published monthly.

For Eligible Mortgage Loans and associated Trades delivered in purchasable form before the end of the month two months prior to the month of settlement (i.e. loans for a June Settlement trade must be Delivered by 4/30), Countrywide shall increase the service release premium by the following amounts:
30 YR Fixed Rate loans:  0.100% (10 basis points)
15 YR Fixed Rate loans:  0.075% (7.5 basis points)

*United Financial - Terms Sheet*
*Page 6*

*August 8, 2002*

14. Fees and Pricing:
- A tax service fee will be charged as provided in the Guide.
- A funding fee of $150 will be charged for Government Loans under this Terms Sheet.
- The price paid for Government ARM Loans with credit scores less than 620 and margins greater than 2% shall be reduced by 0.500% (50 basis points).
- The price paid for Government loans on Non-Owner Occupied properties shall be reduced by 1.500% (150 basis points).

15. Maximum and Minimum Note Rates:

MAXIMUM NOTE RATE:

The maximum note rate on each of the fixed rate mortgage Loans, except for Government Fixed Rate 20 and 30 Yr mortgage loans, delivered under this commitment ("Maximum Note Rate") shall be no greater than one percent (1%) above the highest coupon rate of the applicable Agency security trading closest to par (the "Applicable Coupon Rate") during the previous sixty (60) calendar days from the date the trade is assigned/committed to Buyer.

Should the note rate on the mortgage Loans delivered exceed the Maximum Note Rate, then the SRP shall be reduced by the following amounts on any such Loans:

| Max Note Rate above par | Deduction |
|---|---|
| 1.01% to 1.50% | 50 basis pts |
| 1.51% to 2.00% | 75 basis pts |
| 2.01% or greater | no SRP shall be paid. |

MINIMUM NOTE RATE:

The minimum note rate (the "Minimum Note Rate"), relating only to FHA ARM Loans, which shall be deliverable hereunder shall be no lower than 0.50% below the lowest coupon rate of the applicable Agency security trading closest to par (the "Applicable GNMA II Coupon Rate") during the previous sixty (60) calendar days.

If the note rate on a Loan delivered to Countrywide is below the Minimum Note Rate, Countrywide may, at its option, purchase the Loan; however, Countrywide shall not pay any premium for Excess Margin.

16. Maximum Price Paid:

Notwithstanding anything to the contrary herein, Countrywide shall not pay a price on any individual loan in excess of 105%, including the SRP or any purchase price adjustments allowed herein.

17. Loan Characteristics:

Seller represents that there shall be no adverse selection with respect to Loans delivered hereunder and that the characteristics with respect to, but not limited to note rate distribution, Excess Spread, LTV, credit score and geographic distribution shall be consistent with the characteristics of Seller's overall loan production. Notwithstanding the foregoing, Seller agrees that the Loans delivered hereunder shall have the following characteristics and be subject to the limitations described in this paragraph 17 below.

United Financial - Terms Sheet
Page 7

August 8, 2002

Any applicable amounts due Countrywide as a result of exceeding or failing to meet the percentages/balances listed below will be billed at the end of the commitment period unless otherwise stated.  Seller further agrees to immediately pay the amount billed upon receipt of written invoice from Countrywide.

- Minimum average Government Loan balance delivered must be no less than $140,000. If the average Government Loan balance is less than $140,000 but at least $130,000 the SRP will be reduced by 0.025% (2.5 basis points). If the average Government Loan balance is less than $130,000 but at least $125,000, the SRP will be reduced by 0.045% (4.5 basis points).  If the average Government Loan balance is less than $125,000 but at least $115,000, the SRP will be reduced by 0.085% (8.5 basis points). If the average Government Loan balance is less than $125,000, the SRP will be reduced by 0.105% (10.5 basis points).

  * The SRP for each loan delivered with a balance less than $40,000 will be subject to a 1.0% reduction.   This reduction will be made at the time of purchase.

- No subsidized loans (e.g. 235's, 265's, 203K's) may be delivered hereunder.

- No more than 2.5% of government Loans delivered may be HUD REO Loans, provided said loans are fully underwritten to Countrywide's Correspondent Lending Division's guidelines. The SRP for each HUD REO Loan delivered in excess of this percentage will be subject to a 0.75% reduction, which will be assessed at the end of the commitment period.

- No more than 5% of loans delivered may be buydown loans.

- No more than 30% of the government fixed rate Loans delivered may be VA Loans. The SRP for each VA Loan delivered in excess of this percentage will be subject to a 0.25% reduction.

- On all VA rate-reduction refinance Loans in soft market areas, Countrywide will require a recertification of value. Please see the Seller Guide for current soft market areas.

- No more than 25% of the loans delivered during this commitment period may be government ARM loans.  The SRP for each ARM loan delivered in excess of this percentage will be subject to a 0.375% reduction.

- A flood zone determination (FZD) is required for each loan delivered under this Agreement.  The FZD must conform with all requirements of the National Flood Insurance Reform Act of 1994 and be prepared by a provider approved by Countrywide.  Additionally, life-of-loan monitoring by Flood Data Services, Inc. (FDSI) will be required for each loan.  If the FZD does not include life-of-loan monitoring by FDSI, a fee for such monitoring will be deducted from the purchase proceeds.

- No more than 3% of the loans may be on properties with 2 to 4 units.

- No 3 to 4 Unit properties located in California may be delivered hereunder.

- All loans must be less than 3 months seasoned at time of delivery.

- No more than 15% of the loans delivered may be on Condominium properties.

*United Financial - Terms Sheet*
*Page 8*

*August 8. 2002*

- Buyer has the right to replace the reinsurance coverage or carrier for the loans

18.   Assignment:

Seller may not assign its rights or obligations under this Terms Sheet without the prior written consent of Buyer. This Terms Sheet shall be binding and inure to the benefit of Buyer's successors and assigns.

19.   Termination:

Either party shall have the right to terminate this agreement on thirty days prior written notice to the other party; provided, however, should Seller breach any of the terms or conditions of this Terms Sheet the Direct Trade Addendum, the Assignment of Trade Addendum, the LPA, or the Guide, Buyer may terminate this Terms Sheet immediately without notice to Seller.

20.   Expiration:

This commitment letter shall be of no force or effect unless it is signed by Seller and returned to Countrywide on or before August 23, 2002.

The transaction contemplated herein will be subject to the execution and delivery of a mutually acceptable Assignment of Trade Addendum, Direct Trade Addendum, and Loan Purchase Agreement (the "LPA"), except as already executed and delivered. Unless specifically modified herein, all terms and conditions of the LPA and Amendments and Addenda thereto by and between Buyer and Seller shall remain in full force and effect, including but not limited to Buyer's periodic review and acceptance of Seller's financial and operational condition.

If these terms are acceptable to United Financial, please acknowledge below and return an executed copy of this term letter back to us.

We look forward to working with you on this transaction.

Sincerely,

Mike Quinn
1st Vice President

Countrywide Correspondent Lending Division
8511 Fallbrook Ave Flr3
Mail Stop WH 51B
West Hills, CA 91304-3232

**United Financial Mortgage Corp.**

By:

Name: CHRIS KLOSTER

Title: VICE PRESIDENT

Date: 8/30/02

# EXHIBIT 6



**CORRESPONDENT LENDING**

**Individual Needs. Individual Solutions.** ⁊

February 14, 2003

Mr. Steve Khoshabe
Executive Vice President
**United Financial Mortgage Corp.**
600 Enterprise Dr. Suite 206
Oak Brook, IL 60521

*3132*

RE:    "AOT" and "Direct Trade" Programs - Terms Sheet

Dear Mr. Khoshabe:

I am writing to confirm the terms under which Countrywide Home Loans, Inc. (fka Countrywide Funding Corporation) ("Countrywide" or "Buyer") would enter into an agreement for the purchase of Loans from **United Financial Mortgage Corp.** ("United Financial Mortgage Corp." or "Seller") under Countrywide's "Assignment of Trade Program" ("AOT Program") or "Direct Trade Program" as described below:

1.   GENERAL

This Terms Sheet forms a part of the Assignment of Trade Terms Sheet Addendum and Direct Trade Terms Sheet Addendum, executed by the parties on February 27, 2003.

Under the AOT Program or Direct Trade Program, Seller shall deliver qualifying mortgage loans to Countrywide in groups rather than on an individual basis. Each such delivery of a group of loans shall hereinafter be referred to as a "Delivery". The required minimum aggregate principal balance of a Delivery, as discussed below, shall hereinafter be referred to as the "Minimum Delivery Amount".

2.   PROGRAM DESCRIPTION/DELIVERY OPTIONS:

a.   Assignment of Trade Program

Under the AOT Program, promptly after receipt by Countrywide of each Delivery from Seller and prior to Countrywide's purchase of the loans comprising such Delivery, Seller shall assign to Countrywide a corresponding trade (a "Third Party Trade") for the forward sale of a mortgage backed security, entered into by Seller with a Countrywide authorized securities dealer. The individual mortgage loans comprising a Delivery related to a particular Third Party Trade, shall in every way qualify for inclusion into the mortgage backed security which is the subject of the Third Party Trade. The minimum face amount of each Third Party Trade assigned to Countrywide and the corresponding Minimum Delivery Amount shall be $500,000 for Third Party Trades covering GNMA I, and GNMA II securities. After Countrywide accepts assignment of a Third Party Trade, Countrywide shall purchase each mortgage loan comprising the related Delivery at a purchase price equal to the price to be paid Countrywide for the security as specified on the Third Party Trade, and Countrywide shall further pay Seller the servicing released premiums specified below.

b.   Direct Trade Program

Under the Direct Trade Program, Seller shall enter into a trade directly with Countrywide, (a "Direct Trade") rather than assigning a Third Party Trade. Under this delivery option, loans shall be delivered in a manner similar to the AOT Program, except as discussed below:

   i)    The Minimum Delivery Amount applicable to each Direct Trade shall be $500,000.

   ii)   Individual loans comprising a Delivery and which are the subject of a Direct Trade may be of different loan types (e.g. government, 30 Year and 15 Year, etc.) and may have note rates that would not otherwise qualify all such loans for inclusion in the same mortgage backed security.

February 14, 2003

iii)   All loans comprising a Delivery shall be delivered to and received by Countrywide within the Delivery Period for the related Direct Trade.  Upon entering into a Direct Trade, Seller shall have a mandatory obligation to deliver all loans comprising the Delivery within such Delivery Period, such that any portion of the Delivery which is not filled within such time frame shall be subject to a mark to market pair-off fee which Seller shall pay to Countrywide, if due.

iv)   Countrywide shall price each individual loan which is the subject of a Direct Trade separately at a price equal to the bid price obtainable by Countrywide at the time of the Direct Trade, for the forward sale of the mortgage backed security. The issue date and related forward settlement date of the applicable security on which the loan price shall be based, will be determined by reference to that date during the month on which the corresponding Delivery is to be received by Countrywide pursuant to the provisions of paragraph 14 below.

| | | |
|---|---|---|
| 3. | Term of Contract: | The term of this commitment shall commence March 1, 2003 and end August 31, 2003. |
| 4. | Loan types: | Loans qualifying for delivery hereunder shall be FHA insured fixed rate and ARM loans and VA guaranteed fixed rate mortgage loans underwritten, closed, and delivered pursuant to the guidelines in Countrywide's Correspondent Lending Division's Seller Manual (the "Guide"). |
| 5. | Delivery volume: | A minimum of $5 million and a maximum of $20 million aggregate principal balance per month. |

Seller agrees to deliver a minimum of $75 million principal balance over the life of this contract. Should Seller fail to meet this requirement Seller agrees to pay Buyer a shortfall penalty of 1.00% (100 basis points) on the amount of the shortfall.

If Seller delivers at least 90% of their GNMA eligible loan originations each month, the shortfall penalty will be waived.

Seller agrees to not deliver more than 15% of the total monthly delivery volume for purchase on any one business day.

By entering into this agreement, Seller is no longer eligible to deliver Negotiated commitments to Buyer.

6.   Types of trades which may be assigned (under AOT Program) or on which Direct Trade prices will be based:

GNMA I          GNMA II

Trades assigned under this contract must have settlement months from April 2003 through October 2003.

7.   Servicing Pricing Definitions:

"Delivery": the group of loans to be delivered for purchase associated with a particular trade.

"Countrywide Par Note Rate": the 30 day average of Countrywide's daily par interest rate.

"Gross Spread": the difference between the note rate on a loan and the security coupon on its associated trade.

*United Financial - Terms Sheet*
*Page 3*

February 14, 2003

"Net Spread": the difference between the Gross Spread and the Adjusted Guarantee Fee.

"Base Guarantee Fee": shall be the following as applicable:
GNMA I & II     =   0.060%

"Base Spread": 0.44% (44 basis points) for government loans.

"Excess Spread": the excess of Net Spread over the Base Spread.

"Excess Margin": on FHA ARM loans, the amount of the mortgagor's margin in excess of 2.0%.

"Trade Assignment Date": the date Seller assigns a Trade to Countrywide.

"Loan Premium Pricing": Security prices in excess of 100%, including any adjustments for buyups or buydowns of the Guarantee Fee.

"Service Release Premium": the premium paid for the servicing rights of loans purchased hereunder, including adjustments for excess spread, excess margin and note rate.

8.     Servicing Release Premium (SRP):

a) SRP Percentages - <u>Government Loans</u>

| State Tier | States | 30 Yr * | 15 Yr * |
|---|---|---|---|
| 1 | Arkansas, Florida, Illinois, New Jersey, New York, Oklahoma, Pennsylvania, Texas, Wisconsin | 2.700% | 2.300% |
| 2 | Alaska, Connecticut, DC, Delaware, Georgia, Kentucky, Louisiana, Maryland, Nebraska, North Carolina, North Dakota, Tennessee, Virginia | 2.500% | 2.100% |
| 3 | Alabama, Hawaii, Iowa, Kansas, Missouri, Montana, Nevada, New Mexico, Ohio, Oregon, South Carolina, Vermont, Washington | 2.400% | 2.000% |
| 4 | Arizona, California, Idaho, Mississippi, South Dakota, West Virginia, Wyoming | 2.350% | 1.950% |
| 5 | Colorado, Indiana, Maine, Massachusetts, Michigan, Minnesota, New Hampshire, Rhode Island, Utah | 2.250% | 1.850% |

* Reduce all VA loans by 0.375% (375 basis points)

d) SRP Percentages – <u>Government ARMS</u>

Base Price for Non-California FHA ARM Loans     1.200%
Base Price for California FHA ARM Loans     1.075%

**Obligations to Repurchase VA Loans pursuant to Section 7(A)(6) of Loan Purchase Agreement:**

With respect to each VA Loan delivered to Countrywide hereunder, Seller may amend its obligation to repurchase such loan in the event that a repurchase obligation arises under Section 7(A)(6) of that certain Loan Purchase Agreement by and between Seller and Countrywide, dated February 7, 2001 (the "Loan Purchase Agreement") as follows:

*United Financial - Terms Sheet*
*Page 4*                                                          *February 14, 2003*

Seller has elected to receive the Servicing Release Premiums set forth in Section 9(c) above, with respect to FHA and VA fixed rate loans and will have no obligation to repurchase the related VA loan in the event the circumstances described in Section 7(A)(6) of the Loan Purchase Agreement should arise.

9. Note Rate Price Adjustments:    Countrywide shall adjust the price paid on each Government Fixed Rate 20 and 30 Yr Mortgage Loan based on its note rate in relation to the Countrywide Par Note Rate at the time the trade is assigned to Countrywide. The Countrywide Par Note Rate on the assignment date will be the 30 day average of Countrywide's daily par rate.

The note rate price adjustments associated with the par rate will only be locked for 14 days. Loans must be delivered against AOT and DT positions within 14 days of the assignment date or the par rate/note rate price adjustments will be subject to change. If a loan is delivered after the 14 day requirement, the note rate price adjustment that will be associated with the delivered loan will be the worst of note rate price adjustment as of the initial assignment date or Delivery date.

Countrywide reserves the right to change the Countrywide Par Note Rate or Note Rate Price Adjustments without notice.

## Note Rate Price Adjustments

| Note Rate Price Adjustments | | |
| --- | --- | --- |
| | GN1 30/20 | GN2 30/20 |
| **Par Rate** | 5.625 | 5.625 |
| **Change from Par** | GN1 30 | GN2 30 |
| -1.375 | 0.250 | 0.250 |
| -1.250 | 0.250 | 0.250 |
| -1.125 | 0.200 | 0.250 |
| -1.000 | 0.200 | 0.250 |
| -0.875 | 0.200 | 0.250 |
| -0.750 | 0.150 | 0.250 |
| -0.625 | 0.150 | 0.200 |
| -0.500 | 0.125 | 0.150 |
| -0.375 | 0.100 | 0.150 |
| -0.250 | 0.070 | 0.100 |
| -0.125 | 0.031 | 0.050 |
| **0.000** | **0.000** | **0.000** |
| 0.125 | -0.031 | -0.050 |
| 0.250 | -0.125 | -0.150 |
| 0.375 | -0.250 | -0.300 |
| 0.500 | -0.350 | -0.400 |
| 0.625 | -0.450 | -0.600 |
| 0.750 | -0.600 | -0.850 |
| 0.875 | -0.750 | -0.950 |
| 1.000 | -0.850 | -1.125 |
| 1.125 | -0.950 | -1.300 |
| 1.250 | -1.000 | -1.375 |
| 1.375 | -1.000 | -1.375 |
| 1.500 | -1.000 | -1.375 |
| 1.625 | -1.000 | -1.375 |
| 1.750 | -1.125 | -1.625 |

*United Financial - Terms Sheet*
*Page 5*

February 14, 2003

| 1.875 | -1.250 | -1.625 |
|-------|--------|--------|

**10. Early Payoff:**

Should any eligible mortgage loan delivered hereunder pay off prior to the receipt of the first payment due Countrywide, Loan Premium Pricing if applicable, and the Service Release Premium shall be fully refunded to Countrywide.

Should any Eligible Mortgage Loan delivered hereunder pay off after the receipt of the first payment due Countrywide and within one hundred and twenty (120) days of the date of purchase by Countrywide, the Servicing Released Premium shall be fully refunded to Countrywide.

**11. Premiums for Excess Spread:**

Countrywide shall pay the following additional premiums for Excess Spread:

| Loan Type | Premium | Max. Excess Spread |
|-----------|---------|--------------------|
| Gov't 30 year | 4.00 to 1 | 0.375%* |
| Gov't 15 year | 3.50 to 1 | 0.375%* |
| FHA ARM-30 year | 0.85 to 1* | 0.375%* |

*Countrywide shall price each loan to be pooled in a GNMA II security at a price equal to the bid price obtainable by Countrywide, at the time of the Direct Trade, for the forward sale of the mortgage backed security with the highest coupon (the "Applicable Security") into which such loan can be pooled by Countrywide.

**12. Premiums for Excess Margin:**

Countrywide shall pay the following additional premium for Excess Margin:

| Loan Type | Excess Premium | Margin |
|-----------|----------------|--------|
| FHA ARM-30 year | 0.50 to 1 | 0.01%-0.75%* |

* Maximum margin for which Countrywide shall pay a premium is 2.75%.

Buyer, at its sole discretion, may upon thirty (30) days advance notice to the Seller change or rescind this paragraph 13 relative to payment for Excess Margin on FHA ARM loans.

**13. Delivery Deadlines/ Window Period Deliveries:**

Generally, the last day on which loans may be delivered in relation to particular trades ("Delivery Deadline") is as follows:

| Security | Business days prior to the applicable PSA Settlement Dates * |
|----------|-------------------------------------------------------------|
| GNMA I | 17 |
| GNMA II | approx. 24 |

* See the Correspondent Lending Division's delivery schedule for deadlines applicable to specific settlement months, published monthly.

For Eligible Mortgage Loans and associated Trades delivered in purchasable form before the end of the month two months prior to the month of settlement (i.e. loans for a June Settlement trade must be Delivered by 4/30), Countrywide shall increase the service release premium by the following amounts:
    30 YR Fixed Rate loans:  0.100% (10 basis points)
    15 YR Fixed Rate loans:  0.075% (7.5 basis points)

February 14, 2003

**14. Fees and Pricing:**

- A tax service fee will be charged as provided in the Guide.
- A funding fee of $150 will be charged for Government Loans under this Terms Sheet.
- The price paid for Government ARM Loans with credit scores less than 620 and margins greater than 2% shall be reduced by 0.500% (50 basis points).
- The price paid for Government loans on Non-Owner Occupied properties shall be reduced by 1.500% (150 basis points).

**15. Maximum and Minimum Note Rates:**

**MAXIMUM NOTE RATE:**

The maximum note rate on each of the fixed rate mortgage Loans, except for Government Fixed Rate 20 and 30 Yr mortgage loans, delivered under this commitment ("Maximum Note Rate") shall be no greater than one percent (1%) above the highest coupon rate of the applicable Agency security trading closest to par (the "Applicable Coupon Rate") during the previous sixty (60) calendar days from the date the trade is assigned/committed to Buyer.

Should the note rate on the mortgage Loans delivered exceed the Maximum Note Rate, then the SRP shall be reduced by the following amounts on any such Loans:

| Max Note Rate above par | Deduction |
|---|---|
| 1.01% to 1.50% | 50 basis pts |
| 1.51% to 2.00% | 75 basis pts |
| 2.01% or greater | no SRP shall be paid. |

**MINIMUM NOTE RATE:**

The minimum note rate  (the "Minimum Note Rate"), relating only to FHA ARM Loans, which shall be deliverable hereunder shall be no lower than 0.50% below the lowest coupon rate of the applicable Agency security trading closest to par (the Applicable GNMA II Coupon Rate") during the previous sixty (60) calendar days.

If the note rate on a Loan delivered to Countrywide is below the Minimum Note Rate, Countrywide may, at its option, purchase the Loan; however, Countrywide shall not pay any premium for Excess Margin.

**16. Maximum Price Paid:**

Notwithstanding anything to the contrary herein, Countrywide shall not pay a price on any individual loan in excess of 105%, including the SRP or any purchase price adjustments allowed herein.

**17. Loan Characteristics:**

Seller represents that there shall be no adverse selection with respect to Loans delivered hereunder and that the characteristics with respect to, but not limited to note rate distribution, Excess Spread, LTV, credit score and geographic distribution shall be consistent with the characteristics of Seller's overall loan production. Notwithstanding the foregoing, Seller agrees that the Loans delivered hereunder shall have the following characteristics and be subject to the limitations described in this paragraph 17 below.

*United Financial - Terms Sheet*
*Page 7*

*February 14, 2003*

Any applicable amounts due Countrywide as a result of exceeding or failing to meet the percentages/balances listed below will be billed at the end of the commitment period unless otherwise stated. Seller further agrees to immediately pay the amount billed upon receipt of written invoice from Countrywide.

- Minimum average Government Loan balance delivered must be no less than $140,000. If the average Government Loan balance is less than $140,000 but at least $130,000 the SRP will be reduced by 0.025% (2.5 basis points). If the average Government Loan balance is less than $130,000 but at least $125,000, the SRP will be reduced by 0.045% (4.5 basis points). If the average Government Loan balance is less than $125,000 but at least $115,000, the SRP will be reduced by 0.085% (8.5 basis points). If the average Government Loan balance is less than $125,000, the SRP will be reduced by 0.105% (10.5 basis points).

  * The SRP for each loan delivered with a balance less than $40,000 will be subject to a 1.0% reduction. This reduction will be made at the time of purchase.

- No subsidized loans (e.g. 235's, 265's, 203K's) may be delivered hereunder.

- No more than 2.5% of government Loans delivered may be HUD REO Loans, provided said loans are fully underwritten to Countrywide's Correspondent Lending Division's guidelines. The SRP for each HUD REO Loan delivered in excess of this percentage will be subject to a 0.75% reduction, which will be assessed at the end of the commitment period.

- No more than 30% of the government fixed rate Loans delivered may be VA Loans. The SRP for each VA Loan delivered in excess of this percentage will be subject to a 0.25% reduction.

- On all VA rate-reduction refinance Loans in soft market areas, Countrywide will require a recertification of value. Please see the Seller Guide for current soft market areas.

- No more than 25% of the loans delivered during this commitment period may be government ARM loans. The SRP for each ARM loan delivered in excess of this percentage will be subject to a 0.375% reduction.

- A flood zone determination (FZD) is required for each loan delivered under this Agreement. The FZD must conform with all requirements of the National Flood Insurance Reform Act of 1994 and be prepared by a provider approved by Countrywide. Additionally, life-of-loan monitoring by Flood Data Services, Inc. (FDSI) will be required for each loan. If the FZD does not include life-of-loan monitoring by FDSI, a fee for such monitoring will be deducted from the purchase proceeds.

- No more than 3% of the loans may be on properties with 2 to 4 units.

- No 3 to 4 Unit properties located in California may be delivered hereunder.

- All loans must be less than 3 months seasoned at time of delivery.

- No more than 15% of the loans delivered may be on Condominium properties.

*United Financial - Terms Sheet*
*Page 8*                                        *February 14, 2003*

- Buyer has the right to replace the reinsurance coverage or carrier for the loans

18.   Assignment:        Seller may not assign its rights or obligations under this Terms Sheet without the prior written consent of Buyer.  This Terms Sheet shall be binding and inure to the benefit of Buyer's successors and assigns.

19.   Termination:       Either party shall have the right to terminate this agreement on thirty days prior written notice to the other party; provided, however, should Seller breach any of the terms or conditions of this Terms Sheet the Direct Trade Addendum, the Assignment of Trade Addendum, the LPA, or the Guide, Buyer may terminate this Terms Sheet immediately without notice to Seller.

20.   Expiration:        This commitment letter shall be of no force or effect unless it is signed by Seller and returned to Countrywide on or before February 28, 2003.

The transaction contemplated herein will be subject to the execution and delivery of a mutually acceptable Assignment of Trade Addendum, Direct Trade Addendum, and Loan Purchase Agreement (the "LPA"), except as already executed and delivered.  Unless specifically modified herein, all terms and conditions of the LPA and Amendments and Addenda thereto by and between Buyer and Seller shall remain in full force and effect, including but not limited to Buyer's periodic review and acceptance of Seller's financial and operational condition.

If these terms are acceptable to United Financial, please acknowledge below and return an executed copy of this term letter back to us.

We look forward to working with you on this transaction.

Sincerely,

United Financial Mortgage Corp.

By: _____

Mike Quinn
1ˢᵗ Vice President                      Name:  Chris Kloster

Countrywide Correspondent Lending Division    Title:   Vice President
8511 Fallbrook Ave Flr3
Mail Stop WH 51B                        Date:   February 27, 2003
West Hills, CA 91304-3232

# EXHIBIT 7

# Addendum to Loan Purchase Agreement
## For Delegated Authority

### Application to become an approved delegated lender

866-427

THIS AGREEMENT made this __20__ day of __march 95__ between COUNTRYWIDE FUNDING CORPORATION ("CFC") and __United Financial Mortgage__ ("Seller") is made with reference to the following facts:

A - CFC and Seller are parties to a Loan Purchase Agreement ("LPA") dated as of _____ .

B - CFC and Seller desire to amend the LPA to permit Seller to participate in CFC's Delegated Authority Program.

**NOW, THEREFORE, it is hereby agreed as follows:**

1 - A new section 3.A. is hereby added to Section 3 as follows:

   A.(1) Provided that Seller has been duly approved by CFC as a Delegated Lender, which approval is evidenced by CFC's execution of this Agreement, CFC agrees to purchase conforming and non conforming loans generated by Seller, subject to the limitations specified as to loan products and Loan to Value ratios in the "Delegated Authority" Letter, without prior approval or underwriting review by CFC, except for CFC loan products which specifically require CFC prior approval.

   (2) Seller agrees to submit loans for purchase which conform in all respects to standards established for CFC's Correspondent Lending Division program. Seller also agrees to submit loans for purchase that contain all necessary documentation as outlined in the CFC Correspondent Lending Division Seller's Manual.

   (3) Notwithstanding that Seller has submitted a Loan pursuant to its approval as a Delegated Lender, CFC shall have the right, but not the obligation, to underwrite any Loan submitted for purchase pursuant to this Agreement, or otherwise insure, including by means of post purchase audit or otherwise, that any Loans submitted for purchase or purchased by CFC comply with all terms and conditions of this agreement and the Manual; provided that neither the existence nor the exercise of this right shall affect in any way Seller's obligations hereunder, including without limitation. Seller's repurchase obligations under Section 7 hereof and Seller's hold harmless obligations under Section 9 hereof.

   (4) Approval by CFC of Seller as a Delegated Lender is at the sole and absolute discretion of CFC. The conditions and terms of such approval and Seller's participation in the Delegated Authority program may be altered at any time and such approval may be terminated at any time for any reason by CFC. Such alteration or termination shall be effected by written notice from CFC to Seller, which may be delivered by telefacsimile, US Mail or any delivery service, and shall be effective as of the date specified in the notice.

2 - Existing Section 3.A. is hereby redesignated as Section 3.B. and existing section 3.B. is hereby redesignated as Section 3.C.

3 - The following language is hereby added as Section 6B (6):
   "Seller has, in full force and effect, an Errors and Omissions or fidelity bond insurance policy or policies in an amount sufficient to cover all loans sold to and serviced by CFC."

Except as specifically amended herein, the LPA shall remain in full force and effect.

Executed this __20__ day of __March__ 1995 at _____ , _____

Seller:

By __[signature]__                                    Title: __President__

Acknowledged: Countrywide Funding Corporation

By: __[signature]__                                   Date: __3-28-95__

By: _____                                  Date: _____



**Countrywide**
CORRESPONDENT LENDING

Equal Housing Lender. ©1994 Countrywide Funding Corporation.
All rights reserved. Countrywide is a registered service mark of
Countrywide Credit Industries, Inc. (2/95)

# Addendum to Loan Purchase Agreement
## For Delegated Underwriting

*Application to become an approved delegated underwriter.*

**We are requesting Delegated Lender Underwriter:**

☐ Level I: Conforming Loans A sample package of a conforming loan is attached for this level.

XX Level II: Both Conforming and Non-Conforming Loans A sample package of a non-conforming (Jumbo) loan is attached for this level.

THIS AGREEMENT made this **14** day of **DEC** 19 **93** between COUNTRYWIDE FUNDING CORPORATION ("CFC") and **UNITED FINANCIAL MORTGAGE CORP** ("Seller") is made with reference to the following facts:

A – CFC and Seller are parties to a Loan Purchase Agreement ("LPA") dated as of **5-19-93**

B – CFC and Seller desire to amend the LPA to provide that CFC shall buy loans from Seller without prior approval or underwriting review by CFC and enabling Seller to participate in CFC's Delegated Underwriter Program.

NOW, THEREFORE, it is hereby agreed as follows:

1 – The following language is added to Section 2:

a. Delegated Lender Underwriter – Level I Approved Seller – CFC agrees to purchase conforming loans generated by Seller, without prior approval or underwriting review by CFC. Seller agrees to submit loans for purchase which conform to standards established for CFC's Correspondent Lending Division program. Seller also agrees to submit loans for purchase that contain all necessary documentation as outlined in CFC, Correspondent Lending Division Seller's Manual.

b. Delegated Lender Underwriter – Level II Approved Seller – CFC agrees to purchase conforming and non-conforming loans generated by Seller, without prior approval or underwriting review by CFC. Seller agrees to submit loans for purchase which conform to standards established for CFC's Correspondent Lending Division program. Seller agrees to secure pool insurance prior to loan delivery or agrees that such insurance must be secured by CFC prior to loan funding by CFC. (The requirement of pool insurance and the designated pool insurer will be so noted in CFC program guidelines and/or on the CFC Correspondent Lending Division rate line.) Seller also agrees to submit loans for purchase that contain all necessary documentation as outlined in the CFC Correspondent Lending Division Seller's Manual.

2 – Section 3 is hereby revised to omit the final sentence of the section as by the addendum we are negating the necessity of underwriting review and prior approval.

3 – The following language is added as Section 6 (S):

"Seller has, in full force and effect, an Errors and Omissions or fidelity bond insurance policy or policies in an amount sufficient to cover all loans sold to and serviced by CFC."

4 – Section 7 (D) is amended to read as follows:

"Countrywide determines that the Mortgage Loan is not eligible for GNMA, FNMA, FHLMC or other designated private pool participation or whole loan purchase within 60 days after the date of Countrywide's purchase from seller of such Mortgage Loan. Seller shall also repurchase if Countrywide sells an interest, in whole or in part, in a loan purchased from Seller, and FHLMC, GNMA, FNMA or designated private pool insurer requires Countrywide to repurchase said interest for a period of one (1) year from date of Countrywide's purchase from seller."

Except as specifically amended herein, the LPA shall remain in full force and effect.

Executed this **14** day of **DEC.** at **OAK BROOK IL.**,

Seller:

By: _____ Title: **PRESIDENT**

Acknowledged: Countrywide Funding Corporation

By: _____ Date: 12-30-93.

Approved:

Delegated Lender Underwriter – Level I _____ Delegated Lender Underwriter – Level II _____

NOTE: A copy of this executed Delegated Lender Underwriter agreement must accompany each conventional loan package being delivered by the seller to CFC for purchase under the delegated program.

A representative of the seller (officer and/or underwriter) must sign and date each addendum copy as the loan packages are submitted. Must be an original ink signature.

By: _____ Date: 12-15-03

Countrywide
Correspondent Lending
155 North Lake Avenue
Pasadena, California 91101
(800) 669-6680

**COUNTRYWIDE**
**CORRESPONDENT LENDING**

CL-013b-791

**Delegated Underwriting**

*Definitions and requirements
for new lenders.*

DEC 10 1993

## Definitions

**I. *Delegated Lender Underwriter***

Lender approved to sell conventional loans to Countrywide's Correspondent Lending Division without Countrywide's underwriting prior approval or review. Loans will be underwritten and approved by Lender. Approval will be based on published Countrywide Correspondent Lender guidelines and lender will warrant as to their compliance.

**II. *Level of Delegated Lender Underwriter***

Each lender will receive a level of delegated underwriting approval as follows:

A. Delegated Lender Underwriter–Level I
Lender has approval to sell conforming conventional loans to Countrywide without Countrywide's underwriting prior approval or review.

B. Delegated Lender Underwriter–Level II
Lender has approval to sell non-conforming (Jumbo), as well as conforming conventional loans to Countrywide without Countrywide's underwriting

prior approval or review. When pool insurance is required, evidence of pool insurance must be secured by the lender or by Countrywide prior to Countrywide's funding of the loan.

*Lenders in the COLTA states are not eligible for Delegated Lender Underwriter–Level II status. (Colorado, Oklahoma, Louisiana, Texas and Alaska)

**III. *Loan Type (by loan amount)***
A. Conforming
Loan amount conforms with loan limits as established by FNMA/FHLMC.
B. Non-Conforming (Jumbo)
Loan amount is in excess of loan limits as established by FNMA/FHLMC.

**IV. *Liquidity***
For our purposes, Liquidity Percentage is figured: Divide "Net Equity" by "Total Assets and Liabilities"

## Requirements

**I. *Delegated Lender Underwriter – Level I***
A. Banks – Savings and Loans – Credit Unions
<u>New Lender Applicants</u>
a. Financial Statements – Annual plus YTD (Must be dated within 6 months)
b. Minimum of 3% liquidity required
c. FNMA or FHLMC Seller/Servicer in good standing. Written evidence of satisfactory performance is required
d. Sample, conforming conventional loan file for packaging review by Countrywide

B. Mortgage Bankers
<u>New Lender Applicants</u>
a. Financial Statements – Annual plus YTD (Must be dated within 6 months)
b. Minimum net worth of $400,000
c. Verified confirmation of "Good Standing" and "Performance Record" by one of the following conventional secondary market conduits: FNMA, FHLMC or major conventional conduit (Countrywide to determine acceptability)
d. Sample conforming conventional loan file for package review by Countrywide

**II. *Delegated Lender Underwriter – Level II***
A. Banks – Savings and Loans – Credit Unions
<u>New Lender Applicants</u>

a. Financial Statements – Annual plus YTD (Must be dated within 6 months)
b. Minimum of 3% liquidity required
c. FNMA or FHLMC Seller/Servicer in good standing. Written evidence of satisfactory performance is required
d. Written evidence of "Good Standing" and "Satisfactory Performance" by a major loan conduit now servicing jumbo loans originated by the lender. (This conduit is subject to acceptance by Countrywide)
e. Sample non-conforming (Jumbo) loan file for packaging review by Countrywide

B. Mortgage Bankers
<u>New Lender Applicants</u>
a. Financial Statements – Annual plus YTD (Must be dated within 6 months)
b. Minimum net worth of $1M
c. FNMA or FHLMC Seller/Servicer in good standing. Written evidence of satisfactory performance is required
d. Written evidence of "Good Standing" and "Satisfactory Performance" by a major loan conduit now servicing jumbo loans originated by the lender. (This conduit is subject to acceptability by Countrywide)
e. Sample non-conforming (Jumbo) loan file for packaging review by Countrywide.

# ADDENDUM TO LOAN PURCHASE AGREEMENT

This Addendum to Loan Purchase Agreement (the "Addendum"), dated May 12, 2003, modifies that certain Loan Purchase Agreement, dated July 7, 1995, including all the Commitments, Amendments, Addenda, and Assignments thereto (collectively, the "Loan Purchase Agreement"), by and between Countrywide Home Loans, Inc. ("Countrywide") and Portland Mortgage Company ("Seller"), as follows:

1. Seller has been acquired by United Financial Mortgage Corporation ("Successor") on or about May 6, 2003.

2. Successor hereby agrees to be added as a party to the Loan Purchase Agreement, effective as of May 6, 2003.

3. Successor also agrees to be bound by and assumes all of the rights, liabilities and obligations of Seller under the Loan Purchase Agreement with respect to any loan sold by Seller to Countrywide pursuant to the Loan Purchase Agreement which was sold by Seller to Countrywide within eighteen months on or prior to the date of this Addendum.

4. The parties to this Addendum acknowledge and agree that the foregoing shall not affect in any manner Seller's rights, liabilities and obligations with respect to any loans sold by Seller to Countrywide pursuant to the Loan Purchase Agreement, including, without limitation, any rights, liabilities and obligations of Seller that may arise with respect to any loans that Seller sells or offers to sell to Countrywide under the Loan Purchase Agreement on or after the date hereof. It is further understood and agreed that any loans sold by or offered for sale by Seller to Countrywide on or after the date hereof shall be sold or offered for sale by Seller to Countrywide pursuant to the terms and conditions of the Loan Purchase Agreement.

5. In the event of any conflict between the terms and conditions of the Loan Purchase Agreement and this Addendum, the terms and conditions of this Addendum shall prevail.

THE PARTIES ACKNOWLEDGE AND AGREE TO THIS ADDENDUM TO LOAN PURCHASE AGREEMENT AS OF THE DATE ABOVE FIRST WRITTEN:

United Financial Mortgage Corporation (Successor):

By: _____

Name: STEVE KHOSHABE

Its: PRESIDENT

Countrywide Home Loans, Inc.:

By: _____

Name: _____

Its: _____

# AMENDMENT NO. 1 TO
# LOAN PURCHASE AGREEMENT

This AMENDMENT NO. 1 (this "Amendment") by and between COUNTRYWIDE HOME LOANS, INC., a New York corporation, having an address at 4500 Park Granada, Calabasas, California 91302 ("Countrywide") and United Financial Mortgage Corp., having an address at 600 Enterprise Drive, Suite 206, Oak Brook, IL 60521 ("Seller") is effective as of _____. This Amendment modifies that certain Loan Purchase Agreement by and between Countrywide and Seller effective as of _____, and as amended from time to time (the "Loan Purchase Agreement").

## R E C I T A L S

Countrywide and Purchaser previously entered in the Loan Purchase Agreement pursuant to which Seller agreed to sell to Countrywide and Countrywide agreed to purchase from Seller all of Seller's right, title and interest, including servicing rights, in and to certain mortgage loans agreed upon by the parties.   Countrywide and Purchaser hereby agree that the Loan Purchase Agreement shall be amended as provided herein.

1.      **Section 7. Seller's Repurchase Obligations.**

     A.      Countrywide and Seller agree that subsection A.(2) of Section 7 "Seller's Repurchase Obligations" of the Loan Purchase Agreement shall be deleted in its entirety and replaced with the following:

     "(2)      Countrywide, determines that there is any evidence of material fraud in the origination of the Loan or in the sale of the Loan to Countrywide or that any matter in the mortgage loan file is not true and correct."

3.      Other than as modified and amended herein, the Loan Purchase Agreement shall remain in full force and effect.

4.      Any capitalized term not otherwise defined herein shall have the meaning ascribed to such term in the Loan Purchase Agreement.

     **IN WITNESS WHEREOF,** Countrywide and Seller have caused their names to be signed hereto by their respective officers thereunto duly authorized as of the date first written above.

**COUNTRYWIDE HOME LOANS, INC.,**
as Countrywide

By _____
Name:
Title:

**United Financial Mortgage Corp.**
as Seller

By _____
Name:   Steve Khoshabe
Title:   EVP/CFO

Page 1 of 1

Acknowledged Seller: _____
Acknowledged CHL: _____



**CORRESPONDENT LENDING**

3132
2/28/06

### Individual Needs. Individual Solutions.™

## AMENDMENT TO THE ASSIGNMENT OF TRADE ADDENDUM AND DIRECT TRADE ADDENDUM

This Amendment ("Amendment") amends the Assignment of Trade (AOT) and Direct Trade Addendum and that certain Loan Purchase Agreement (the "LPA") dated February 7, 2001 and is entered into by and between Countrywide Home Loans, Inc. (fka Countrywide Funding Corporation), a New York corporation ("Buyer"), and United Financial ("Seller"), commencing on February 28, 2006. All capitalized terms used in this Amendment, to the extent not otherwise defined in this Amendment, shall have the respective meanings for such terms set forth in the Addendum.

### R E C I T A L S

A.  Buyer and Seller entered into that certain Assignment of Trade and Direct Trade Addendum dated August 1, 2005 whereby Buyer agreed to purchase from Seller and Seller agreed to sell to Buyer of all of its right, title and interest in those certain FHA, VA and/or Conventional mortgage loans to be pooled by Buyer into Mortgage Backed Securities issued or guaranteed by the Government National Mortgage Association (GNMA), Federal National Mortgage Association (FNMA) and/or Federal Home Loan Mortgage Corporation (FHLMC).

B.  BUYER and SELLER desire to amend the Addendum and the LPA, as set forth in this Amendment.

C.  Commencing for trades taken on or after amendment is signed by Seller and received by Buyer, Buyer agrees to purchase from Seller Loans that comply with the following terms and conditions:

**With respect to Termination Date:**

**The following shall be deleted:**

   February 28, 2006

**The following shall be added:**

   May 31, 2006

D.  All terms and conditions of the Loan Purchase Agreement shall be applicable and remain valid, binding and in full force and effect, except as specifically modified herein.

E.  The term of this Amendment shall expire May 31, 2006 unless otherwise earlier terminated by either party giving thirty days prior written notice of termination to the other party.

All other terms and conditions shall remain the same.

IN WITNESS WHEREOF, the parties have caused this document to be executed by their proper corporate officers as of the day and year first above written.

**COUNTRYWIDE HOME LOANS, INC.**

By: _____
Mike Quinn          February 28, 2006
Executive Vice President

**UNITED FINANCIAL**

_____   3/17/06
Signature                          Date

## AMENDMENT TO LOAN PURCHASE AGREEMENT

This Amendment, which shall be effective with respect to Loans purchased by Countrywide from Seller on and after August 1, 1995 (the "Effective Date"), amends the Loan Purchase Agreement dated the ___16th___ day of ___January___, 19_95_ by and between Countrywide Funding Corporation ("Countrywide") and __United Financial Mort.__ ("Seller") (the "Agreement") and shall modify, amend and form a part of the terms of the Agreement. The terms and conditions of the Agreement are incorporated herein by reference. All capitalized terms contained in this Amendment shall have the same meaning as in the Agreement, unless they are otherwise defined in this Amendment. In the event of any conflict between the terms and conditions of the Agreement and this Amendment, the terms and conditions of this Amendment shall prevail.

1.  With respect to Loans purchased by Countrywide from Seller on and after the Effective Date, Subsection 7.A.(4) of the Agreement is amended to read as provided below. This amendment is *not* retroactive and shall be in effect only for Loans purchased by Countrywide on and after the Effective Date. With respect to Loans purchased by Countrywide from Seller prior to the Effective Date, Subsection 7.A.(4) of the Agreement shall apply as if this Amendment had not been entered into.

    "(4)   If the first payment due Countrywide is not received by Countrywide, whether from the borrower directly or forwarded by Seller if the Borrower has submitted the payment to Seller, by the last day of the month in which it is due, and, in addition, at any time within the first twelve months after the Loan has been purchased by Countrywide the Borrower is 90 days delinquent with respect to a monthly payment. For this purpose a Borrower shall be considered to be 90 days delinquent on a monthly payment if it is not received by Countrywide by the last day of the third month, regardless of the number of days in the month. For example, if the Borrower has not made his/her January payment by the last day of March, the Borrower shall be considered 90 days delinquent with respect to the January payment. Seller shall not have the right to advance funds for or on behalf of a Borrower for any delinquent payment or to otherwise make funds available to any Borrower to avoid or cure a default by the Borrower. A payment for which Countrywide deducted funds at the time it purchased the Loan from Seller shall not be considered the first payment due Countrywide.

2.  With respect to Loans purchased by Countrywide from Seller on and after the Effective Date of this Amendment, Subsection 7.A.(6) of the Agreement is deleted, except with respect to Loans which are purchased by Countrywide on an Assignment of Trade basis pursuant to an Assignment of Trade Addendum entered into between the parties or on a Direct Trade basis pursuant to a Direct Trade Addendum entered into between the parties. The provisions of 7.A.(6) shall remain in full force and effect for any Loans heretofore or hereinafter purchased by Countrywide pursuant to an Assignment of Trade Addendum or Direct Trade Addendum and for all Loans purchased by Countrywide pursuant to the Agreement prior to the Effective Date of this Amendment.

**IN WITNESS WHEREOF**, the parties have duly executed this Amendment to be effective as of the Effective Date set forth above.

**COUNTRYWIDE FUNDING CORPORATION**

By: _____   Date: _1-6-95_

Name:   Dawn Brayton                 Its:   Vice President

**SELLER:**   _United Financial mtg corp_

By: _____   Date: _9-12-91_

Name:   _Joseph Khosravi_            Its:   _Brown_

# ASSIGNMENT OF TRADE TERM SHEET ADDENDUM

This Addendum ("AOT Addendum") constitutes an addendum to that Loan Purchase Agreement (the "LPA") dated February 7, 2001, by and between Countrywide Home Loans, Inc. ("Countrywide" or "Buyer"), a New York Corporation, and United Financial Mortgage Corp.. ("Seller"). This AOT Addendum is for the purpose of setting forth the obligations of the Seller to Countrywide, related to Seller's delivery of loans to Countrywide under Countrywide's Assignment of Trade program, ("AOT Program") which is further detailed in the Assignment of Trade Terms Sheet ("AOT Terms Sheet") attached hereto as Exhibit A, dated August 8, 2002. This AOT Addendum shall modify, amend, and form a part of the terms of the LPA. All capitalized terms contained herein which are not defined shall have the same meaning as in the LPA. In the event of any conflict between the terms and conditions of the LPA and this AOT Addendum as it pertains to delivery of loans under the AOT Program, the terms and conditions of this AOT Addendum shall prevail. All other provisions of the LPA shall remain unchanged and be in full force and effect.

I. <u>**COMMITMENT TO PURCHASE LOANS AND ACCEPTANCE OF ASSIGNMENTS OF TRADE**</u>.

Buyer hereby commits to purchase from Seller first lien mortgage loans secured by residential properties (the "Mortgage Loans") falling within the product loan types, meeting the other criteria of, and delivered in accordance with, the terms and conditions set forth in this AOT Addendum, the AOT Terms Sheet, the LPA and the Guide. Countrywide also commits to accept from Seller assignments of Trade, subject to all of the terms and conditions set forth in this AOT Addendum.

II. <u>**DEFINITIONS**</u>.

A. "Approved Investor" shall mean a securities dealer listed on Exhibit B attached to this AOT Addendum (which list may be revised by Buyer from time to time) or a securities dealer otherwise approved by Buyer in writing, which approval may be withheld in Buyer's sole discretion.

B. "Assignment Notification" shall mean a form of assignment of a Trade fully completed and executed by Seller substantially in the form of Exhibit C attached to this AOT Addendum.

C. "Business Day" shall mean any day other than a Saturday, Sunday or a day on which commercial banks in Los Angeles, California are authorized or required by law or executive order to close.

D. "Delivery" shall have the meaning set forth in Section III.A. of this AOT Addendum.

E. "Delivery Date Schedule" shall mean the schedule attached to this AOT Addendum as Exhibit D.

F. "Eligible Mortgage Loans" shall have the meaning specified in Section III.A. of this AOT Addendum.

G. "Final Delivery Date" shall mean the applicable dates reflected in the column entitled "Final Delivery Date" set forth in Exhibit D attached to this AOT Addendum.

H. "GNMA" shall mean Government National Mortgage Association.

I. "Guide" shall mean Countrywide's Correspondent Lending Division Loan Purchase Program Seller's Manual.

J. "Minimum Delivery Amount" shall mean the minimum aggregate principal balance of the Eligible Mortgage Loans to be covered by a specific Trade, plus or minus the Tolerance.

2

K.   "Mortgage Loan" shall mean an obligation evidenced by a promissory note secured by a first lien upon a residential property and the servicing rights, titles and interests therein and thereto, together with the Mortgage Loan File, escrow accounts and all records pertaining to such loan.

L.   "Mortgage Loan Purchase Price" shall have the meaning set forth in Section V of this AOT Addendum.

M.   "Pool Cut-Off Date" shall mean the applicable date reflected in the column entitled "Pool Cut-Off Date" set forth in Exhibit D attached to this AOT Addendum.

N.   "Purchase Date" shall mean the actual date that Buyer pays the Purchase Price for each Eligible Mortgage Loan following the Receipt Date for such Eligible Mortgage Loan.

O.   "Purchase Voucher" shall mean the Correspondent Lending Division Purchase Voucher as described in the Guide.

P.   "Receipt Date" shall mean the date of receipt by Buyer of a complete Mortgage Loan File for each Eligible Mortgage Loan.

Q.   "Rejected Loan" shall have the meaning specified in Section IX.A. of this AOT Addendum.

R.   "Settlement Date" shall mean the applicable date reflected in the column entitled "Settlement Date" set forth on Exhibit D attached to this AOT Addendum.

S.   "Tolerance" shall mean 1.00% of the applicable Trade amount or such other amount as specified by the Public Securities Association ("PSA").

T.   "Shortfall Amount" shall mean the amount by which the Delivery Amount is less than the Minimum Delivery Amount.

U.   "Trade" shall mean an obligation to deliver a Mortgage-Backed Security or a Participation Certificate to an Approved Investor at a particular Trade Price on the Settlement Date for such Trade.

V.   "Trade Price" shall mean the negotiated price with an Approved Investor for the delivery of a mortgage-backed security or a participation certificate.

3

## III.  MORTGAGE LOAN DELIVERIES.

A.  Seller shall deliver from time to time to Buyer under the terms of this AOT Addendum Mortgage Loans for purchase that are eligible for pooling into the mortgage-backed securities which are the subject of a corresponding Trade and that meet all other criteria specified herein and in the AOT Terms Sheet, the LPA and the Guide ("Eligible Mortgage Loans"). The aggregate unpaid principal balance of Eligible Mortgage Loans delivered by Seller to Buyer from time to time in conjunction with the assignment of a particular Trade (a "Delivery") shall meet the following criteria:

   1.  The aggregate unpaid principal balance of each Delivery shall be equal to the face amount of the corresponding Trade to be assigned by Seller to Buyer in conjunction with the Delivery plus or minus the Tolerance; and

   2.  The aggregate unpaid principal balance of each Delivery shall, in no event, be less than $500,000 for Deliveries relating to Trades of GNMA I and GNMA II securities.

B.  All Eligible Mortgage Loans comprising a Delivery associated with a particular Trade shall qualify in every respect for inclusion in the security covered by the applicable Trade. Buyer shall have full discretion as to whether to retain or sell any Eligible Mortgage Loan or to use any Eligible Mortgage Loan to fill the corresponding Trade.

C.  Buyer's obligation to purchase an Eligible Mortgage Loan shall be contingent on (1) Seller's concurrent delivery to Buyer of (a) evidence of the corresponding Trade and (b) all other Eligible Mortgage Loans comprising the Delivery, the aggregate principal balances of which, together with the subject Eligible Mortgage Loan, correspond to the dollar amount of the corresponding Trade as provided in Section III.A. above and in Section IV hereof, (2) the assignment of the applicable Trade by Seller to Buyer and the acceptance of such assignment by Buyer as evidenced by the execution of the Assignment Notification by Seller, Buyer and the Approved Investor and (3) Buyer's review and acceptance of the Mortgage Loan File, which acceptance shall be evidenced by Buyer's payment to Seller of the Purchase Price for such Mortgage Loans as set forth in Section V below; provided, however, that such review and acceptance shall not in any way diminish Seller's obligations, representations or warranties, or Buyer's rights, under this AOT Addendum or the LPA.

D.  Seller agrees to deliver to Buyer under the combined AOT and Direct Trade Programs an aggregate minimum amount of $5 Million ($5,000,000) and a maximum amount of $20 Million ($20,000,000) in Deliveries during each calendar month during the term of this AOT Addendum. Should Seller desire to deliver in excess of $20 Million ($20,000,000) in Deliveries in any one month, such excess Deliveries shall require the prior written approval of Buyer. Seller further agrees to not deliver more than 15% of the total monthly delivery volume for purchase on any one Business Day provided, however, that if such 15% amount is less than $1 million, Seller may deliver up to $1 Million in Eligible Mortgage Loans per Business Day.

Seller agrees to deliver to Buyer under the combined AOT and Direct Trade Programs an aggregate minimum amount of $75 Million ($75000,000) in Deliveries during the term of this Agreement. Should Seller fail to deliver $75 Million ($75,000,000), Seller agrees to pay Buyer a shortfall penalty of 1.00% (100 basis points) on the amount of the shortfall.

If Seller delivers at least 90% of their GNMA eligible loan originations each month, the shortfall penalty will be waived.

E.  A complete Mortgage Loan File containing each of the documents required pursuant to the Guide shall be delivered for each Eligible Mortgage Loan. The Mortgage Loan Files shall be accompanied by a fully completed copy of the Purchase Voucher for each of the Mortgage Loans to be purchased. Seller shall send, by overnight mail, the complete Mortgage Loan Files and the original notes, with bailee letters from Seller's warehouse bank attached, if applicable, and wiring instructions such that Buyer receives them by the Final Delivery Date.

4

## IV. COMMITMENT TO ACCEPT ASSIGNMENTS OF TRADE.

Buyer hereby commits to accept assignments of Trades from Seller in conjunction with Deliveries to be made by Seller hereunder under the following terms and conditions:

**A.** The Trade must have been issued by and subject to closing with an Approved Investor; the Trade must be for the forward sale of an eligible security as specified in the AOT Terms Sheet; and the Trade must be for a face amount of no less than $500,000 for trades covering GNMA I and GNMA II securities. Seller shall negotiate the Trade Price with the Approved Investor, thereby assuming any market gain or loss with regard to the Eligible Mortgage Loans associated with the Trade.

**B.** Buyer's obligation to accept assignment of the Trade is contingent upon Buyer having received from Seller all of the Eligible Mortgage Loans necessary to form the security covered by the Trade on or prior to the Final Delivery Date. Each of the Mortgage Loans shall be fully eligible for inclusion within the security covered by the Trade, and the aggregate of the unpaid principal balances of such Eligible Mortgage Loans received by Buyer in the Delivery associated with the Trade shall be not less nor more than the face amount of the Trade, plus or minus the Tolerance.

**C.** The assignment of the Trade shall be effectuated, at Buyer's option, either by assignment of the Trade pursuant to the form attached hereto as Exhibit C or by the cancellation through the applicable Approved Investor of the Trade in Seller's name and the reissuance of the Trade in the name of Buyer or by such other means as Buyer shall reasonably require.

**D.** Notwithstanding any assumption or acceptance of a Trade by Buyer, Seller hereby acknowledges, understands and agrees that Buyer shall have no obligation to deliver all or any of the Eligible Mortgage Loans being purchased hereunder against any Trade assumed by Buyer and that Buyer will be free to pair off the Trade being assumed, to reassign the Trade to a third party, to fully cancel the Trade or to make any other disposition of the Trade that Buyer, in its sole discretion, shall determine.

## V. PURCHASE PRICE, ADJUSTMENTS AND SERVICING RELEASED PREMIUMS

**A.** Buyer shall purchase each Eligible Mortgage Loan delivered for sale by Seller to Buyer pursuant to the AOT Program for a purchase price (the "Mortgage Loan Purchase Price") which shall be calculated by multiplying the unpaid principal balance of the applicable Eligible Mortgage Loan by the percentage which is equal to the Trade Price (expressed as a percentage of par) on the Trade associated with the Delivery in which the Eligible Mortgage Loan is included. Additionally, the Mortgage Loan Purchase Price shall be adjusted by any buyup or buydown fees, impound balances, accrued interest, and other adjustments or fees provided for in the AOT Terms Sheet or the Guide.

**B.** Additionally, Buyer shall pay Seller a servicing released premium ("Servicing Released Premium") on each Eligible Mortgage Loan purchased, which shall be calculated by multiplying the unpaid principle balance of such Eligible Mortgage Loan by the applicable Servicing Released Premium percentage provided for in the AOT Terms Sheet.

**C.** Buyer shall use its best efforts to pay the Mortgage Loan Purchase Price and Servicing Released Premium with respect to each Eligible Mortgage Loan within five (5) Business Days following the Receipt Date (the actual date of purchase being the "Purchase Date").

5

## VI.    LOAN CHARACTERISTICS.

Seller represents that the characteristics of all Eligible Mortgage Loans to be delivered by Seller hereunder shall fully conform to the required characteristics set forth in this AOT Addendum, the AOT Terms Sheet and the Guide.

## VII.    UNDERWRITING.

Each Loan purchased pursuant to the AOT Program shall be underwritten by Seller in accordance with the underwriting guidelines and the lending requirements set forth in the Guide, the regulations of FHA or VA, as applicable, and the guidelines of any applicable mortgage insurance companies. Seller shall be responsible for ensuring that Eligible Mortgage Loans submitted to Buyer comply with all terms and conditions of this AOT Addendum and the aforementioned regulations and guidelines.

Buyer shall have the right, but not the obligation, to underwrite any Eligible Mortgage Loan submitted for purchase pursuant to this AOT Addendum, the LPA and the Guide or otherwise ensure that any Eligible Mortgage Loan submitted for purchase complies with all of the terms and conditions of this AOT Addendum, the LPA and the Guide; provided that the existence of this right shall not affect in any way Seller's obligations hereunder, including without limitation, Seller's repurchase obligations, and Seller's hold harmless obligations under the LPA.

## VIII.    TIMING OF DELIVERIES/PAIR OFF FEES

Seller agrees to deliver all Eligible Mortgage Loans associated with a particular Trade on or before the applicable Final Delivery Date related to that Trade.  Exhibit D may be modified from time to time by Buyer in its sole and absolute discretion.

In the event that Seller fails to deliver an Eligible Mortgage Loan applicable to an assignment of Trade by the related Final Delivery Date established for that Assignment of Trade, Buyer shall:

> On the day after the Pool Cut-Off Date for trades not previously rolled, roll the unpurchased portion of the trade into the next settlement month.

> On the day after the first rolled Pool Cut-Off Date, roll any delivered but unpurchased portion of the Trade into the next settlement month and pair-off any undelivered portion of the Trade, less the Trade Tolerance.

> On the day after the second rolled Pool Cut-Off Date, pair-off any unpurchased portion of the trade and transfer any delivered loans to float status.

> If the day after the Pool Cut-Off Date falls on a weekend or holiday, commitment shortfalls will be addressed the next Business Day.  Roll fees will be determined as of the close of business on a security's Pool Cut-Off Date and published the morning of the next Business Day.

Seller shall pay Countrywide a mark to market pair-off fee ("Pair-Off Fee") for which any shall be calculated by multiplying the principal balance of the Eligible Mortgage Loan(s) not delivered by a percentage equal to the positive difference, if any, between (x) the bid price (expressed as a percent) obtainable by Countrywide on Pool Cut-Off Date for the Associated Security which was designated for the Eligible Mortgage Loan, and (y) the price offered by Countrywide, and accepted by Seller for such non-delivered Loan pursuant to the assignment of Trade.

## IX.    REPURCHASE OF MORTGAGE LOANS

A.    In the event that Buyer, GNMA, FHA or VA as applicable, reject a Mortgage Loan prior to the date such Loan is sold to them or pooled into a mortgage backed security, and Buyer has

6

purchased the rejected Mortgage Loan from Seller, then Seller shall repurchase such Mortgage Loan, and Buyer shall have all other remedies as set forth in the LPA.

**B.**   In the case set forth in Paragraph IX.A above, Seller shall also indemnify and hold Buyer harmless from and against all costs, expenses and other charges incurred by the Buyer as provided for in the LPA and Guide.

**X.   COMMITMENT PERIOD**

The term of this AOT Term Addendum will extend from the day this contract is executed and delivered to Buyer through February 28, 2003; however, this AOT Term Addendum may be extended by the written consent of both Buyer and Seller.

**XI.   TERMINATION**

Notwithstanding the commitment period specified in Section X above, this AOT Term Addendum may be terminated by the mutual consent of Buyer and Seller or upon the giving of 30 days notice by either party to the other. Notice shall be effective the earliest of (i) the date on which it is received, (ii) four (4) days after being sent by certified or registered U.S. Mail, or (iii) two (2) days after being delivered by an overnight courier. Should Seller breach any of the terms or conditions of this AOT Term Addendum, the LPA or the Guide, Buyer may terminate this AOT Term Addendum immediately without notice to Seller. Termination of this AOT Term Addendum shall not in any way affect either Seller's or Buyer's obligations, representations, warranties or indemnifications with respect to Eligible Mortgage Loans already purchased by, or Trades already assigned to, Buyer; provided, however, that Buyer may immediately terminate its obligations hereunder without notice and immediately re-assign any unfilled Trades and/or return any Eligible Mortgage Loans not purchased back to Seller, and Seller shall accept such re-assignment or return, as applicable, if Buyer reasonably determines that there has been any non-performance, deception, fraud, concealment or material misrepresentation by Seller in performing any of its duties, obligations, responsibilities or actions undertaken in connection with this AOT Term Addendum including but not limited to Seller's:

   (i)   origination or servicing of the Eligible Mortgage Loans;

   (ii)   purchase or assignment of any Trade;

   (iii)   assignment or delivery of any Eligible Mortgage Loan to Buyer;

   (iv)   making of any representation or warranty;

   (v)   performance of its repurchase obligations;

   (vi)   adjudication as a bankrupt, insolvency or application for or consent to the appointment of a receiver, trustee, liquidator, custodian or similar official for itself or any of its properties or assets;

   (vii)   assignment or attempt to assign any of its rights or obligations under this AOT Term Addendum without the prior written consent of Buyer;

   (viii)   breach any of its obligations under this AOT Term Addendum;

   (ix)   failure to be a qualified originator of Eligible Mortgage Loans in any jurisdiction where mortgaged property securing any Eligible Mortgage Loan is located.

In such event, Buyer shall be entitled to avail itself of all remedies as set forth in the AOT Term Addendum, the LPA and the Guide.

7

Additionally, Buyer may terminate this AOT Term Addendum with thirty (30) days written notice to Seller should any Federal or State law be enacted which adversely affects the value of the servicing rights being acquired, including, but not limited to, changes in law impacting interest on escrow balance requirements.

## XII.    FINANCIAL STATEMENTS

Seller shall provide Buyer with interim financial statements and other information at least quarterly within sixty (60) days following the end of each quarter.  Seller shall provide audited financial statements certified by an independent certified public accountant within one hundred (100) days following the end of Seller's fiscal year.

## XIII.    RIGHT OF OFFSET AND DELIVERY OF PAYMENTS

A.    In addition to any rights now or hereafter granted under this AOT Term Addendum, the LPA or Guide by applicable law or otherwise, and not by way of limitation of any such rights, Buyer is hereby authorized at any time or from time to time, without presentment, demand, protest or other notice of any kind to Seller or to any other person, any such notice being hereby expressly waived, to set off and to appropriate and apply any and all amounts at any time owing by Buyer to or for the credit or the account of Seller against and on account of the obligations and liabilities of Seller to Buyer under this AOT Term Addendum, irrespective of whether or not Buyer shall have made any demand therefor.

B.    Except as expressly otherwise set forth in this AOT Term Addendum, the LPA or Guide, any amounts due from Seller to Buyer pursuant to any provision of this AOT Term Addendum, the LPA or Guide shall be remitted by Seller to Buyer no later than five (5) Business Days from Seller's receipt of notice from Buyer of the amounts due hereunder.

## XIV.    EXHIBITS

All exhibits attached hereto or referred to in this AOT Term Addendum are incorporated by reference into this AOT Term Addendum and made a part hereof.

## XV.    ASSIGNMENT

Seller may not assign its rights or obligations under this AOT Term Addendum without the prior written consent of Buyer.  This AOT Term Addendum shall be binding and inure to the benefit of Buyer's successors and assigns.

8

XVI.   <u>CONFIDENTIALITY</u>

Seller will not disclose to any third party the fact of or any of the specific details of this agreement.  If Seller violates this confidentiality provision of this agreement, then Buyer shall be entitled to injunctive relief as a matter of right, and to any and all other remedies which may be available under applicable law (none of which remedies shall be mutually exclusive, and all of which remedies may be pursued concurrently and cumulatively).

**COUNTRYWIDE HOME LOANS, INC.**

**UNITED FINANCIAL MORTGAGE CORP.**

By:   <u>Michael Quinn</u>
      1st Vice President

By:

Date:   August 8, 2002

Date:   8/30/02

## DIRECT TRADE PROGRAM TERM SHEET ADDENDUM

This Addendum ("Direct Trade Addendum" or "Direct Trade Commitment") constitutes an addendum to that Loan Purchase Agreement (the "LPA") dated February 7, 2001, by and between Countrywide Home Loans, Inc. ("Countrywide" or "Buyer"), a New York Corporation, and United Financial Mortgage Corp.. ("Seller"). This Direct Trade Addendum is for the purpose of setting forth the obligations of the Seller to Countrywide, related to Seller's delivery of loans to Countrywide under Countrywide's Direct Trade program, ("Direct Trade Program") which is further detailed in the Direct Trade Terms Sheet (the "Terms Sheet") attached hereto as Exhibit A, dated August 8, 2002. This Direct Trade Addendum shall modify, amend, and form a part of the terms of the LPA. All capitalized terms contained herein which are not defined shall have the same meaning as in the LPA. In the event of any conflict between the terms and conditions of the LPA and this Direct Trade Addendum as it pertains to delivery of loans under the Direct Trade Program, the terms and conditions of this Direct Trade Addendum shall prevail. All other provisions of the LPA shall remain unchanged and be in full force and effect.

## I. COMMITMENT TO PURCHASE LOANS

Buyer hereby commits to purchase from Seller during the term of this Commitment, first lien mortgage loans secured by residential properties falling within the product loan types, meeting the other criteria of, and delivered in accordance with, the terms and conditions set forth in this Direct Trade Addendum, the Direct Trade Terms Sheet, the LPA and the Guide ("Eligible Mortgage Loans").

## II. DEFINITIONS

A. "Associated Security" shall mean that mortgage backed security which Countrywide shall designate for each mortgage loan covered by a Direct Trade as provided in section IV herein.

B. "Business Day" shall mean any day other than a Saturday, Sunday or a day on which commercial banks in Los Angeles, California are authorized or required by law or executive order to close.

C. "Delivery" shall mean the delivery by Seller to Countrywide of a group of Eligible Mortgage Loans which are to be delivered by Seller to Countrywide to satisfy the Seller's delivery obligations in conjunction with a Direct Trade.

D. "Direct Trade" shall mean a mandatory commitment entered into directly between Countrywide and Seller whereby Seller agrees to sell and Countrywide agrees to purchase a specific group of Eligible Mortgage Loans at a specific purchase price, and which further provides that all such Eligible Mortgage Loans are to be delivered by Seller to Countrywide on or prior to the Mandatory File Receipt Date.

E. "Direct Trade Date" shall mean the date that a Direct Trade was entered into between Countrywide and Seller.

F. "Eligible Mortgage Loans" shall mean Mortgage Loans which are eligible for pooling into their designated Associated Security and that meet all of the criteria specified herein, the Terms Sheet, the LPA and the Guide.

G. "FHA" shall mean the Federal Housing Administration.

H. "Final Delivery Date" shall mean the applicable dates reflected in the column entitled "Final Delivery Date" set forth in Exhibit B attached to this Direct Trade Addendum.

I. "GNMA" shall mean the Government National Mortgage Association.

J. "Guide" shall mean Countrywide's Correspondent Lending Division Loan Purchase Program Seller's Manual.

K. "Mandatory File Receipt Date" shall mean that date which is five business days subsequent to the Direct Trade Date.

L. "Minimum Delivery Amount" shall mean the minimum aggregate principal balance of the Eligible Mortgage Loans to be covered by a specific Direct Trade.

M.   "Mortgage Loan" shall mean an obligation evidenced by a promissory note secured by a first lien upon a residential property and the servicing rights, titles and interests therein and thereto, together with the Mortgage Loan File, escrow accounts and all records pertaining to such loan.

N.   "Mortgage Loan Files" shall mean all of those documents required to have been obtained or produced pursuant to the Guide, this Direct Trade Addendum and the requirements of FHA or VA as applicable.

O.   "Mortgage Loan Purchase Price" shall have the meaning set forth in Section IV of this Direct Trade Addendum.

P.   "Pool Cut-Off Date" shall mean the applicable date reflected in the column entitled "Pool Cut-Off Date" set forth in Exhibit B attached to this Direct Trade Addendum.

Q.   "Purchase Date" shall mean the actual date that Buyer pays the Purchase Price for each Eligible Mortgage Loan following the Receipt Date for such Eligible Mortgage Loan.

R.   "Purchase Voucher" shall mean the Correspondent Lending Division Purchase Voucher as described in the Guide.

S.   "Receipt Date" shall mean the date of receipt by Buyer of a complete Mortgage Loan File for each Eligible Mortgage Loan.

T.   "Rejected Loan" shall have the meaning specified in Section VIII.A. of this Direct Trade Addendum.

U.   "Settlement Date" shall mean the applicable date reflected in the column entitled "Settlement Date" set forth on Exhibit B attached to this Direct Trade Addendum.

V.   "Shortfall Amount" shall mean the amount by which the Delivery amount is less than the Minimum Delivery Amount.

W.   "Suspension Cure Date" shall mean that date which is the earlier of the "Pool Cutoff Date" or that date which is five (5) calendar days subsequent to the date Countrywide gives Seller notice that a loan delivered by Seller to Countrywide contains a suspense making the loan not eligible for purchase by Countrywide hereunder.

X.   "Tolerance" shall mean 2.50% of the applicable loan amount for which Seller has substituted an Eligible Mortgage Loan.

Y.   "VA" shall mean the Veterans Administration.

3

## III.   DIRECT TRADES AND DELIVERIES

Seller agrees to enter into Direct Trades and make corresponding Deliveries of Eligible Mortgage Loans during each month during the term of this Direct Trade Commitment, which Direct Trades and related Deliveries shall comply with the following provisions:

A.   The aggregate principle balance of each Direct Trade and corresponding Delivery shall not be less than the Minimum Delivery Amount.

B.   The complete Mortgage Loan File on each of the Eligible Mortgage Loans which comprise a Delivery and which are the subject of a Direct Trade shall be delivered to, and received by Countrywide no later than the Mandatory File Receipt Date.

C.   Each Eligible Mortgage Loan delivered in conjunction with a Direct Trade shall qualify in every respect for inclusion in the Associated Security designated for such loan as discussed in Section IV. herein.

D.   Countrywide's obligation to purchase an Eligible Mortgage Loan shall be contingent on (1) Seller's concurrent delivery to Buyer of complete Mortgage Loan Files on all of the Eligible Mortgage Loans comprising the Delivery by the Mandatory File Receipt Date, and (2) Countrywide's review and acceptance of the Mortgage Loan File, which acceptance shall be evidenced by Buyer's payment to Seller of the Mortgage Loan Purchase Price for such Eligible Mortgage Loan as set forth in section IV. below; provided however that such review and acceptance shall not in any way diminish Seller's obligations, representations or warranties, or Buyer's rights, under this Direct Trade Addendum or the LPA.

E.   Seller agrees to deliver to Buyer under the combined AOT and Direct Trade Programs an aggregate minimum amount of $5 Million ($5,000,000) and a maximum amount of $20 Million ($20,000,000) in Deliveries during each calendar month during the term of this Agreement.   Should Seller desire to deliver in excess of $20 Million ($20,000,000) in Deliveries in any one month, such excess Deliveries shall require the prior written approval of Buyer.  Seller further agrees to not deliver more than 15% of the total monthly delivery volume for purchase on any one business day.

Seller agrees to deliver to Buyer under the combined AOT and Direct Trade Programs an aggregate minimum amount of $75 Million ($75,000,000) in Deliveries during the term of this Agreement.  Should Seller fail to deliver $75 Million ($75,000,000), Seller agrees to pay Buyer a shortfall penalty of 1.00% (100 basis points) on the amount of the shortfall.

If Seller delivers at least 90% of their GNMA eligible loan originations each month, the shortfall penalty will be waived.

## IV.   PURCHASE PRICE/SERVICING RELEASE PREMIUM

A.   The purchase price (the "Mortgage Loan Purchase Price") to be paid by Countrywide on each Eligible Mortgage Loan delivered which is covered by a Direct Trade will be equal to the product of (x) the unpaid principal balance of such Eligible Mortgage Loan on the Purchase Date, multiplied by (y) the percentage price ("Purchase Price Percentage") offered by Countrywide to Seller, and accepted by Seller for such Eligible Mortgage Loan at the time the Direct Trade was entered into.

1.   The Purchase Price Percentage which Countrywide shall offer for each Eligible Mortgage Loan shall be equal to the bid price which Countrywide believes it can obtain at the time of the Direct Trade for the forward sale of the Applicable Security (defined below) designated by Countrywide for each such Eligible Mortgage Loan.

2.   The "Applicable Security" designated by Countrywide for each Eligible Mortgage Loan shall be that mortgage backed security with the highest coupon rate of interest into which the Eligible Mortgage Loan can be pooled into by Countrywide.  The coupon rate of interest of the Applicable Security (the "Applicable Security Coupon Rate") shall be in even .50% increments.

4

3.   The Applicable Security shall be either GNMA I security for fixed rate FHA and VA loans, and a GNMA II security for FHA or VA adjustable rate loans.

4.   The Issue Date and related public securities association (PSA) settlement date of the Applicable Security shall be determined by reference to the Mandatory File Receipt Date applicable to the Direct Trade and the Final Delivery Dates specified in Exhibit B attached hereto.

B.   The Mortgage Loan Purchase Price shall be further adjusted by any Buyup or Buydown fees, impound balances, accrued interest and other adjustments or fees as provided for in the Terms Sheet or the Guide.

C.   In addition to the payment of the Mortgage Loan Purchase Price, net of adjustments as provided for in paragraphs IV.A. and IV.B. above, Countrywide shall pay Seller a servicing released premium ("Servicing Released Premium") on each Eligible Mortgage Loan purchased which shall be calculated by multiplying the unpaid principal balance of such Eligible Mortgage Loan on the Purchase Date by the applicable Servicing Released Premium percentage provided for in the Terms Sheet.

## V.   LOAN CHARACTERISTICS

Seller represents that the characteristics of all Eligible Mortgage Loans to be delivered by Seller hereunder shall fully conform to the required characteristics and parameters set forth in this Addendum, the Terms Sheet and the Guide.

## VI.   UNDERWRITING

Each Loan purchased pursuant to the Direct Trade Program shall be underwritten by Seller in accordance with the underwriting guidelines and the lending requirements set forth in the Guide, the regulations of FHA or VA, as applicable, and the guidelines of any applicable mortgage insurance companies. Seller shall be responsible for ensuring that Eligible Mortgage Loans submitted to Buyer comply with all terms and conditions of this Direct Trade Addendum and the aforementioned regulations and guidelines.

Buyer shall have the right, but not the obligation, to underwrite any Eligible Mortgage Loan submitted for purchase pursuant to this Direct Trade Addendum, the LPA and the Guide or otherwise ensure that any Eligible Mortgage Loan submitted for purchase complies with all of the terms and conditions of this Direct Trade Addendum, the LPA and the Guide; provided that the existence of this right shall not affect in any way Seller's obligations hereunder, including without limitation, Seller's repurchase obligations, and Seller's hold harmless obligations under the LPA.

## VII.   TIMING OF DELIVERIES/PAIR OFF FEES

Seller agrees to deliver all Eligible Mortgage Loans associated with a particular Trade on or before the applicable Final Delivery Date related to that Trade. Exhibit D may be modified from time to time by Buyer in its sole and absolute discretion.

In the event that Seller fails to deliver an Eligible Mortgage Loan applicable to an assignment of Trade by the related Final Delivery Date established for that Direct Trade, Buyer shall:

On the day after the Pool Cut-Off Date for trades not previously rolled, roll the unpurchased portion of the trade into the next settlement month.

On the day after the first rolled Pool Cut-Off Date, roll any delivered but unpurchased portion of the trade into the next settlement month and pair-off any undelivered portion of the trade, less the trade tolerance. Tolerance for direct trades will be calculated at the individual security (suffix) level.

On the day after the second rolled Pool Cut-Off Date, pair-off any unpurchased portion of the trade and transfer any delivered loans to float status.

5

If the day after the Pool Cut-Off Date falls on a weekend or holiday, commitment shortfalls will be addressed the next business day. Roll fees will be determined as of the close of business on a security's Pool Cut-Off Date and published the morning of the next business day.

Seller shall pay Countrywide a mark to market pair-off fee ("Pair-Off Fee") for any which shall be calculated by multiplying the principal balance of the Eligible Mortgage Loan(s) not delivered by a percentage equal to the positive difference, if any, between (x) the bid price (expressed as a percent) obtainable by Countrywide on Pool Cut-Off Date for the Associated Security which was designated for the Eligible Mortgage Loan, and (y) the price offered by Countrywide, and accepted by Seller for such non-delivered Loan pursuant to the Direct Trade.

## VIII.   REPURCHASE OF MORTGAGE LOANS

**A.**    In the event that Buyer FHA or VA as applicable, reject a Mortgage Loan prior to the date such Loan is sold to them or pooled into a mortgage backed security, and Buyer has purchased the rejected Mortgage Loan from Seller, then Seller shall repurchase such Mortgage Loan, and Buyer shall have all other remedies as set forth in the LPA.

**B.**    In the case set forth in Paragraph VIII.A above, Seller shall also indemnify and hold Buyer harmless from and against all costs, expenses and other charges incurred by the Buyer as provided for in the LPA and Guide.

## IX.   COMMITMENT PERIOD

The term of this Direct Trade Term Addendum will extend from the day this contract is executed and delivered to Buyer through February 28, 2003; however, this Direct Trade Term Addendum may be extended by the written consent of both Buyer and Seller.

## X.   TERMINATION

Notwithstanding the commitment period specified in Section IX above, this Direct Trade Term Addendum may be terminated by the mutual consent of Buyer and Seller or upon the giving of 30 days notice by either party to the other.  Notice shall be effective the earliest of the date (i) the date on which it is received, (ii) four (4) days after being sent by certified or registered U.S. Mail, or (iii) two (2) days after being delivered by an overnight courier.  Should Seller breach any of the terms or conditions of this Direct Trade Term Addendum, the LPA, the Term Commitment, or the Guide, Buyer may terminate this Direct Trade Term Addendum immediately without notice to Seller.  Termination of this Direct Trade Term Addendum shall not in any way affect either Seller's or Buyer's obligations, representations, warranties or indemnifications with respect to Eligible Mortgage Loans already purchased by, or Direct Trades already entered into by Seller and Buyer; provided, however, that Buyer may immediately terminate its obligations hereunder without notice and immediately cancel any unfilled Direct Trades and/or return any Eligible Mortgage Loans not purchased back to Seller, and Seller shall accept such re-assignment or return, as applicable, if Buyer reasonably determines that there has been any non-performance, deception, fraud, concealment or material misrepresentation by Seller in performing any of its duties, obligations, responsibilities or actions undertaken in connection with this Direct Trade Term Addendum including but not limited to Seller's:

**(i)**      origination or servicing of the Eligible Mortgage Loans;

**(ii)**     delivery of any Eligible Mortgage Loan to Buyer;

**(iii)**    making of any representation or warranty;

**(iv)**    performance of its repurchase obligations;

**(v)**     adjudication as a bankrupt, insolvency or application for or consent to the appointment of a receiver, trustee, liquidator, custodian or similar official for itself or any of its properties or assets;

6

(vi)   assignment or attempt to assign any of its rights or obligations under this Direct Trade Term Addendum without the prior written consent of Buyer;

(vii)   breach any of its obligations under this Direct Trade Term Addendum;

(viii)   failure to be a qualified originator of Eligible Mortgage Loans in any jurisdiction where mortgaged property securing any Eligible Mortgage Loan is located.

In such event, Buyer shall be entitled to avail itself of all remedies as set forth in the Direct Trade Term Addendum, the LPA and the Guide.

Additionally, Buyer may terminate this Direct Trade Term Addendum with thirty (30) days written notice to Seller should any Federal or State law be enacted which adversely affects the value of the servicing rights being acquired, including, but not limited to, changes in law impacting interest on escrow balance requirements.

## XI.   FINANCIAL STATEMENTS

Seller shall provide Buyer with interim financial statements and other information at least quarterly within sixty (60) days following the end of each quarter.  Seller shall provide audited financial statements certified by an independent certified public accountant within one hundred (100) days following the end of Seller's fiscal year.

## XII.   RIGHT OF OFFSET AND DELIVERY OF PAYMENTS

A.   In addition to any rights now or hereafter granted under this Direct Trade Term Addendum, the LPA or Guide by applicable law or otherwise, and not by way of limitation of any such rights, Buyer is hereby authorized at any time or from time to time, without presentment, demand, protest or other notice of any kind to Seller or to any other person, any such notice being hereby expressly waived, to set off and to appropriate and apply any and all amounts at any time owing by Buyer to or for the credit or the account of Seller against and on account of the obligations and liabilities of Seller to Buyer under this Direct Trade Term Addendum, irrespective of whether or not Buyer shall have made any demand therefor.

B.   Except as expressly otherwise set forth in this Direct Trade Term Addendum, the LPA or Guide, any amounts due from Seller to Buyer pursuant to any provision of this Direct Trade Term Addendum, the LPA or Guide shall be remitted by Seller to Buyer no later than five (5) Business Days from Seller's receipt of notice from Buyer of the amounts due hereunder.

## XIII.   EXHIBITS

All exhibits attached hereto or referred to in this Direct Trade Term Addendum are incorporated by reference into this Direct Trade Term Addendum and made a part hereof.

## XIV.   ASSIGNMENT

Seller may not assign its rights or obligations under this Direct Trade Term Addendum without the prior written consent of Buyer.  This Direct Trade Term Addendum shall be binding and inure to the benefit of Buyer's successors and assigns.

7

## XV.   CONFIDENTIALITY

Seller will not disclose to any third party the fact of or any of the specific details of this agreement.  If Seller violates this confidentiality provision of this agreement, then Buyer shall be entitled to injunctive relief as a matter of right, and to any and all other remedies which may be available under applicable law (none of which remedies shall be mutually exclusive, and all of which remedies may be pursued concurrently and cumulatively).

**COUNTRYWIDE HOME LOANS, INC.**

By:  Michael Quinn
      1st Vice President

Date:  August 8, 2002

**UNITED FINANCIAL MORTGAGE CORP.**

By:

Date:  8/30/02

## EDI DELIVERY ADDENDUM TO LOAN PURCHASE AGREEMENT

THIS EDI DELIVERY ADDENDUM TO LOAN PURCHASE AGREEMENT (the "Addendum") is made as of **May 23, 2005**, by and between Countrywide Home Loans, Inc. ("Countrywide") and **United Financial Mortgage Corp (#3132)**.   This Addendum supplements and amends that certain Loan Purchase Agreement by and between Countrywide and Seller dated 2/7/2001 (including any Commitments, Amendments, Addenda and Assignments related thereto, collectively, the "Loan Purchase Agreement").  Capitalized terms used herein and not defined herein shall have the meanings assigned such terms in the Agreements (as defined below), as applicable.

### RECITALS

A.      In connection with the sale and purchase of loans to Countrywide under the Loan Purchase Agreement, Seller is required to deliver to Countrywide certain Documents (as defined herein) as required by Countrywide's Correspondent Lending Seller's Guide (as amended from time to time by Countrywide, the "**Guide**") and the Loan Purchase Agreement (the Guide, the Loan Purchase Agreement and any other agreement by and between Countrywide and Seller related to the sale and purchase of loans to Countrywide under the Loan Purchase Agreement shall be collectively referred to herein as the "**Agreements**").

B.      With respect to certain Documents, Seller has requested that in lieu of delivering such Documents as required by the Agreements that Seller be allowed to deliver to Countrywide the information contained on such Documents via Countrywide's EDI System and deliver such Documents in accordance with the terms herein (loans delivered in such manner being referred to herein as "**EDI Loans**").

C.      Countrywide has agreed to allow Seller to do so in accordance with the terms herein.

NOW, THEREFORE, in consideration of the above premises and the terms and conditions contained herein, Seller and Countrywide hereby agree as follows:

1.      **Definitions.**

   (a)      As used herein, the "**Documents**" shall mean all the documents that Seller is required to deliver to Countrywide in accordance with any of the Agreements.

2.      **Sale and Purchase of EDI Loans; Delivery of Documents.**

   (a)      Sale and Purchase of EDI Loans; EDI Delivery.  To initiate a sale and purchase of an EDI Loan under this Addendum, Seller shall provide, at a minimum, the related Inputted Information (as defined below) through Countrywide's EDI System on or prior to the File Due Date (as defined in the Agreements). In no event will Countrywide be obligated to purchase any EDI Loan if the Inputted Information is not provided by Seller as required herein.

   (b)      Inputted Information.  Countrywide has or shall deliver to Seller the list of certain loan information that Countrywide will require to be delivered through its EDI System, which Countrywide may modify or add to from time to time upon notice to Seller at Countrywide's sole and absolute discretion (such list, the "**Inputted Information**"). Seller is responsible for having whatever systems or other products necessary to deliver the Inputted Information to Countrywide in the format necessary for Countrywide's EDI System to process the Inputted Information in the manner required by Countrywide.

(c) <u>Failure to Provide Inputted Information</u>.  If Seller attempts to provide Inputted Information in accordance with the terms herein, but is unsuccessful, then such EDI Loan shall be treated as a standard Loan, not an EDI Loan, and Seller shall be responsible for delivering all related Documents in accordance with the Agreements.

(d) <u>Delivery of Documents</u>.  All Documents related to any EDI Loan shall be delivered to Countrywide within sixty (60) days after the date that Countrywide actually purchases the EDI Loan (such date, the "**Purchase Date**") unless the Agreements expressly provide for an additional time period in which Seller may deliver any such Documents to Countrywide.  Notwithstanding the foregoing sixty (60) day delivery requirement, it is understood and agreed by Seller and Countrywide that with respect to the original security instrument with evidence of recording thereon, the original Assignment and all intervening Assignments with evidence of recording thereon, the original final policy of title insurance, the original recorded Power of Attorney, if applicable, and the original Modification Agreement with evidence of recording thereon, if applicable, Seller shall deliver such Documents to Countrywide promptly following receipt thereof, but in no event later than one hundred and twenty (120) days after the related Purchase Date (or such extended period during which such Document is held at the appropriate recording office for recording, which Seller shall certify to Countrywide upon request)

(e) <u>Delivery of Imaged Documents</u>. For purposes of complying with its obligations to deliver Documents related to EDI Loans under the Agreements, Seller may deliver to Countrywide imaged versions of certain Documents in lieu of delivering the original or certified copy of such Documents.  Countrywide has or will deliver to Seller the list of those Documents which Seller may deliver an imaged version to Countrywide, which such list Countrywide may modify or add to from time to time upon notice to Seller at Countrywide's sole and absolute discretion.  Further, those Documents which Seller may deliver an imaged version to Countrywide shall be determined by Countrywide in its sole and absolute discretion.  Seller is solely responsible for having whatever computer systems or other software products necessary to deliver the imaged version of the Document in the format and in the manner required by Countrywide.

(f) <u>Failure to Timely Deliver Documents</u>.  If, with respect to any EDI Loan, any Document is not delivered within sixty (60) days after the related Purchase Date of such EDI Loan (except for those Documents wherein the Agreements expressly provide for an additional time period in which Seller may deliver such Documents to Countrywide), Countrywide may assess, and Seller will be obligated to pay, Countrywide's then current late document delivery fee for each day that any such Document remains undelivered.  As of the date hereof, the current late document delivery fee is fifty ($50) dollars per EDI Loan per day.  If any Document is not delivered to Countrywide within one hundred and twenty (120) days after the related Purchase Date of such EDI Loan as required under this Addendum or the Agreements, Seller will, upon the request of Countrywide, repurchase the related EDI Loan in accordance with the provisions of the Loan Purchase Agreement.

3. **Representations and Warranties.**

(a) <u>Representations and Warranties in the Agreements</u>.  Any and all representations and warranties regarding the Documents contained in the Agreements, including, without limitation, Section 6 of the Loan Purchase Agreement or any section of the Guide, shall be applicable and enforceable regarding all Documents, regardless of when any such Document is actually delivered to Countrywide or the form in which any Document is delivered.

(b) <u>Additional Representations and Warranties</u>.  With respect to each EDI Loan, Seller represents and warrants to Countrywide that as of the related Purchase Date: (i) nothing

contained in any Document not delivered to Countrywide contradicts or is inconsistent with anything contained in any of the Inputted Information or any other information which may have otherwise been provided by Seller to Countrywide on or prior to the Purchase Date, (ii) the Inputted Information delivered to Countrywide is accurate, true and correct and (iii) each EDI Loan is eligible for purchase by Countrywide and otherwise complies with all requirements of the Agreements.

4.  **Seller's Obligations under Agreements.**  Seller's obligations in connection with its obligations in the Agreements shall include its representations, warranties and agreements contained herein, including but not limited to Seller's obligations under Section 7.A.(5) and Section 9.A of the Loan Purchase Agreement.  Without limitation, Seller's obligations under Section 9.A. of the Loan Purchase Agreement shall include any Loss arising out of or in connection with Seller's failure to perform its obligations under this Addendum.  Additionally, without limitation, Seller's obligations under Section 7.A.(5) of the Loan Purchase Agreement shall include its failure to observe or perform or breach in any material respect any of the representations, warranties or agreements contained in this Addendum.

5.  **Interim Custodianship.**

    (a)  <u>Custodian of Documents</u>.  Countrywide hereby appoints Seller, and Seller hereby accepts its appointment, to act as the interim agent and bailee of Countrywide, and its successors and assigns, for the purpose of taking custody of any and all Documents related to EDI Loans prior to delivery to Countrywide, which such appointment shall be subject to the terms and conditions set forth herein.  With respect to each individual EDI Loan, the Seller's interim appointment as Countrywide's bailee and agent shall terminate upon the earlier of (a) the delivery by Seller of all related Documents to Countrywide or its designee (b) the receipt by Seller of a written termination notice from Countrywide and delivery by Seller of all related Documents or (c) Seller ceases to originate mortgage loans and delivers all related Documents to Countrywide.  Within thirty (30) days of (i) receipt of written termination notice or (ii) Seller ceasing to originate mortgage loans, Seller shall deliver all Documents not already delivered to Countrywide or its designee.  Seller's obligations to deliver Documents to Countrywide hereunder will survive any termination of the Loan Purchase Agreement or this Addendum.

    (b)  <u>Possession, Records and Insurance</u>.  At all times during which Seller is acting as Countrywide's agent and bailee with respect to any Documents not delivered to Countrywide, Seller shall retain possession and custody of the Documents for the sole benefit of Countrywide and as bailee and custodian for Countrywide for all purposes until otherwise notified by Countrywide pursuant to the terms hereof.  Seller shall segregate and maintain continuous custody of all Documents required by it in secure and firerated facilities, all in accordance with commercially reasonable standards in the mortgage banking business for such custody.  Seller shall implement and maintain administrative and operating procedures pursuant to which it shall keep and maintain all records and information necessary to permit the regular identification of all Documents held or released by it hereunder.  Seller shall also make appropriate notation in Seller's books and records reflecting that the Documents are owned by Countrywide unless otherwise notified by Countrywide pursuant to the terms hereof.  Seller shall maintain such insurance against loss or damage to the Documents as Countrywide deems appropriate.

    (c)  <u>Delivery Upon Request</u>.  Notwithstanding the delivery time period requirements of this Addendum or the Agreements for any Document, within five (5) business days after Countrywide's request therefore, Seller shall provide originals or copies, as requested and at Seller's expense, to Countrywide, or such other person or entity as directed by Countrywide in such request, of any Document in Seller's possession or control. If any such Document is not received by Countrywide or such other person or entity as directed by Countrywide within such time period, Countrywide may, at its sole option and

discretion, require Seller to repurchase the related EDI Loan in accordance with the Loan Purchase Agreement, or, in lieu of requiring such repurchase, charge Seller Countrywide's then-current per loan late fee for each day the Document remains undelivered. Seller shall not deliver or give access to any Documents or permit any copies thereof to any person other than Countrywide without the express written consent or instruction from Countrywide.

(d)   Inspection. At all times during which Seller is acting as Countrywide's agent and bailee with respect to any Document, Seller shall permit Countrywide (and its auditors, if requested by Countrywide) to: (i) inspect any such Document and the records of Seller related to this Addendum and (ii) make copies of the Documents and the records of Seller related to this Addendum, which such inspection or making of copies may occur on Seller's premises during normal business hours after reasonable notice by Countrywide to Seller.

(e)   No Set-Off. Notwithstanding anything contained in this Addendum or the Agreements to the contrary, Seller shall not at any time exercise or seek to enforce any claim, right or remedy, including any statutory or common law rights of set-off, if any, that the Seller may otherwise have against all or any part of the Documents.

6.   **Successors and Assigns.** This Addendum shall bind and inure to the benefit of and be enforceable by Seller and Countrywide and the respective permitted successors and assigns of Seller and the successors and assigns of Countrywide. This Addendum shall not be assigned, pledged or hypothecated by Seller without the prior written consent of Countrywide. Seller shall not delegate or appoint any other person or entity to perform or carry out any of its duties, responsibilities or obligations under this Addendum, unless Seller has obtained the prior written consent of Countrywide. This Addendum may be assigned, pledged or hypothecated or otherwise transferred or encumbered by Countrywide without the consent of Seller.

7.   **Severability Clause.** Any part, provision, representation or warranty of this Addendum which is prohibited or which is held to be void or unenforceable shall be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof. Any part, provision, representation or warranty of this Addendum which is prohibited or unenforceable or is held to be void or unenforceable in any relevant jurisdiction shall be ineffective, as to such jurisdiction, to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction as to any Loan shall not invalidate or render unenforceable such provision in any other jurisdiction. To the extent permitted by applicable law, the parties hereto waive any provision of law which prohibits or renders void or unenforceable any provision hereof.

8.   **Governing Law.** This Addendum shall be governed by and interpreted in accordance with the laws of the State of California applicable to agreements entered into and wholly performed within said jurisdiction.

9.   **Loan Purchase Agreement in Full Force and Effect.**   Nothing contained in this Addendum shall be deemed to waive any rights, remedies or privileges of Countrywide under the Agreements. Except as expressly modified herein, the Loan Purchase Agreement and Guide, and all of the terms and conditions thereof, shall remain in full force and effect and apply equally to the terms hereof.

10.   **Counterparts.** This Addendum may be executed in counterparts, each of which when so executed shall be an original, but all of which taken together shall constitute one and the same agreement, and either of the parties hereto may execute this Addendum by signing such counterpart.

(Signature page follows)

IN WITNESS WHEREOF, Seller and Countrywide have caused their names to be signed hereto by their respective officers thereunto duly authorized as of the date first above written.

COUNTRYWIDE HOME LOANS, INC.

By: _____

United Financial Mortgage Corp (#3132)

MARIUS NICOLAU

EVP, LOAN ACQUISITIONS


By: _____

Name: CHRIS KLOSER

Title: EVP

## *Addendum to Loan Purchase Agreement*

# MANDATORY COMMITMENTS (BULK SALES)

*This Agreement (the "Addendum") constitutes an Addendum to that Loan Purchase Agreement dated* __February 7,__ _____, 2001 *by and between Countrywide Home Loans, Inc., a New York Corporation ("Countrywide"), and* __United Financial Mortgage__ __an Illinois__ *("Seller") (the "Agreement").*

This Addendum is for the purpose of setting forth the obligations of the Seller to Countrywide in accordance with Countrywide's mandatory commitment program, which is further described in the Seller's Manual. The terms and conditions of the Loan Purchase Agreement are incorporated herein by reference. This Addendum shall modify, amend, and form a part of the terms of the Agreement. All terms contained herein shall have the same meaning as in the Agreement, unless otherwise defined herein. In the event of any conflict between the terms and conditions of the Agreement and this Addendum, unless otherwise defined herein. In the commitment program, the terms and conditions of this Addendum shall prevail.

## GENERAL

Sellers may elect to deliver loans to Countrywide under the mandatory commitment program by entering into a mandatory delivery commitment (a "Commitment") to deliver a specified amount and type of loan on or before a specified date. Under the mandatory commitment program, the Seller shall be obligated to pay a mark-to-market pair-off fee if the Seller fails to deliver qualifying loans by the date specified in the Commitment (the "Commitment Expiration Date"), in the amount specified in the Commitment (the "Commitment Amount"), or otherwise under the terms provided in the applicable Commitment.

## I. PAIR-OFF ASSESSMENT

Pair-off fees shall be assessed as of the dates and times (the "Pair-Off Assessment Date") provided for:

(a) as of the date and time that the Seller notifies Countrywide of its election for a reduction of any portion of the Commitment Amount; or

(b) as of the date and time that the Seller notifies Countrywide of its election for a program substitution as described in the Seller's Manual for any portion of the mandatory commitment (such substitution to be treated as a reduction of the Commitment Amount); or

(c) as of the close of the Commitment Expiration Date if qualifying loan files are not delivered by seller in an amount equal to the Commitment Amount, less the allowable delivery variance provided for in the Commitment; or

(d) as of the close of business on such date subsequent to the Commitment Expiration Date that Countrywide determines that a loan delivered by the Commitment Expiration Date was not eligible for purchase.

## II. PAIR-OFF CALCULATION AND PAYMENT OF PAIR-OFF FEES

The pair-off fee shall be assessed and calculated as provided:

(a) A pair-off fee shall be assessed should the Seller notify Countrywide of its election to pair-off all or a portion of the Commitment Amount prior to the Commitment Expiration Date pursuant to the provisions of paragraphs I(a) and I(b) above. In such event, the Commitment shall be amended to require Seller to deliver, and for Countrywide to purchase, the original Commitment Amount reduced by the amount paired-off by Seller (the "Amended Commitment Amount") with all other terms of the Commitment remaining unchanged. Any such amount which Seller elects to pair-off shall hereinafter be referred to as the "Amount Paired-Off By Seller."

(b) A pair-off fee shall be assessed should Seller fail to deliver qualifying loans by the Commitment Expiration Date with an aggregate principal balance equal to the Commitment Amount or the Amended Commitment Amount applicable, less the allowable delivery variance provided for in the Commitment. Any such shortfall in the delivery of qualifying loans by the Commitment Expiration Date shall be hereinafter referred to as the "Delivery Shortfall Amount."

(c) The pair-off fee to be assessed on Amounts Paired-Off by Seller and Delivery Shortfall Amounts shall be calculated by multiplying the Amount Paired-Off by Seller or Delivery Shortfall Amount, as applicable, by a percentage equal to the sum of .125% (the "Administrative Fee"), plus the positive price difference, if any, between the percentage price posted by Countrywide as of the Pair-Off Assessment Date (on the loans which were the subject of the Commitment), and the percentage price to have been paid by Countrywide pursuant to the Commitment, and the price on the Pair-Off Assessment Date shall be determined as follows:

i. If the Pair-Off Assessment Date is the Commitment Expiration Date, or a subsequent date, pursuant to paragraph I(c) and (d) above, the posted percentage price to be used shall be that percentage price posted by Countrywide


**Countrywide**
CORRESPONDENT LENDING
• 29 09

PAGE 1

applicable to the earliest delivery option available on such Pair-Off Assessment Date (e.g., the price for a mandatory 2 day delivery).

ii. If the Pair-Off Assessment Date is earlier than the Commitment Expiration Date pursuant to paragraphs I (a) or I (b), then the posted price to be used shall be the posted mandatory delivery price applicable to the delivery period option which expires closest to, but not after the Commitment Expiration Date. For example, if the Pair-Off Assessment Date is 10 days prior to the Commitment Expiration Date, the posted price to be used for the pair-off fee calculation shall be Countrywide's 29 day mandatory delivery price on the Pair-Off Assessment Date. (For purposes of this example, available mandatory delivery periods are: 2, 7, 15, 29, 45, 60 and 75 days.)

(d) Notwithstanding the provisions of paragraph II (c) above, the administrative fee shall be a minimum of $100.

(e) The pair-off fees assessed hereunder shall be due and payable within five (5) business days after the Pair-Off Assessment Date. In addition to Countrywide's other remedies, if pair-off fees are not paid within this time period, Seller agrees that Countrywide shall be entitled to net and offset such fees against other amounts owed by Countrywide to Seller.

AUTHORIZED AGENTS

The following person(s) have been authorized by appropriate resolution of Seller to execute this Addendum and all documents necessary and appropriate to bind Seller pursuant to the terms of this Addendum. Countrywide may rely on any instructions received from such person(s) and the same shall be fully binding on Seller until such time as Countrywide shall receive written instructions revoking the authority of such person to bind Seller to any future transactions.

1. Chris Kloster

2. Steve Khoshabe

3. _____

4. _____


COUNTRYWIDE HOME LOANS, INC. ("BUYER")

BY: _____

TITLE: SVP & CFO, CLD

DATE: _____

("SELLER") United Financial Mortgage Corp.

BY: _____

TITLE: Executive Vice President/CFO

DATE: February 7, 2001



# Addendum To Loan Purchase Agreement I

## MANDATORY COMMITMENTS (BULK SALES)

This Agreement (the "Addendum") constitutes an addendum to that Loan Purchase Agreement dated April 19 , 1993 by and between Countrywide Funding Corporation, a New York Corporation ("Countrywide"), and **United Financial Mortgage Corp., an IL. Mortgage Banker** ("Seller") (the "Agreement"). This Addendum is for the purpose of setting forth the obligations of the Seller to Countrywide in accordance with Countrywide's mandatory commitment program, which is futher described in the Seller's Manual. The terms and conditions of the Loan Purchase Agreement are incorporated herein by reference. This Addendum shall modify, amend, and form a part of the terms of the Agreement. All terms contained herein shall have the same meaning as in the Agreement, unless otherwise defined herein. In the event of any conflict between the terms and conditions of the Agreement and this Addendum as it pertains to the mandatory commitment program, the terms and conditions of this Addendum shall prevail.

## GENERAL

Sellers may elect to deliver loans to Countrywide under the mandatory commitment program by entering into a mandatory delivery commitment (a "Commitment") to deliver a specified amount and type of loan on or before a specified date. Under the mandatory commitment program, the Seller shall be obligated to pay a mark-to-market pair-off fee if Seller fails to deliver qualifying loans by the date specified in the Commitment (the "Commitment Expiration Date"), in the amount specified in the Commitment (the "Commitment Amount"), or otherwise under the terms provided in the applicable Commitment.

## I. PAIR-OFF ASSESSMENT

Pair-off fees shall be assessed as of the dates and time (the "Pair-Off Assessment Date") provided for:

   (a)   as of the date and time that Seller notifies Countrywide of its election for a reduction of any portion of the Commitment Amount; or

   (b)   as of the date and time that Seller notifies Countrywide of its election for a program substitution as described in the Seller's Manual for any portion of the mandatory commitment (such substitution to be treated as a reduction of the Commitment Amount); or

   (c)   as of the close of the Commitment Expiration Date if qualifying loan files are not delivered by seller in an amount equal to the Commitment Amount.

## II. PAIR-OFF CALCULATION AND PAYMENT OF PAIR-OFF FEES

The pair-off fee shall be assessed and calculated as provided:

   (a)   A pair-off fee shall be assessed should Seller notify Countrywide of its election to pair-off all or a portion of the Commitment Amount prior to the Commitment Expiration Date pursuant to the provisions of paragraphs I (a) and I (b) above. In such event, the Commitment shall be amended to require Seller to deliver, and for Countrywide to purchase the original Commitment Amount reduced by the amount paired-off by Seller ( the "Amended Commitment Amount") with all other terms of the Commitment remaining unchanged. Any such amount which Seller elects to pair-off shall hereinafter be referred to as the "Amount Paired-Off By Seller."

   (b)   A pair-off fee shall be assessed should Seller fail to deliver qualifying loans by the Commitment Expiration Date with an aggregate principal balance equal to the Commitment Amount or the Amended Commitment Amount as applicable, less the allowable delivery variance provided for in the Commitment. Any such shortfall in the delivery of qualifying loans by the Commitment Expiration Date shall be hereinafter referred to as the "Delivery Shortfall Amount."

   (c)   Except as provided in paragraph II (d) below, the pair-off fee to be assessed on Amounts Paired-Off by Seller and Delivery Shortfall Amounts shall be calculated by multiplying the Amount Paired-Off By Seller or Delivery Shortfall Amount, as applicable, by a percentage equal to the sum of .125% (the "Administrative Fee"), plus the positive price difference, if any (on the loans which are the subject of the Commitment), which shall be determined by subtracting from the percentage price posted by Countrywide on such loans as of the Pair-Off Assessment Date, the percentage price to have been paid by Countrywide on such loans pursuant to the Commitment. Countrywide's posted percentage price on the Pair-Off Assessment Date shall be determined as follows:



**COUNTRYWIDE**
**CORRESPONDENT LENDING**
Equal Housing Lender ©1994 Countrywide Funding Corporation.
All rights reserved. Countrywide is a registered service mark of
Countrywide Credit Industries, Inc.

## Addendum To Loan Purchase Agreement 2

    i. If the Pair-Off Assessment Date is the Commitment Expiration Date pursuant to paragraph I (c) above, the posted percentage price to be used shall be that percentage price posted by Countrywide applicable to the earliest delivery option available on such Pair-Off Assessment Date (e.g., the price for 2 day delivery).

    ii. If the Pair-Off Assessment Date is earlier than the Commitment Expiration Date pursuant to paragraphs I (a) or I (b), then the posted price to be used shall be the posted mandatory delivery price applicable to the delivery period option which expires closest to, but not after the Commitment Expiration Date. For example, if the Pair-Off Assessment Date is 40 days prior to the Commitment Expiration Date, the posted price to be used for the pair-off fee calculation shall be Countrywide's 29 day mandatory delivery price on the Pair-Off Assessment Date. (For purposes of this example, available mandatory delivery periods as of June 1, 1994 are: 2, 7, 15, 29, 45, 60 and 75 days.)

(d) The pair-off fee's assessed hereunder shall be due and payable within five (5) business days after the Pair-Off Assessment Date. In addition to Countrywide's other remedies, if pair-off fees due are not paid within this time period, Seller agrees that Countrywide shall be entitled to net and offset such by Countrywide to Seller.

### AUTHORIZED AGENTS

The following person(s) have been authorized by appropriate resolution of Seller to execute this addendum and all documents necessary and appropriate to bind Seller pursuant to the terms of this Addendum. Countrywide may rely on any instructions received from such person (s) and the same shall be fully binding on Seller until such time as Countrywide shall receive written instructions revoking the authority of such person to bind Seller to any future transactions.

1.   Joseph Khoshabe
2.   _____
3.   _____
4.   _____


COUNTRYWIDE FUNDING CORP. ("BUYER")

BY: _____

TITLE: VP

DATE: 8-2-94


United Financial Mortgage Corp. ("SELLER")

BY: _____

TITLE: President

DATE: 7-22-94

COUNTRYWIDE
CORRESPONDENT LENDING

Equal Housing Lender. ©1994 Countrywide Funding Corporation.
All rights reserved. Countrywide is a registered service mark of
Countrywide Credit Industries, Inc.

804-995   A. E. #9

# Addendum To Loan Purchase Agreement 1

## MANDATORY COMMITMENTS (BULK SALES)

This Agreement (the "Addendum") constitutes an addendum to that Loan Purchase Agreement dated MAY 27, , 1994 by and between Countrywide Funding Corporation, a New York Corporation ("Countrywide"), and UNITED FINANCIAL MORTGAGE CORP. , a ILLINOIS CORPORATION ("Seller") (the "Agreement"). This Addendum is for the purpose of setting forth the obligations of the Seller to Countrywide in accordance with Countrywide's mandatory commitment program, which is further described in the Seller's Manual. The terms and conditions of the Loan Purchase Agreement are incorporated herein by reference. This Addendum shall modify, amend, and form a part of the terms of the Agreement. All terms contained herein shall have the same meaning as in the Agreement, unless otherwise defined herein. In the event of any conflict between the terms and conditions of the Agreement and this Addendum as it pertains to the mandatory commitment program, the terms and conditions of this Addendum shall prevail.

### GENERAL

Sellers may elect to deliver loans to Countrywide under the mandatory commitment program by entering into a mandatory delivery commitment (a "Commitment") to deliver a specified amount and type of loan on or before a specified date. Under the mandatory commitment program, the Seller shall be obligated to pay a mark-to-market pair-off fee if Seller fails to deliver qualifying loans by the date specified in the Commitment (the "Commitment Expiration Date"), in the amount specified in the Commitment (the "Commitment Amount"), or otherwise under the terms provided in the applicable Commitment.

### I.  PAIR-OFF ASSESSMENT

Pair-off fees shall be assessed as of the dates and time (the "Pair-Off Assessment Date") provided for:

(a)  as of the date and time that Seller notifies Countrywide of its election for a reduction of any portion of the Commitment Amount; or

(b)  as of the date and time that Seller notifies Countrywide of its election for a program substitution as described in the Seller's Manual for any portion of the mandatory commitment (such substitution to be treated as a reduction of the Commitment Amount); or

(c)  as of the close of the Commitment Expiration Date if qualifying loan files are not delivered by seller in an amount equal to the Commitment Amount.

### II.  PAIR-OFF CALCULATION AND PAYMENT OF PAIR-OFF FEES

The pair-off fee shall be assessed and calculated as provided:

(a)  A pair-off fee shall be assessed should Seller notify Countrywide of its election to pair-off all or a portion of the Commitment Amount prior to the Commitment Expiration Date pursuant to the provisions of paragraphs I (a) and I (b) above. In such event, the Commitment shall be amended to require Countrywide to deliver, and for Countrywide to purchase the original Commitment Amount reduced by the amount paired-off by Seller ( the "Amended Commitment Amount") with all other terms of the Commitment remaining unchanged. Any such amount which Seller elects to pair-off shall hereinafter be referred to as the "Amount Paired-Off By Seller."

(b)  A pair-off fee shall be assessed should Seller fail to deliver qualifying loans by the Commitment Expiration Date with an aggregate principal balance equal to the Commitment Amount or the Amended Commitment Amount as applicable, less the allowable delivery variance provided for in the Commitment. Any such shortfall in the delivery of qualifying loans by the Commitment Expiration Date shall be hereinafter referred to as the "Delivery Shortfall Amount."

(c)  Except as provided in paragraph II (d) below, the pair-off fee to be assessed on Amounts Paired-Off by Seller and Delivery Shortfall Amounts shall be calculated by multiplying the Amount Paired-Off By Seller or Delivery Shortfall Amount, as applicable, by a percentage equal to the sum of .125% (the "Administrative Fee"), plus the positive price difference, if any (on the loans which are the subject of the Commitment), which shall be determined by subtracting from the percentage price posted by Countrywide on such loans as of the Pair-Off Assessment Date, the percentage price to have been paid by Countrywide on such loans pursuant to the Commitment. Countrywide's posted percentage price on the Pair-Off Assessment Date shall be determined as follows:

 COUNTRYWIDE. CORRESPONDENT LENDING   Equal Housing Lender. ©1994 Countrywide Funding Corporation. All rights reserved. Countrywide is a registered service mark of Countrywide Credit Industries, Inc.

# Addendum To Loan Purchase Agreement 2

     i. If the Pair-Off Assessment Date is the Commitment Expiration Date pursuant to paragraph I (c) above, the posted percentage price to be used shall be that percentage price posted by Countrywide applicable to the earliest delivery option available on such Pair-Off Assessment Date (e.g., the price for 2 day delivery).

     ii. If the Pair-Off Assessment Date is earlier than the Commitment Expiration Date pursuant to paragraphs I (a) or I (b), then the posted price to be used shall be the posted mandatory delivery price applicable to the delivery period option which expires closest to, but not after the Commitment Expiration Date. For example, if the Pair-Off Assessment Date is 40 days prior to the Commitment Expiration Date, the posted price to be used for the pair-off fee calculation shall be Countrywide's 29 day mandatory delivery price on the Pair-Off Assessment Date. (For purposes of this example, available mandatory delivery periods as of June 1, 1994 are: 2, 7, 15, 29, 45, 60 and 75 days.)

  (d) The pair-off fee's assessed hereunder shall be due and payable within five (5) business days after the Pair-Off Assessment Date. In addition to Countrywide's other remedies, if pair-off fees due are not paid within this time period, Seller agrees that Countrywide shall be entitled to net and offset such by Countrywide to Seller.

## AUTHORIZED AGENTS

The following person(s) have been authorized by appropriate resolution of Seller to execute this addendum and all documents necessary and appropriate to bind Seller pursuant to the terms of this Addendum. Countrywide may rely on any instructions received from such person (s) and the same shall be fully binding on Seller until such time as Countrywide shall receive written instructions revoking the authority of such person to bind Seller to any future transactions.

1.   JOSEPH KHOSHABE
2.   TOM SAMPSON
3.
4.


COUNTRYWIDE FUNDING CORP. ("BUYER")

BY: *B.T. Herlgin*

TITLE: *VP*

DATE: *10-10-94*


UNITED FINANCIAL MORTGAGE CORP. ("SELLER")

BY:

TITLE: PRESIDENT

DATE: MAY 27, 1994

**COUNTRYWIDE**
*CORRESPONDENT LENDING*

Equal Housing Lender. ©1994 Countrywide Funding Corporation.
All rights reserved. Countrywide is a registered service mark of
Countrywide Credit Industries, Inc.

# Addendum to Loan Purchase Agreement - Subprime

This Addendum is made this **22nd** day of **April**, **2002** between Countrywide Home Loans, Inc., ("Countrywide") and **United Financial Mortgage** ("Seller") to the Loan Purchase Agreement ("LPA") dated as of **February 7, 2001**

**1. Definitions.** The terms "Subprime Loan", "Mortgage Loan Schedule", "Commitment", "Commitment Letter", "Pool Commitment", "Spot Commitment" and "Closing Date" shall have the meanings set forth therefor in the "Guide" (as defined below).

**2. Commitment to Purchase Loans.** The following is hereby added at the end of the first sentence of Section 2: "except that for the purposes of Subprime Loans, the procedure pursuant to which Seller may commit to sell a Subprime Loan to Countrywide is detailed in the Subprime section of the Guide."

**3. Representations and Warranties.**

A. Section 6.A (7) is amended and restated in its entirety as follows: "All federal and state laws, rules and regulations applicable to the Loan for its applicable Loan Type have been complied with, including but not limited to: the Real Estate Settlement Procedures Act, the Flood Disaster Protection Act, the Federal Consumer Credit Protection Act including the Truth-in-Lending and Equal Credit Opportunity Acts, the Federal Fair Housing Act, the Home Ownership and Equity Protection Act of 1994 and all applicable federal and state statutes or regulations governing fraud, lack of consideration, unconscionability, consumer credit transactions, consumer protection, interest or other charges, licensing and mortgage insurance."

B. Section 6.B (1) is amended and restated in its entirety as follows: "Seller is duly organized, validly existing and in good standing under the laws of its state of incorporation and is qualified and/or licensed as necessary to transact business, including the originating and selling of each Loan, including without limitation, with rates of interest, loan type and other terms provided in the Loan documents, and is in good standing in each state where property securing a Loan is located."

C. Section 6.A (18) is added as follows: "For each Subprime Loan, all information regarding such Subprime Loan in the Confirmation therefor and the Mortgage Loan Schedule attached to such Confirmation is true and correct."

**4. Purchase Limitation.** The obligation to purchase any Subprime Loans identified in a Confirmation does not extend to any Loans that would violate any representation and warranty by Seller contained in the LPA.

**5. Purchase Price.** The purchase price of each Subprime Loan shall be calculated by multiplying the unpaid principal balance of each Subprime Loan (as adjusted for the borrower's next payment) on the Closing Date by its applicable purchase price percentage calculated in accordance with the rate sheet at the time of purchase for "Spot" Commitments, or as stated in the Commitment letter for "Pool" Commitments (the **"Purchase Price"**). If a borrower's payment is due 15 days or earlier after the Closing Date (an "Early Payment"), the portion of such payment attributable to principal shall be deducted from the unpaid principal balance for calculating the Purchase Price. Seller shall then retain borrower's Early Payment when made. The purchase proceeds paid by Countrywide to Seller shall consist of the Purchase Price plus accrued interest as of the Closing Date and less (i) any positive escrow balances, and (ii) any amounts actually owed and paid by Seller for Mortgage Loan tax service contracts and flood certification determinations which are transferable and transferred to Countrywide on the Closing Date. Without limitation on Countrywide's other rights hereunder, the Purchase Price is subject to change if it is determined that the loan characteristics of the Subprime Loan to be purchased differ from the characteristics represented on the Mortgage Loan Schedule

**6. Premium Recapture.** Should any Borrower prepay a Subprime Loan during the twelve month period following Countrywide's purchase of the loan, Seller shall reimburse Countrywide, upon demand, some or all of the purchase price premium above par paid by Countrywide. The reimbursement shall be calculated using the following formula for "Spot" commitments and "Pool" commitments unless stated otherwise in the "Pool" commitment letter:

| Purchase Price Premium Paid by Countrywide | x | 12 minus the number of months expired since the date of purchase / 12 | − | Prepay Penalty | = | Premium Refund |
|---|---|---|---|---|---|---|

**7. Seller's Repurchase Obligations.** Section 7.A (4) is amended and restated in its entirety as follows: "If the first payment due Countrywide is not received by Countrywide, whether from the borrower directly or forwarded by Seller if the Borrower has submitted the payment to Seller, within 90 days of the first payment due Countrywide. For this purpose a Borrower shall be considered to be 90 days delinquent with respect to the first monthly payment due Countrywide if the payment is not received by Countrywide

**Countrywide**
CORRESPONDENT LENDING

FORMS & COUNTY LMTD 8  © 2002 COUNTRYWIDE HOME LOANS, INC.  TRADEMARK(S) NAMES ARE THE PROPERTY OF COUNTRYWIDE CREDIT INDUSTRIES, INC. AND/OR ITS SUBSIDIARIES.  ARIZONA MORTGAGE BANKER LICENSE # 0906
ICOND; LICENSED BY THE DEPARTMENT OF CORPORATIONS UNDER THE CALIFORNIA RESIDENTIAL MORTGAGE LENDING ACT, GEORGIA RESIDENTIAL MORTGAGE LICENSEE, ILLINOIS RESIDENTIAL MORTGAGE LICENSEE, THE DEPARTMENT OF BANKING...

within three months of the payment due date, regardless of the number of days in the month. For example, if the due date of the first payment due to Countrywide is January 15th and the Borrower has not made his/her January 15th payment by April 14th, the Borrower shall be considered 90 days delinquent with respect to the January 15th payment. Seller shall not have the right to advance funds for or on behalf of a Borrower for any delinquent payment or to otherwise make funds available to any Borrower to avoid or cure a default by the Borrower. A payment for which Countrywide deducted funds at the time it purchased the Loan from Seller shall not be considered the first payment due Countrywide."

**8. Repurchase Price.** For the purposes of determining the repurchase price of a Subprime Loan, Sections 8.A(4), 8.B(4) and 8.C(4) are deleted, and Sections 8.A(1), 8.B(1) and 8.C(1) are amended and restated in their entirety as follows: "The repurchase price shall be the original Purchase Price (as defined in this Addendum), less principal reduction made since the Closing Date."

**9. Seller's Guide.** All references to "Countrywide's Correspondent Lender Division Loan Purchase Program Seller's Manual" or "Manual" throughout the LPA are replaced with "Countrywide's Correspondent Lending Seller's Guide" or "Guide", respectfully. Seller acknowledges receipt of the Guide, which may be amended, modified or supplemented from time to time by Countrywide, in its sole and absolute discretion, which amendments, modifications or supplements shall be effective upon Countrywide's sending the same to Seller.

**10. Brokers.** Neither party has employed or otherwise engaged, nor shall employ, or otherwise engage, any broker or finder in connection with the negotiation or execution of the LPA, this Addendum or any Commitment, nor with respect to the transactions contemplated by this Addendum, in such a manner as to give rise to any claim, against any party, for any brokerage commission, finder's fee or similar payment. Each party shall indemnify and defend the other party for any claims for brokerage commission, finder's fee or similar payment based upon statements or agreements alleged to have been made by the indemnifying party.

**11. LPA Terms.** All provisions of the LPA shall be applicable and remain valid, binding and in full force and effect, except as specifically modified herein.

**The parties hereto do hereby agree to the foregoing as of the date above first written.**

SELLER:

United Financial Mortgage Corp.

a: n Illinois corporation

By: _____
   SIGNATURE

Name: Steve Khoshabe

Title: Executive Vice President

COUNTRYWIDE:

COUNTRYWIDE HOME LOANS, INC.

A NEW YORK CORPORATION

By: _____
   SIGNATURE

Name: CATHERINE A KAISER

Title: SENIOR VICE PRESIDENT



RECEIVED
APR 29 2002
BY: 3132

 Countrywide
CORRESPONDENT LENDING

PAGE 2

# EXHIBIT 8

#3132

## ADDENDUM TO LOAN PURCHASE AGREEMENT
## FOR RELATED SELLER

This Addendum to Loan Purchase Agreement for Related Seller (the "Addendum"), dated November 6, 2006, modifies that certain Loan Purchase Agreement dated February 27, 2001 (including all Commitments, Amendments, Addenda, and Assignments related thereto, collectively, the "Loan Purchase Agreement"), by and between Countrywide Home Loans, Inc. ("Countrywide") and United Financial Mortgage Corporation ("Seller") as follows:

1.  Alliance Bancorp ("Related Seller") is an affiliate or a subsidiary of Seller.

2.  Countrywide, Seller and Related Seller hereby add Related Seller as an additional named "Seller" to the Loan Purchase Agreement, effective as of February 27, 2001.

3.  By being added as an additional named "Seller" to the Loan Purchase Agreement, Related Seller agrees to be bound by all of the rights, liabilities and obligations of "Seller" under the Loan Purchase Agreement. This includes, without limitation, being bound by all the rights, liabilities and obligations of "Seller" under the Loan Purchase Agreement with respect to any loans that Seller, Related Seller or any other related seller sold to Countrywide under the Loan Purchase Agreement prior to the date hereof or that Seller, Related Seller or any other related seller sells or offers to sell to Countrywide under the Loan Purchase Agreement on or after the date hereof.

4.  Seller and Related Seller hereby expressly agree to be jointly and severally liable for all rights, liabilities and obligations of "Seller" under, and all terms and conditions pursuant to, the Loan Purchase Agreement. This includes, without limitation, being jointly and severally liable for any repurchase and indemnification obligations of "Seller" under the Loan Purchase Agreement with respect to any loans that Seller, Related Seller or any other related seller sold to Countrywide under the Loan Purchase Agreement prior to the date hereof or that Seller, Related Seller or any other related seller sells or offers to sell to Countrywide under the Loan Purchase Agreement on or after the date hereof, regardless of which party sold or sells such loans to Countrywide.

5.  In the event of any conflict between the terms and conditions of the Loan Purchase Agreement and this Addendum, the terms and conditions of this Addendum shall prevail.

6.  All other terms and conditions of the Loan Purchase Agreement shall remain in full force and effect.

7.  This Addendum may be executed in any number of counterparts by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which when taken together shall constitute one and the same Addendum. Telecopy signatures shall be deemed valid and binding to the same extent as the original.

THE PARTIES ACKNOWLEDGE AND AGREE TO THIS ADDENDUM AS OF THE DATE ABOVE FIRST WRITTEN:

**United Financial Mortgage Corporation** (Seller):

By: _____

Name: _____

Its: _____

**Alliance Bancorp** (Related Seller):

By: _____

Name: _____

Its: _____

**Countrywide Home Loans, Inc.:**

By: _____

Name: _____

Its: _____

Version: 1/04

# ADDENDUM TO LOAN PURCHASE AGREEMENT
## FOR RELATED SELLER

This Addendum to Loan Purchase Agreement for Related Seller (the "Addendum"), dated November 6, 2006, modifies that certain Loan Purchase Agreement dated February 27, 2001 (including all Commitments, Amendments, Addenda, and Assignments related thereto, collectively, the "Loan Purchase Agreement"), by and between Countrywide Home Loans, Inc. ("Countrywide") and United Financial Mortgage Corporation ("Seller") as follows:

1.  Alliance Bancorp ("Related Seller") is an affiliate or a subsidiary of Seller.

2.  Countrywide, Seller and Related Seller hereby add Related Seller as an additional named "Seller" to the Loan Purchase Agreement, effective as of February 27, 2001.

3.  By being added as an additional named "Seller" to the Loan Purchase Agreement, Related Seller agrees to be bound by all of the rights, liabilities and obligations of "Seller" under the Loan Purchase Agreement. This includes, without limitation, being bound by all the rights, liabilities and obligations of "Seller" under the Loan Purchase Agreement with respect to any loans that Seller, Related Seller or any other related seller sold to Countrywide under the Loan Purchase Agreement prior to the date hereof or that Seller, Related Seller or any other related seller sells or offers to sell to Countrywide under the Loan Purchase Agreement on or after the date hereof.

4.  Seller and Related Seller hereby expressly agree to be jointly and severally liable for all rights, liabilities and obligations of "Seller" under, and all terms and conditions pursuant to, the Loan Purchase Agreement. This includes, without limitation, being jointly and severally liable for any repurchase and indemnification obligations of "Seller" under the Loan Purchase Agreement with respect to any loans that Seller, Related Seller or any other related seller sold to Countrywide under the Loan Purchase Agreement prior to the date hereof or that Seller, Related Seller or any other related seller sells or offers to sell to Countrywide under the Loan Purchase Agreement on or after the date hereof, regardless of which party sold or sells such loans to Countrywide.

5.  In the event of any conflict between the terms and conditions of the Loan Purchase Agreement and this Addendum, the terms and conditions of this Addendum shall prevail.

6.  All other terms and conditions of the Loan Purchase Agreement shall remain in full force and effect.

7.  This Addendum may be executed in any number of counterparts by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which when taken together shall constitute one and the same Addendum. Telecopy signatures shall be deemed valid and binding to the same extent as the original.

THE PARTIES ACKNOWLEDGE AND AGREE TO THIS ADDENDUM AS OF THE DATE ABOVE FIRST WRITTEN:

**United Financial Mortgage Corporation (Seller):**

By: _____

Name: _____

Its: _____

**Alliance Bancorp (Related Seller):**

By: _____

Name: _____

Its: _____

**Countrywide Home Loans, Inc.:**

By: _____

Name: _____

Its: _____

Version: 1/04

## ADDENDUM TO LOAN PURCHASE AGREEMENT
## FOR RELATED SELLER

This Addendum to Loan Purchase Agreement for Related Seller (the "Addendum"), dated November 2, 2006 modifies that certain Loan Purchase Agreement dated February 7, 2001 (including all Commitments, Amendments, Addenda, and Assignments related thereto, collectively, the "Loan Purchase Agreement"), by and between Countrywide Home Loans, Inc. ("Countrywide") and United Financial Mortgage Corporation ("Seller") as follows:

1. Alliance Bancorp ("Related Seller") is an affiliate of Seller.

2. Countrywide, Seller and Related Seller hereby add Related Seller as an additional named "Seller" to the Loan Purchase Agreement, effective as of November 2, 2006.

3. By being added as an additional named "Seller" to the Loan Purchase Agreement, Related Seller agrees to be bound by all of the rights, liabilities and obligations of "Seller" under the Loan Purchase Agreement. This includes, without limitation, being bound by all the rights, liabilities and obligations of "Seller" under the Loan Purchase Agreement with respect to any loans that Seller, Related Seller or any other related seller sold to Countrywide under the Loan Purchase Agreement prior to the date hereof or that Seller, Related Seller or any other related seller sells or offers to sell to Countrywide under the Loan Purchase Agreement on or after the date hereof.

4. Seller and Related Seller hereby expressly agree to be jointly and severally liable for all rights, liabilities and obligations of "Seller" under, and all terms and conditions pursuant to, the Loan Purchase Agreement. This includes, without limitation, being jointly and severally liable for any repurchase and indemnification obligations of "Seller" under the Loan Purchase Agreement with respect to any loans that Seller, Related Seller or any other related seller sold to Countrywide under the Loan Purchase Agreement prior to the date hereof or that Seller, Related Seller or any other related seller sells or offers to sell to Countrywide under the Loan Purchase Agreement on or after the date hereof, regardless of which party sold or sells such loans to Countrywide.

5. In the event of any conflict between the terms and conditions of the Loan Purchase Agreement and this Addendum, the terms and conditions of this Addendum shall prevail.

6. All other terms and conditions of the Loan Purchase Agreement shall remain in full force and effect.

THE PARTIES ACKNOWLEDGE AND AGREE TO THIS ADDENDUM AS OF THE DATE ABOVE FIRST WRITTEN:

United Financial Mortgage Corporation (Seller):

By: _Lisa A Duehring_

Name: _Lisa A Duehring_

Its: _President_

Alliance Bancorp. (Related Seller):

By: _Lisa A Duehring_

Name: _Lisa A Duehring_

Its: _President_

Countrywide Home Loans, Inc.:

By: _____

Name: KEVIN A CRICHTON

Its: EVP RISK Management

# EXHIBIT 9

#3132

Recording Requested by
Countrywide Home Loans, Inc.

AND WHEN RECORDED MAIL TO:

Countrywide Home Loans, Inc.
155 North Lake Avenue, MSN 5-53
Post Office Box 7137
Pasadena, California 91109-7137
Attention: Lender Approval Department

Space Above for Recorder's Use

## LIMITED POWER OF ATTORNEY

### KNOW ALL MEN BY THESE PRESENTS:

WHEREAS, Countrywide Home Loans, Inc., a New York corporation ("Countrywide") has recently changed its name from Countrywide Funding Corporation;

WHEREAS, United Financial Mortgage Corp. _____, a corporation organized and existing under the laws of Illinois , ("Lender") sells, transfers and assigns mortgage loans to Countrywide pursuant to a written agreement(s) between Countrywide and Lender;

WHEREAS, Lender may, from time to time, incorrectly endorse the promissory notes and deliver assignments of the underlying security instruments relating to such mortgage loans in Countrywide's prior name (Countrywide Funding Corporation); and

WHEREAS, Lender has agreed to give to Countrywide a power of attorney on the terms and conditions contained herein in order to correct such notes endorsements and security assignments.

NOW, THEREFORE, Lender hereby constitutes and appoints Countrywide, its true and lawful Attorney-in-Fact and agent, with full power and authority hereby conferred in its name, place and stead and for its use and benefit, to correct any endorsement by Lender of any promissory note or any assignment by Lender of any mortgage instrument relating to any loan which Lender has sold, transferred and assigned to Countrywide in order to correct such note endorsement or assignment to properly reflect Countrywide's name change from "Countrywide Funding Corporation" to "Countrywide Home Loans, Inc.".

The undersigned gives to said Attorney-in-Fact and agent full power and authority to execute such instruments and to do and perform all and every act and thing requisite, necessary and proper to carry into effect the power or powers granted by or under this Limited Power of Attorney as fully, to all intents and purposes, as the undersigned might or could do, and hereby does ratify and confirm all that said Attorney-in-Fact and agent shall lawfully do or cause to be done by authority hereof.

Third parties without actual notice may rely upon the power granted under this Limited Power of Attorney upon the exercise of such power by the Attorney-in-Fact and agent that all conditions precedent to such exercise of power have been satisfied and that this Limited Power of Attorney has not been revoked unless an instrument of revocation has been recorded.

Lender's Name including any DBAs:
United Financial Mortgage Corp.

By: _____

Its: President

Typed Name: Joseph Khoshabe

Typed Title: President

Date: March 13, 1996

## CERTIFICATE OF ACKNOWLEDGMENT

STATE OF ___Illinois___ )

                              )    SS.

COUNTY OF ___Cook___ )

On this ___13___ day of ___March___ 1996 before me, ___Glen A. Schap___, Notary Public, personally appeared ___Joseph Khoshabe___ personally known to me to be the person whose name is signed to the within instrument and acknowledged to me that he/she executed the same in his/her authorized capacity, and that by his/her signature on the instrument the person, or entity upon behalf of which the person acted, executed the instrument.

WITNESS my hand and official seal.

"OFFICIAL
GLEN A. SCHAP
NOTARY PUBLIC STATE
MY COMMISSION

# EXHIBIT 10

# 313

## HOME EQUITY LINES OF CREDIT
## PURCHASE PRICE PREMIUM OPTION FORM

As outlined in the Countrywide Correspondent Lending Seller's Guide, the purchase price premium amount may be paid under either of the following two options:

**1.   Up-front Premium Option:**
Seller will receive an up-front premium based on the first draw amount at closing, less any curtailments received from the borrower prior to date of sale to Countrywide. The up-front premium percentage is based upon the loan program and the start rate of the loan according to the rate published on the HELOC rate sheet.

**Or**

**2.   Participation Option:**
Seller will receive a participation premium for a five-year period. For each qualified loan (see Qualification Criteria below) funded under this option, the premium is based upon the average daily outstanding balance per month multiplied by $1/12^{th}$ of the participation percentage. The participation percentage is set at the time of loan registration, based upon rates published on the HELOC rate sheet. The participation premium payment will be paid monthly, 30 days after each end of the calendar month.

Qualification Criteria:
*   A participation premium will be paid on a loan only for those months when one or more entire payments (i.e., payments advancing the due date) are received and posted during the month.
*   Payments posted during months when the note rate is not fully indexed (i.e., loans with "discounted start rates" or "teaser rates") will not be eligible for a participation premium payment.
*   Payments posted during months when the note rate equals the maximum interest rate cap allowed by the loan documents will not be eligible for a participation premium payment.

Participation premium payment = average daily balance * participation rate/12
(subject to minimum and maximum amounts, if any)

Seller may choose either the Up-front Premium Option or the Participation Option. Seller may change its purchase price premium option at any time by providing written notice to Countrywide 30 days prior to the effective date of the change. The payment of purchase price premium on all HELOC loans sold to Countrywide by the Seller will be paid in accordance with the option selected on this form by the Seller.

**Seller hereby elects:** ✓ Up-front Premium Option _____ Participation Premium Option

Seller: United Financial Mortgage Corp.
Approved by:
Signature: Steve Khoshabe
Its: Executive Vice President/CFO
Date: 2/7/01

Revised 7/99

# EXHIBIT 11

## MORTGAGE LOAN PURCHASE AND INTERIM SERVICING AGREEMENT

This Mortgage Loan Purchase and Interim Servicing Agreement is dated and effective as of June 22, 2005 (the "Agreement"), between Alliance Bancorp, having an address at 91 Westborough Blvd., South San Francisco, California 94080 (the "Seller"), and Countrywide Home Loans, Inc., having an address at 4500 Park Granada, Calabasas, California 91302 (the "Purchaser").

## R E C I T A L S

The Seller desires to sell and transfer to the Purchaser from time to time, and the Purchaser desires to purchase from the Seller from time to time, certain mortgage loans identified in a Purchase Confirmation (as defined below) executed by the Purchaser and the Seller, including all servicing rights relating thereto (as defined herein, the "Mortgage Loans"), upon such terms set forth below.

In consideration of the promises and the mutual agreements and undertakings set forth herein, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

## ARTICLE I

## DEFINITIONS

Unless the context otherwise requires, all capitalized terms used herein shall have the meanings assigned to such terms in this Article I unless defined elsewhere herein. Any capitalized term used or defined in a Purchase Confirmation that conflicts with the corresponding definition set forth herein shall supercede such term:

**Adjustable Rate Mortgage Loan or ARM**: Any Mortgage Loan in which the related Mortgage Note contains a provision whereby the Mortgage Interest Rate is adjusted from time to time in accordance with the terms of such Mortgage Note.

**Agencies**: Both Fannie Mae and Freddie Mac.

**Agreement**: This Mortgage Loan Purchase and Interim Servicing Agreement, including all exhibits and supplements hereto, and all amendments hereof.

**ALTA**: The American Land Title Association or any successor thereto.

**Appraised Value**: With respect to any Mortgage Loan, the value of the related Mortgaged Property based upon the lesser of (i) the appraisal made for the originator at the time of origination of the Mortgage Loan or (ii) the purchase price of the Mortgaged Property at the time of origination of the Mortgage Loan, with respect to a refinanced Mortgage Loan in which the Mortgagor purchased the related Mortgaged Property twelve (12) months or more prior to the origination date of such refinanced Mortgage Loan, such value is based solely upon the appraisal made at the time of origination of such refinanced Mortgage Loan.

**Assignment of Mortgage**: An assignment of the Mortgage, notice of transfer or equivalent instrument in recordable form, sufficient under the laws of the jurisdiction wherein the related Mortgaged Property is located to reflect the sale of the Mortgage to the Purchaser.

**Balloon Mortgage Loan**: Any Mortgage Loan wherein the Mortgage Note matures prior to full amortization and requires a final and accelerated payment of principal.

**Business Day**: Any day other than (i) a Saturday or Sunday, or (ii) a day on which banking and savings and loan institutions in the State of California, are authorized or obligated by law or executive order to be closed.

**Closing**: The consummation of the sale and purchase of each Mortgage Loan Package.

**Closing Date**: With respect to each sale and purchase of a Mortgage Loan Package as contemplated hereunder, the closing date on which the purchase and sale of the Mortgage Loans constituting a Mortgage Loan Package is consummated, as set forth in the related Trade Confirmation and Purchase Confirmation.

**Code**: The Internal Revenue Code of 1986, as it may be amended from time to time or any successor statute thereto, and applicable U.S. Department of Treasury regulations issued pursuant thereto.

**Conventional Mortgage Loan**: A Mortgage Loan that is not insured by the FHA or guaranteed by the VA.

**Convertible Mortgage Loan**: Any Adjustable Rate Mortgage Loan that contains a provision whereby the Mortgagor is permitted to convert the Mortgage Loan to a fixed-rate mortgage loan in accordance with the terms of the related Mortgage Note.

**Custodial Agreement**: The agreement, if any, executed by the Seller, the Purchaser and the Custodian governing the retention of the originals of each Mortgage Note, Mortgage, Assignment of Mortgage and other Mortgage Loan Documents, in a form acceptable to the Purchaser.

**Custodian**: The custodian under the Custodial Agreement, or its successor in interest or assigns, or any successor to the Custodian under the Custodial Agreement, as therein provided.

**Cut-off Date**: With respect to each sale and purchase of a Mortgage Loan Package as contemplated hereunder, the cut-off date as set forth in the related Purchase Confirmation.

**Due Date**: The day of the month on which a Monthly Payment is due on a Mortgage Loan, exclusive of any days of grace.

**Escrow Account**: An account or accounts maintained by the Seller, or the Seller's predecessor in interest, maintained for the deposit of Escrow Payments received in respect of one or more Mortgage Loans.

**Escrow Payments**: The amounts held in Escrow Accounts which include amounts being held for payment of taxes, assessments, water rates, mortgage insurance premiums, fire and hazard insurance premiums and other payments required to be escrowed by the Mortgagor pursuant to any Mortgage Loan.

**Fannie Mae**: The Federal National Mortgage Association or any successor thereto.

**FHA**: The Federal Housing Administration or any successor thereto.

**Fixed Rate Mortgage Loan**: Any Mortgage Loan wherein the Mortgage Interest Rate set forth in the Mortgage Note is fixed for the term of such Mortgage Loan.

**Freddie Mac**: The Federal Home Loan Mortgage Corporation, or any successor thereto.

**Government Mortgage Loan**: A Mortgage Loan insured by the FHA or guaranteed by the VA.

2



**Gross Margin**:  With respect to each Adjustable Rate Mortgage Loan, the fixed percentage amount set forth in the related Mortgage Note which amount is added to the Index in accordance with the terms of the related Mortgage Note to determine the Mortgage Interest Rate for such Mortgage Loan.

**Hazardous Substances**:  Any substances, materials or waste that are or become regulated under applicable federal, state or local laws or regulations or that are classified as hazardous or toxic under federal, state or local laws or regulations.

**HMDA**:  The Home Mortgage Disclosure Act, as amended.

**HUD**:  The Department of Housing and Urban Development or any successor thereto.

**Index**:  With respect to each Adjustable Rate Mortgage Loan, the Index shall mean the rate per annum as set forth in the related Mortgage Loan Schedule with respect to each Segment.

**Initial Purchaser**:  Countrywide Home Loans, Inc.

**Interest Adjustment Date**:  With respect to each adjustable rate Mortgage Loan, the date on which an adjustment to the Mortgage Interest Rate on a Mortgage Note becomes effective.

**Interim Servicing Period**:  With respect to each Mortgage Loan Package, the period commencing with the related Closing Date and ending with the related Servicing Transfer Date.

**LGC**:  A loan guarantee certificate issued by the VA.

**Lifetime Mortgage Interest Rate Cap**:  The absolute maximum Mortgage Interest Rate payable for an Adjustable Rate Mortgage Loan, above which the Mortgage Interest Rate shall not be adjusted, as provided in the related Mortgage Loan Schedule.

**Loan-to-Value Ratio** or **LTV**:  With respect to any Mortgage Loan, the ratio of the original outstanding principal amount to the Appraised Value of the Mortgage Loan.

**MERS**:  Mortgage Electronic Registration Systems, Inc. or any successor or assign thereto.

**MERS® System**:  The electronic system of recording transfers of mortgages maintained by MERS.

**MIC**:  A mortgage insurance certificate issued by HUD.

**MIN**:  The mortgage identification number issued to each Mortgage Loan registered with MERS on the MERS® System.

**MOM Loan**:  A Mortgage Loan that was registered on the MERS® System at the time of origination thereof and for which MERS appears as the record mortgagee on the related Mortgage, solely as nominee for the originator of such Mortgage Loan, and its successors and assigns, at the origination thereof.

**Monthly Payment**:  The scheduled monthly payment of principal and interest on a Mortgage Loan.

**Mortgage**:  The mortgage, deed of trust or other such instrument securing a Mortgage Note, which creates a first lien or second lien, as specified in the related Mortgage Loan Schedule, on an unsubordinated estate in fee simple in real property securing the Mortgage Note or a first lien or second

3

lien, as specified in the related Mortgage Loan Schedule, upon a leasehold estate of Mortgagor, as the case may be.

**Mortgage File**:  The file containing the Mortgage Loan Documents, all other documents in connection with the origination of a particular Mortgage Loan, all appraisals and/or appraisal reviews and/or any property valuations relating to a Mortgaged Property, and all documents, files and other information reasonably necessary to service the Mortgage Loans.

**Mortgage Interest Rate**:  The annual rate at which interest accrues on any Mortgage Loan, exclusive of any primary mortgage insurance, as adjusted from time to time in accordance with the provisions of the related Mortgage Note, if applicable.

**Mortgage Loan**:  A mortgage loan identified in the Mortgage Loan Schedule which is sold pursuant to this Agreement, which Mortgage Loan includes without limitation the Mortgage Loan Documents, the Mortgage File, the Monthly Payments, Principal Prepayments, any related Escrow Accounts, the Servicing Rights and all other rights, benefits, proceeds and obligations arising from or in connection with such Mortgage Loan.  Unless the context requires otherwise, any reference to the Mortgage Loans in this Agreement shall refer to the Mortgage Loans constituting the Mortgage Loan Package.

**Mortgage Loan Documents**:  The following documents pertaining to any Mortgage Loan:

(a) The original Mortgage Note bearing all intervening endorsements, endorsed "Pay to the order of _____" and signed in the name of the Seller by an authorized officer;

(b) The original Assignment of Mortgage for each Mortgage Loan from the Seller to blank (except for Mortgage Loans registered with the MERS® System);

(c) The original Mortgage with evidence of recording thereon (except for MOM Loans, evidence of the related MIN);

(d) The originals of all intervening assignments of mortgage with evidence of recording thereon (except for Mortgage Loans registered with the MERS® System, in which case, the originals of all intervening assignments of mortgage with evidence of recording thereon from the originator to MERS); and

(e) The original mortgagee title insurance policy.

**Mortgage Loan Package**:  The Mortgage Loans sold to the Purchaser pursuant to a Purchase Confirmation and identified on a Mortgage Loan Schedule.

**Mortgage Loan Schedule**:  With respect to each Mortgage Loan Package, the schedule of Mortgage Loans included therein and made a part of the related Purchase Confirmation, which schedule shall include, the following information with respect to each Mortgage Loan: (i) information sufficient to uniquely identify such Mortgage Loan; (ii) the Mortgage Interest Rate as of the Cut-off Date; (iii) with respect to any Adjustable Rate Mortgage Loan, the Gross Margin, the Periodic Rate Cap, the Lifetime Rate Cap, the next Interest Adjustment Date and whether such Adjustable Rate Mortgage Loan is a Convertible Mortgage Loan, (iv) with respect to a PMI Loan, the PMI Rate, (v) the LTV at origination; (vi) the remaining term as of the Cut-off Date and the original term of such Mortgage Loan, and (vii) any other information pertaining to such Mortgage Loan as may be reasonably requested by the Purchaser. The information set forth in the Mortgage Loan Schedule relating to the Mortgage Interest Rate, Periodic Rate Cap and Lifetime Rate Cap with respect to any PMI Loan, as applicable, is exclusive of the PMI Rate.

**Mortgage Note**:  The note or other evidence of the indebtedness of a Mortgagor secured by a Mortgage.

**Mortgaged Property**: The real property securing repayment of the debt evidenced by a Mortgage Note.

**Mortgagor**: The obligor on a Mortgage Note.

**Net Escrow Payments**: Escrow Payment balances remaining after advances by the Seller for taxes and insurance to the extent documented under a detailed statement provided to the Purchaser.

**Pass-Through Transfer**: The sale or transfer of some or all of the Mortgage Loans to a trust to be formed as part of a publicly or privately traded, rated or unrated mortgage pass-through, pay-through or other mortgage-backed securities transaction.

**Periodic Mortgage Interest Rate Cap**: With respect to each Adjustable Rate Mortgage Loan, the provision of a Mortgage Note which provides for an absolute maximum amount by which the Mortgage Interest Rate therein may increase or decrease on an Interest Adjustment Date above the Mortgage Interest Rate previously in effect, equal to the rate set forth in the related Mortgage Loan Schedule, as applicable.

**PMI Loan**: A Mortgage Loan covered by a Primary Mortgage Insurance Policy as of the related Cut-off Date.

**PMI Rate**: With respect to each PMI Loan, the portion of the Mortgage Interest Rate as set forth on the related Mortgage Loan Schedule, which shall be used to pay the premium due on the related Primary Mortgage Insurance Policy.

**Primary Mortgage Insurance Policy**: A policy of primary mortgage guaranty insurance issued by a Qualified Insurer, providing coverage at least equal to the level of coverage required by the Agencies at the time the related Mortgage Loan was originated if such Mortgage Loan was to be eligible for sale to, and securitization by, either Fannie Mae or Freddie Mac.

**Principal Prepayment**: Any payment or other recovery of principal on a Mortgage Loan which is received in advance of its scheduled Due Date, including any prepayment penalty or premium thereon, which is not accompanied by an amount of interest representing scheduled interest due on any date or dates in any month or months subsequent to the month of prepayment.

**Purchase Confirmation**: Those certain purchase confirmations substantially in the form of **Exhibit E** hereto, executed by the Seller and the Purchaser in connection with the purchase and sale of each Mortgage Loan Package, which sets forth the terms relating thereto including a description of the related Mortgage Loans (including the Mortgage Loan Schedule), the Purchase Price for such Mortgage Loans, the Closing Date, the Cut-off Date and the Servicing Transfer Date.

**Purchase Price**: The purchase price to be paid by the Purchaser for the Mortgage Loans (including the Servicing Rights relating thereto) which, unless otherwise specified in the Purchase Confirmation, shall equal the product of (a) the Purchase Price Percentage, times (b) the Stated Principal Balance of the Mortgage Loans.

**Purchase Price Percentage**: The purchase price percentage set forth in the Purchase Confirmation.

**Purchase Proceeds**: The purchase proceeds to be paid by the Purchaser for the Mortgage Loans constituting each Mortgage Loan Package, as set forth in a funding schedule in the form of **Exhibit B** hereto.

5

**Purchaser**: Any entity which purchases the Mortgage Loans pursuant to this Agreement or its successor in interest or any successor or assign to or designee of the Purchaser under this Agreement as herein provided. Unless the context requires otherwise, all references to "Purchaser" in this Agreement shall be deemed to include such Purchaser's successors in interest, assignees or designees.

**Qualified Insurer**: An insurance company duly qualified as such under the laws of the states in which the Mortgaged Properties are located, duly authorized and licensed in such states to transact the applicable insurance business and to write the insurance provided, approved as an insurer by the Agencies and whose claims paying ability is rated in the two highest rating categories by the Standard & Poor's Ratings Group or Moody's Investors Service with respect to primary mortgage insurance and in the two highest rating categories by Best's with respect to hazard and flood insurance.

**Reconstitution Agreements**: Any of the agreement or agreements entered into by the Purchaser and/or certain third parties, and if necessary the Seller, on the Reconstitution Date or Dates with respect to any or all of the Mortgage Loans conveyed hereunder, in connection with a Whole Loan Transfer or a Pass-Through Transfer as set forth in Section 4.3.

**Reconstitution Date**: The date or dates on which any or all of the Mortgage Loans purchased pursuant to this Agreement shall be reconstituted as part of a Whole Loan Transfer or a Pass-Through Transfer pursuant to Section 4.3.

**REMIC**: A "real estate mortgage investment conduit" within the meaning of Section 860D of the Code.

**REMIC Provisions**: Provisions of the federal income tax law relating to a REMIC, which appear at Section 860A through 860G of Subchapter M of Chapter 1, Subtitle A of the Code, and related provisions, and regulations, rulings or pronouncements promulgated thereunder, as the foregoing may be in effect from time to time.

**Repurchase Price**: With respect to any Mortgage Loan, a price equal to the sum of (a) the product of (i) the unpaid principal balance of the Mortgage Loan at the time of repurchase, and (ii) the greater of par or the Purchase Price Percentage (subject to any adjustments as contemplated in the Transaction Documents, if any), plus (b) interest on such unpaid principal balance at the Mortgage Interest Rate from the last date through which interest has been paid and distributed to the Purchaser to the date of repurchase, plus (c) any outstanding escrow advances and any outstanding servicing advances made by the Purchaser on account of the Mortgage Loan, plus (d) any costs and damages that may be assessed to the Purchaser due to the Mortgage Loan being found to violate a predatory/abusive lending law.

**Segment(s)**: One or more segments of Mortgage Loans (each, a "Segment") comprising the segment(s) of Mortgage Loans set forth in the related Mortgage Loan Schedule, whether individually or in the aggregate, as applicable.

**Servicing Rights**: With respect to each Mortgage Loan, any and all of the following: (a) all rights to service the Mortgage Loans; (b) any payments or monies payable or received for servicing the Mortgage Loans; (c) any late fees, assumption fees, penalties or similar payments with respect to the Mortgage Loans; (d) all agreements or documents creating, defining or evidencing any such Servicing Rights and all rights of the Seller thereunder, including, but not limited to, any clean-up calls and termination options; (e) Escrow Payments or other similar payments with respect to the Mortgage Loans and any amounts actually collected with respect thereto; (f) all accounts and other rights to payments related to any of the property described in this paragraph; (g) possession and use of any and all Mortgage Files pertaining to the Mortgage Loans or pertaining to the past, present, or prospective servicing of the Mortgage Loans; and (h) all rights, powers and privileges incident to any of the foregoing.



**Servicing Transfer Date**: With respect to each sale and purchase of Mortgage Loans as contemplated hereunder, the servicing transfer date as set forth in the related Purchase Confirmation, or such other date as the Purchaser may select upon reasonable notice to the Seller.

**Stated Principal Balance**: The unpaid principal balance of the Mortgage Loans at the related Cut-off Date.

**Trade Confirmation**: A letter agreement executed by the Seller and the Purchaser prior to the applicable Closing Date confirming the general terms and conditions of a prospective transaction contemplated herein and identifying certain loan characteristics of the Mortgage Loans constituting the Mortgage Loan Package to be purchased hereunder.

**Transaction Documents**: With respect to any Mortgage Loan Package purchased by the Purchaser hereunder, the related Trade Confirmation, the related Purchase Confirmation and this Agreement.

**VA**: The Department of Veterans Affairs.

**Whole Loan Transfer**: The sale or transfer by the Purchaser of some or all of the Mortgage Loans in a whole loan format.

## ARTICLE II

### SALE OF THE MORTGAGE LOANS

**Section 2.1     Agreement of Sale**.  On each Closing Date, the Seller does hereby agree to sell, convey, transfer and assign to the Purchaser all right, title and interest in and to the Mortgage Loans, all in accordance with the terms and conditions set forth herein.  The Seller confirms that its agreement to sell, convey, transfer and assign to Purchaser the Mortgage Loans as provided in this Agreement shall occur automatically each time it enters into a Purchase Confirmation with the Purchaser and accepts payment from the Purchaser as provided herein.  On and after each Closing Date, the Seller shall hold the Mortgage Loan Documents and Mortgage Files in trust for the Purchaser and shall act only in accordance with the terms of this Agreement and the Purchaser's instructions with respect thereto.

**Section 2.2     Payment of the Purchase Proceeds**.  On each Closing Date, the Purchaser shall pay to the Seller the Purchase Proceeds, by wire transfer in immediately available funds to the account designated by the Seller.  Upon completion of the wire transfer to the Seller's designated account, the Purchaser shall own the Mortgage Loans and the Servicing Rights, free and clear of any lien or encumbrance whatsoever.

**Section 2.3     Entitlement to Payment on the Mortgage Loans**.  The Purchaser shall be entitled to all collections and recoveries of principal and interest received or applied to any Mortgagor's account after the related Cut-off Date.  All payments and remittances on the Mortgage Loans received by the Seller after the related Closing Date and payable to the Purchaser shall be paid promptly to the Purchaser in accordance to the terms set forth in Article IV or Article V, as applicable.

**Section 2.4     Examination of Mortgage Loan Documents by the Purchaser**.  Prior to the related Closing Date, the Purchaser shall have the right to review each Mortgage File and, based on its review, decline to purchase any Mortgage Loan which the Purchaser determines not to be in compliance with each of the representations and warranties contemplated hereby or which is otherwise unsatisfactory to the Purchaser.  It is expressly understood by the parties that the Purchaser is purchasing the Mortgage Loans for the express purpose of reselling such Mortgage Loans to a subsequent purchaser and, as such, the Purchaser's right to decline to purchase any of the Mortgage Loans as contemplated above may be directly influenced by the results of such subsequent purchaser's

own due diligence on the Mortgage Loans. The Seller agrees to deliver or make available to the Purchaser a complete Mortgage File for each Mortgage Loan on or before such date as may be reasonably requested by the Purchaser. The fact that the Purchaser has conducted or has failed to conduct any partial or complete examination of the Mortgage Files shall not affect the Purchaser's right to demand repurchase or to avail itself of any other remedy available hereunder. Notwithstanding anything contained herein to the contrary, should there be a material adverse change in the characteristics of the Mortgage Loans remaining after the exclusion or rejection of one or more Mortgage Loans by the Purchaser as contemplated above, the Purchaser may, in its sole discretion, elect not to purchase the remaining Mortgage Loans and the Purchaser shall have no liability therefor.

Section 2.5    **Delivery of Mortgage Loan Documents**. At least two (2) Business Days prior to each Closing Date, the Seller shall deliver the Mortgage Loan Documents with respect to each Mortgage Loan to the Purchaser or a bonded third party custodian (the "Custodian") and, in the case of the latter, shall cause the Custodian to deliver to the Purchaser a custodian's certification pursuant to which the Custodian certifies to the Purchaser that (i) with respect to each Mortgage Loan, it has in its possession originals of each of the Mortgage Loan Documents, (ii) all of the Mortgage Loan Documents appear on their face to be genuine originals or copies, as applicable, and (iii) upon the Purchaser's wiring of the Purchase Proceeds to the Seller, that the Custodian shall hold the Mortgage Loan Documents with respect to each Mortgage Loan in trust for the Purchaser and will, subsequent thereto, act only in a manner consistent with the Purchaser's instructions with respect thereto. In the event that any of the Mortgage Loan Documents set forth in clauses (c) through (e) of the definition of Mortgage Loan Documents in Article I have not been delivered to the Purchaser in the time specified above (the "Missing Documents") either because such Missing Documents have not been returned by the applicable public recording office with respect to items (c) and (d), or because the final original title policy has not yet been issued by the title company with respect to item (e), then the Seller shall deliver to the Purchaser certified true and correct copies of the same and shall further deliver the originals of any such Missing Documents promptly upon its receipt thereof, but in no event later than ninety (90) days from the related Closing Date. If the Seller fails to deliver any of the Missing Documents relating to a Mortgage Loan within the time specified above, the Seller shall, upon written request from the Purchaser, repurchase such Mortgage Loan in accordance with Section 3.3.

Section 2.6    **Conditions to Closing**. The Purchaser's obligations hereunder with respect to any Mortgage Loan Package are subject to the fulfillment of the following conditions precedent. In the event that any of the conditions set forth below are not satisfied, the Purchaser shall not have any obligation to purchase any of the Mortgage Loans or to pay the Purchase Proceeds as contemplated hereunder and shall instead be entitled, in its sole discretion, to terminate this Agreement in its entirety as it relates to such Mortgage Loan Package.

(a) Each of the representations and warranties made by the Seller hereunder shall be true and correct in all material respects as of the related Closing Date and no event shall have occurred which, with notice or the passage of time, would constitute a default under this Agreement.

(b) The Seller shall have delivered to the Purchaser all of the Mortgage Loan Documents in accordance with Section 2.5 and a complete Mortgage File with respect to each Mortgage Loan.

(c) Each of the terms and conditions set forth herein which are required to be satisfied on or before the related Closing Date shall have been satisfied unless waived by the prejudiced party(ies).

(d) The Seller shall have delivered to the Purchaser on or before the related Closing Date the following documents:

(1) an executed Agreement;

(2) the Mortgage Loan Schedule, which shall include, without limitation, the Stated Principal Balance of each Mortgage Loan;

8

(3)   an executed Funding Schedule, in the form of <u>Exhibit B</u> hereto;

(4)   an executed Officer's Certificate, in the form of <u>Exhibit C</u> hereto;

(5)   an executed Authorized Signatories Agreement, in the form of <u>Exhibit D</u> hereto;

(6)   an executed Purchase Confirmation, in the form of <u>Exhibit E</u> hereto; and

(7)   such other documents related to the purchase and sale of the Mortgage Loans and the Servicing Rights as the Purchaser may reasonably request.

(e) The document specified in subsection (d)(1) shall only be required with respect to the initial Closing Date unless the Purchaser subsequently requests the Seller to reexecute such documents.

**Section 2.7    Record Title.** With respect to each Mortgage Loan, record title to each Mortgage and the related Mortgage Note shall be transferred by the Seller to the Purchaser. The Seller shall, at the option of the Purchaser, either (i) prepare and cause to be recorded the Assignment of Mortgage for each Mortgage Loan and shall, promptly upon its receipt of each original recorded Assignment of Mortgage from the applicable recording office, deliver the same to the Purchaser, (ii) prepare and deliver to the Purchaser an original Assignment of Mortgage either in blank, in either case, within the time and in the manner specified in <u>Section 2.5</u>, or (iii) with respect to any Mortgage Loan registered on the MERS® System, the Seller shall, at its sole cost and expense on or prior to the Closing Date, cause the MERS® System to reflect that such Mortgage Loans have been assigned to the Purchaser as the sole owner of the beneficial rights related to the Mortgage Loans. The Seller shall bear the cost and expense related to (A) providing all Assignments of Mortgages and endorsements of Mortgage Notes for any transfer of record title required hereunder with respect to the obligations of the Mortgage Notes and the underlying security interest related to each Mortgage Loan, and (B) recording title of the Mortgage Loans including, but not limited to, recording fees and fees for title policy endorsements.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES

**Section 3.1    <u>Representations and Warranties Respecting the Seller</u>.** The Seller represents, warrants and covenants to the Purchaser that, as of each Closing Date:

(a) The Seller is duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation and is qualified to transact business in and is in good standing under the laws of each state where a Mortgaged Property is located or is otherwise exempt under applicable law from such qualification or is otherwise not required under applicable law to effect such qualification and no demand for such qualification has been made upon the Seller by any state having jurisdiction and in any event the Seller is or will be in compliance with the laws of any such state to the extent necessary to insure the enforceability of each Mortgage Note and the sale of the Mortgage Loans and Servicing Rights as contemplated by this Agreement;

(b) The Seller has the full power and authority to perform, and to enter into and consummate, all transactions contemplated by this Agreement. The Seller has the full power and authority to hold each Mortgage Loan and to sell each Mortgage Loan and the Servicing Rights;

(c) Neither the acquisition or origination of the Mortgage Loans by the Seller, the sale of the Mortgage Loans or the Servicing Rights to the Purchaser, the consummation of the transactions contemplated hereby, nor the fulfillment of or compliance with the terms and conditions of this Agreement, will conflict with or result in a breach of any of the terms, conditions or provisions of the Seller's certificate



of incorporation or bylaws or result in a material breach of any legal restriction or any agreement or instrument to which the Seller is now a party or by which it is bound, or constitute a material default or result in an acceleration under any of the foregoing, or result in the violation of any law, rule, regulation, order, judgment or decree to which the Seller or its property is subject;

(d)   The Seller is an approved seller/servicer for the Agencies, in good standing with each such agency, and is a mortgagee approved by the Secretary of HUD pursuant to sections 203 and 211 of the National Housing Act.  No event has occurred, including but not limited to, a change in insurance coverage, which would make the Seller unable to comply with Fannie Mae, Freddie Mac or HUD-eligibility requirements or which would require notification to the Agencies or HUD.  The Seller is a member of MERS in good standing, is current in the payment of all fees and assessments imposed to the Seller by MERS and has complied in all respects with the rules and procedures of MERS;

(e)   The Seller does not believe, nor does it have any reason or cause to believe, that it cannot perform each and every covenant contained in this Agreement.  Seller is solvent and the sale of the Mortgage Loans will not cause Seller to become insolvent.  The sale of the Mortgage Loans is not undertaken with the intent to hinder, delay or defraud any of Seller's creditors;

(f)   There is no action, suit, proceeding, investigation or litigation pending or, to the best of the Seller's knowledge, threatened, which either in any one instance or in the aggregate, if determined adversely to the Seller, would adversely affect the sale of the Mortgage Loans or the Servicing Rights to the Purchaser, or the Seller's ability to perform its obligations under this Agreement;

(g)   No consent, approval, authorization or order of any court or governmental agency or body is required for the execution, delivery and performance by the Seller of or compliance by the Seller with this Agreement or the terms of the Mortgage Loans, the delivery of the Mortgage Files to the Purchaser, the sale of the Mortgage Loans and the Servicing Rights to the Purchaser or the consummation of the transactions contemplated by this Agreement, or if required, such consent, approval, authorization or order has been obtained prior to the related Closing Date;



(h)   Neither the Agreement nor any statement, report or other document furnished or to be furnished by the Seller pursuant to this Agreement or in connection with the transactions contemplated hereby contains any untrue statement of fact or omits to state a fact necessary to make the statements contained herein or therein not misleading;

(i)   The consummation of the transactions contemplated by this Agreement are in the ordinary course of business of the Seller, and the transfer, assignment and conveyance of the Mortgage Notes, the Mortgages and/or the Servicing Rights by the Seller pursuant to this Agreement are not subject to the bulk transfer or any similar statutory provisions in effect and applicable to this transaction;

(j)   [Reserved];

(k)   Seller has determined that the disposition of the Mortgage Loans pursuant to this Agreement will be afforded sale treatment for tax and accounting purposes; and the sale of each Mortgage Loan shall be reflected on Seller's balance sheet and other financial statements as a sale of assets by Seller;

(l)   Seller has not dealt with any broker, investment banker, agent or other person that may be entitled to any commission or compensation in connection with the sale of the Mortgage Loans;

(m)   The consideration received by Seller upon the sale of such Mortgage Loans pursuant to this Agreement constitutes fair consideration and reasonably equivalent value for the Mortgage Loans; and

(n)   This Agreement evidences the valid, binding and enforceable obligation of Seller, and all the requisite corporate action has been taken by Seller to make this Agreement valid and binding



upon Seller in accordance with the Agreement's terms.

Section 3.2    **Representations and Warranties Regarding Individual Mortgage Loans.** With respect to each Mortgage Loan and unless otherwise indicated in the related Trade Confirmation and/or Purchase Confirmation, the Seller represents and warrants to the Purchaser that as of the related Closing Date:

(a)    The information set forth in the Mortgage Loan Schedule, the Transaction Documents, the information provided pursuant to Section 5.2(a) and Section 5.3(a) as of the related Servicing Transfer Date, and in each Mortgage File is complete, true and correct;

(b)    All payments required under the terms of the Mortgage Note to be made on or prior to the Closing Date have been made; the Seller has not advanced funds, or induced, solicited or knowingly received any advance of funds from a party other than the owner of the Mortgaged Property subject to the Mortgage, directly or indirectly, for the payment of any amount required under the Mortgage Loan; all payments required to be made by the Mortgagor upon any mortgage loan that is senior or equal in priority to a Mortgage Loan and which is secured by the same Mortgaged Property as the Mortgage Loan has been made. Except as set forth in the related Trade Confirmation and in the related Mortgage Loan Schedule, there has been no delinquency of thirty (30) days or more in any payment by the Mortgagor thereunder during the last twelve (12) months. None of the Mortgagors is deceased and no Mortgage Loan is subject to any pending litigation, foreclosure, bankruptcy, insolvency, or reorganization proceeding. Notwithstanding the foregoing, with respect to any Mortgage Loan for which the Monthly Payment with a Due Date in the month of the related Closing Date has not been made, the Purchaser has nonetheless agreed to purchase such Mortgage Loan, provided, however, that if such Monthly Payment is not received by the Purchaser, whether from the Mortgagor directly within thirty (30) days of the related Due Date or forwarded by the Seller if the Mortgagor has submitted the payment to the Seller, within thirty-five (35) days of the related Due Date, the Seller shall be deemed to have breached this warranty and representation with respect to such Mortgage Loan and such breach shall further be deemed to materially and adversely affect the value of such Mortgage Loan and the Purchaser's interest therein, and the Seller shall, at the Purchaser's option and not later than five (5) Business Days after receipt of notice from the Purchaser, repurchase such Mortgage Loan at the Repurchase Price notwithstanding anything contained herein to the contrary. Nothing contained in this <u>Section 3.2(b)</u> shall in any way limit any other rights of the Purchaser as provided hereunder;

(c)    There are no delinquent taxes, water charges, sewer rents, assessments, insurance premiums, leasehold payments, including assessments payable in future installments, or other outstanding charges affecting the related Mortgaged Property;

(d)    The terms of the Mortgage Note and the Mortgage have not been impaired, waived, altered or modified in any respect, except by written instruments which are in the Mortgage File and have been or will be recorded, if necessary to protect the interests of the Purchaser, and which have been delivered to the Purchaser, all in accordance with this Agreement. The substance of any such waiver, alteration or modification has been approved by the primary mortgage guaranty insurer, if any, and by the title insurer, to the extent required by the related policy, and its terms are reflected on the Mortgage Loan Schedule. No Mortgagor has been released, in whole or in part, except in connection with an assumption agreement approved by the primary mortgage insurer, if any, and title insurer, to the extent required by the policy, and which assumption agreement is part of the Mortgage File and the terms of which are reflected in the Mortgage Loan Schedule, if executed prior to the related Closing Date;

(e)    The Mortgage Note and the Mortgage are not subject to any right of rescission, set-off, counterclaim or defense, including the defense of usury, nor will the operation of any of the terms of the Mortgage Note and the Mortgage, or the exercise of any right thereunder, render the Mortgage unenforceable, in whole or in part, or subject to any right of rescission, set-off, counterclaim or defense, including the defense of usury and no such right of rescission, set-off, counterclaim or defense has been asserted with respect thereto;

11

(f)     All buildings upon, or comprising part of, the Mortgaged Property are insured by an insurer acceptable to the Agencies against loss by fire, hazards of extended coverage and such other hazards as are customary in the area where the Mortgaged Property is located in an amount that is the lesser of the outstanding principal balance of the Mortgage Loan or the replacement cost of the Mortgaged Property, and such insurer is licensed to do business in the state where the Mortgaged Property is located.  All such insurance policies (collectively, the "hazard insurance policy") contain a standard mortgagee clause naming the Seller, its successors and assigns as mortgagee and all premiums thereon have been paid.  If upon origination of the Mortgage Loan, the Mortgaged Property was, or was subsequently deemed to be, in an area identified in the Federal Register by the Federal Emergency Management Agency as having special flood hazards (and such flood insurance has been made available), which require under applicable law that a flood insurance policy meeting the requirements of the current guidelines of the Federal Insurance Administration (or any successor thereto) be obtained, such flood insurance policy is in effect which policy conforms to the requirements of the Agencies.   The Mortgage obligates the Mortgagor thereunder to maintain all such insurance at Mortgagor's cost and expense and, on the Mortgagor's failure to do so, authorizes the holder of the Mortgage to maintain such insurance at Mortgagor's cost and expense and to obtain reimbursement therefor from the Mortgagor. Each Mortgage Loan has in place a fully-paid life of loan flood certification from a Fannie Mae or Freddie Mac approved vendor, assigned in care of the Purchaser, which provides for notification to the Purchaser of changes in designated flood areas which would affect such Mortgage Loan;

(g)     Any and all requirements of any federal, state or local law including, without limitation, usury, truth in lending, real estate settlement procedures including, without limitation, the Real Estate Settlement Procedures Act of 1974, as amended, consumer credit and privacy protection, predatory and abusive lending, equal credit opportunity or disclosure laws applicable to the Mortgage Loan have been complied with in all material respects;

(h)     The Mortgage has not been satisfied, canceled, subordinated, or rescinded, in whole or in part, and the Mortgaged Property has not been released from the lien of the Mortgage, in whole or in part, nor has any instrument been executed that would effect any such release, cancellation, subordination or rescission;

(i)     The Mortgage is a valid, existing and enforceable first lien or second lien, as specified in the related Mortgage Loan Schedule, on the Mortgaged Property, including all improvements on the Mortgaged Property, if any, subject only to (a) the lien of current real property taxes and assessments not yet due and payable, (b) covenants, conditions and restrictions, rights of way, easements and other matters of the public record as of the date of recording being acceptable to mortgage lending institutions generally and specifically referred to in the lender's title insurance policy delivered to the originator of the Mortgage Loan and which do not adversely affect the Appraised Value (as defined in clause (i) of such definition) of the Mortgaged Property, (c) if a second lien, any first mortgage loan secured by the Mortgaged Property, and (d) other matters to which like properties are commonly subject which do not materially interfere with the benefits of the security intended to be provided by the Mortgage or the use, enjoyment, value or marketability of the related Mortgaged Property. The Seller has full right to sell and assign the Mortgage to the Purchaser;

(j)     The Mortgage Note and the related Mortgage are genuine and each is the legal, valid and binding obligation of the maker thereof, enforceable in accordance with its terms, except as the enforceability thereof may be limited by bankruptcy, insolvency or reorganization;

(k)     All parties to the Mortgage Note and the Mortgage had the legal capacity to enter into the Mortgage Loan transaction and to execute and deliver the Mortgage Note and the Mortgage, and the Mortgage Note and the Mortgage have been duly and properly executed by such parties;

(l)     The proceeds of the Mortgage Loan have been fully disbursed and there is no requirement for future advances thereunder and any and all requirements as to completion of any on-site or off-site improvement and as to disbursements of any escrow funds therefor have been complied with.



All costs, fees and expenses incurred in making or closing the Mortgage Loan and the recording of the Mortgage were paid, and the Mortgagor is not entitled to any refund of any amounts paid or due under the Mortgage Note or Mortgage;

(m)     The Seller is the sole owner and holder of the Mortgage Loan and the related Servicing Rights and is the custodian of the related Escrow Account, if applicable. The Mortgage Loan has neither been assigned nor pledged, and the Seller has good and marketable title thereto, and has full right to transfer and sell the Mortgage Loan and the related Servicing Rights to the Purchaser free and clear of any encumbrance, equity, lien, pledge, charge, claim or security interest and has full right and authority subject to no interest or participation of, or agreement with, any other party, to sell and assign each Mortgage Loan and the related Servicing Rights to the Purchaser pursuant to the terms of this Agreement;

(n)     All parties which have had any interest in the Mortgage, whether as mortgagee, assignee, pledgee or otherwise, are (or, during the period in which they held and disposed of such interest, were) (a) in compliance with any and all applicable licensing requirements of the laws of the state wherein the Mortgaged Property is located, and (b) (i) organized under the laws of such state, or (ii) qualified to do business in such state, or (iii) a federal savings and loan association or national bank having principal offices in such state, or (iv) not deemed to be doing business in such state under applicable law;

(o)     The Mortgage Loan is covered by an ALTA lender's title insurance policy acceptable to the Agencies, issued by a title insurer acceptable to the Agencies and qualified to do business in the jurisdiction where the Mortgaged Property is located, insuring (subject to the exceptions contained in (i)(a), (b) and (c) above) the Seller, its successors and assigns as to the first priority or second priority lien of the Mortgage, as applicable, in the original principal amount of the Mortgage Loan and against any loss by reason of the invalidity or unenforceability of the lien resulting from the provisions of the Mortgage Note and/or Mortgage providing for adjustment in the Mortgage Interest Rate and Monthly Payment. Additionally, such lender's title insurance policy affirmatively insures ingress and egress, and against encroachments by or upon the Mortgaged Property or any interest therein. The Seller is the sole insured of such lender's title insurance policy, and such lender's title insurance policy is in full force and effect and will be in full force and effect upon the consummation of the transactions contemplated by this Agreement. No claims have been made under such lender's title insurance policy, and no prior holder of the related Mortgage, including the Seller, has done, by act or omission, anything which would impair the coverage of such lender's title insurance policy;

(p)     There is no default, breach, violation or event of acceleration existing under the Mortgage or the Mortgage Note and no event which, with the passage of time or with notice and the expiration of any grace or cure period, would constitute a default, breach, violation or event of acceleration, and the Seller has not waived any default, breach, violation or event of acceleration;

(q)     There are no mechanics' or similar liens or claims which have been filed for work, labor or material (and no rights are outstanding that under law could give rise to such lien) affecting the related Mortgaged Property which are or may be liens prior to or equal with, the lien of the related Mortgage;

(r)     All improvements which were considered in determining the Appraised Value (as defined in clause (i) of said definition) of the related Mortgaged Property lay wholly within the boundaries and building restriction lines of the Mortgaged Property, and no improvements on adjoining properties encroach upon the Mortgaged Property;

(s)     Each Mortgage Loan was originated by a savings and loan association, savings bank, commercial bank, credit union, insurance company, or mortgage banking company which is supervised and examined by a federal or state authority, or by a mortgage originator approved by the Secretary of Housing and Urban Development pursuant to Sections 2.03 and 2.11 of the National Housing Act;

(t)     The origination, servicing and collection practices with respect to each Mortgage Note and Mortgage including, without limitation, the establishment, maintenance and servicing of the Escrow Accounts and Escrow Payments, if any, since origination, have been conducted in all respects in accordance with the terms of the Mortgage Note and in compliance with all applicable laws and regulations and, unless otherwise required by law or a Fannie Mae or Freddie Mac standard, in accordance with the proper, prudent and customary practices in the mortgage origination and servicing business. With respect to the Escrow Accounts and Escrow Payments, if any, all such payments are in the possession or under the control of the Seller and there exists no deficiencies in connection therewith for which customary arrangements for repayment thereof have not been made. No escrow deposits or Escrow Payments or other charges or payments due the Seller have been capitalized under any Mortgage or the related Mortgage Note. All Mortgage Interest Rate adjustments have been made in strict compliance with state and federal law and the terms of the related Mortgage Note. Any interest required to be paid pursuant to state and local law has been properly paid and credited;

(u)     The Mortgaged Property is free of material damage and waste and there is no proceeding pending for the total or partial condemnation thereof;

(v)     The Mortgage and related Mortgage Note contains customary and enforceable provisions to render the rights and remedies of the holder thereof adequate for the realization against the Mortgaged Property of the benefits of the security intended to be provided thereby, including, (a) in the case of a Mortgage designated as a deed of trust, by trustee's sale, and (b) otherwise by judicial foreclosure. There is no other exemption available to the Mortgagor which would interfere with the right to sell the Mortgaged Property at a trustee's sale or the right to foreclose the Mortgage. The Mortgagor has not notified the Seller and the Seller has no knowledge of any relief requested or allowed to the Mortgagor under the Soldiers and Sailors Civil Relief Act of 1940;

(w)     The Mortgage Note is not and has not been secured by any collateral except the lien of the applicable Mortgage;

(x)     The Mortgage File contains an appraisal of the related Mortgaged Property signed prior to the approval of the Mortgage Loan application by an appraiser who meets the minimum requisite qualifications of the Agencies for appraisers, duly appointed by the originator, who had no interest, direct or indirect, in the Mortgaged Property or in any loan made on the security thereof, and whose compensation is not affected by the approval or disapproval of the Mortgage Loan; the appraisal is in a form acceptable to the Agencies, with such riders as are acceptable to the Agencies; such appraisal was conducted in compliance with all applicable laws and regulations and in accordance with the proper, prudent and customary practices in the appraisal business and represents the fair market value of the Mortgaged Property at the time of origination of the related Mortgage Loan;

(y)     In the event the Mortgage constitutes a deed of trust, a trustee, duly qualified under applicable law to serve as such, has been properly designated and currently so serves and is named in the Mortgage, and no fees or expenses are or will become payable by the Purchaser to the trustee under the deed of trust, except in connection with a trustee's sale after default by the Mortgagor;

(z)     No Mortgage Loan contains a permanent or temporary "buydown" provision;

(aa)    The Mortgagor has executed one or more statements to the effect that the Mortgagor has received all disclosure materials required by applicable law with respect to the making of the Mortgage Loan. The Seller shall maintain all such statements in the Mortgage File;

(bb)    No Mortgage Loan was made in connection with (a) the construction or rehabilitation of a Mortgaged Property or (b) facilitating the trade-in or exchange of a Mortgaged Property;

(cc)    If any Mortgage Loan is indicated in the Transaction Documents as having a Primary Mortgage Insurance Policy, such policy provides coverage in an amount at least equal to that



which would be required by the Agencies if such Mortgage Loan was being delivered for sale to, and securitization by, each Agency. In addition, and regardless if indicated in the Transaction Documents, each Mortgage Loan with either an LTV at origination or a current LTV (based on current market value and amortization) greater than eighty percent (80.00%) is and will be subject to a Primary Mortgage Insurance Policy which provides coverage in an amount at least equal to that which would be required by the Agencies if such Mortgage Loan was being delivered for sale to, and securitization by, each Agency. With respect to any Mortgage Loan which allows negative amortization, such Primary Mortgage Insurance Policy shall contain provisions to cover the potential negative amortization of such Mortgage Loan. All provisions of any Primary Mortgage Insurance Policy have been and are being complied with, such policy is in full force and effect, and all premiums due thereunder have been paid. Any Mortgage subject to any such Primary Mortgage Insurance Policy obligates the Mortgagor thereunder to maintain such insurance and to pay all premiums and charges in connection therewith. The Mortgage Interest Rate for the Mortgage Loan is exclusive of any such insurance premium;

(dd)     The Mortgaged Property is lawfully occupied under applicable law and all inspections, licenses and certificates required to be made or issued with respect to all occupied portions of the Mortgaged Property and, with respect to the use and occupancy of the same, including but not limited to certificates of occupancy, have been made or obtained from the appropriate authorities;

(ee)     No action has been taken or failed to be taken, no event has occurred and no state of facts exists or has existed on or prior to the related Closing Date (whether or not known to the Seller on or prior to such date) which has resulted or will result in an exclusion from, denial of, or defense to coverage under any Primary Mortgage Insurance Policy (including, without limitation, any exclusions, denials or defenses which would limit or reduce the availability of the timely payment of the full amount of the loss otherwise due thereunder to the insured) whether arising out of actions, representations, errors, omissions, negligence or fraud of the Seller, the related Mortgagor or any party involved in the application for such coverage, including the appraisal, plans and specifications and other exhibits or documents submitted therewith to the insurer under such insurance policy, or for any other reason under such coverage, but not including the failure of such insurer to pay by reason of such insurer's breach of such insurance policy or such insurer's financial inability to pay;

(ff)     The Assignment of Mortgage is in recordable form and is acceptable for recording under the laws of the jurisdiction in which the Mortgaged Property is located, and with respect to any Mortgage Loan registered with the MERS® System, the Seller has complied in all respects with the rules and procedures of MERS in connection with the transfer to the Purchaser of the beneficial rights as registered by the MERS® System, as of the Closing Date, and the Servicing Rights as registered by the MERS® System, as of the Servicing Transfer Date, of such Mortgage Loans;

(gg)     Any future advances made to the Mortgagor prior to the related Closing Date have been consolidated with the outstanding principal amount secured by the Mortgage, and the secured principal amount, as consolidated, bears a single interest rate and single repayment term. The lien of the Mortgage securing the consolidated principal amount is expressly insured as having first lien or second lien priority, as applicable, by a title insurance policy, an endorsement to the policy insuring the mortgagee's consolidated interest or by other title evidence acceptable to the Agencies.   The consolidated principal amount does not exceed the original principal amount of the Mortgage Loan;

(hh)     If the Mortgaged Property is a condominium unit or a planned unit development, such condominium or planned unit development project meets the eligibility requirements of the  Seller's underwriting guidelines as of the date of origination of the related Mortgage Loan;

(ii)     The Mortgage Note and Mortgage are on forms acceptable for sale and securitization to either of the Agencies;

(jj)     The Mortgaged Property is located in the state indicated on the Mortgage Loan Schedule, and consists of a single parcel of real property with a detached single family residence erected

15

thereon, or an individual condominium unit, or a 2-4 family dwelling or an individual unit in a planned unit development as defined by Fannie Mae, none of which is a mobile home or manufactured dwelling;

(kk)    There are no circumstances or conditions with respect to the Mortgage, the Mortgaged Property, the Mortgagor, the Mortgage File or the Mortgagor's credit standing that can reasonably be expected to cause private institutional investors to regard the Mortgage Loan as an unacceptable investment, cause the Mortgage Loan to become delinquent, or adversely affect the value or marketability of the Mortgage Loan;

(ll)    The Mortgage contains an enforceable provision for the acceleration of the payment of the unpaid principal balance of the Mortgage Loan in the event that the Mortgaged Property is sold or transferred without the prior written consent of the mortgagee thereunder;

(mm)    There are no circumstances existing that could reasonably be expected to adversely affect the value or the marketability of any Mortgaged Property or Mortgage Loan or to cause the Mortgage Loans to prepay during any period materially faster or slower than the mortgage loans of similar characteristics originated by the Seller generally;

(nn)    Each Mortgage Loan is covered by a valid and transferable tax service contract with Transamerica, or such other vendor as may be reasonably acceptable to the Purchaser, which may be assigned without the payment of any fee by the Purchaser;

(oo)    Each Mortgage Loan requires monthly payments sufficient to fully amortize the original principal balance of the Mortgage Loan over the original term of the Mortgage Loan as set forth in the related Mortgage Note and each monthly payment is due on the first day of each month.  Unless indicated in the Mortgage Loan Schedule otherwise, no Mortgage Loan has negatively amortized nor shall any Mortgage Loan have any negative amortization after the related Closing Date. Except for any initial fixed term as indicated in the Mortgage Loan Schedule, the Mortgage Interest Rate for each Adjustable Rate Mortgage Loan adjusts annually in accordance with the related Mortgage Note.  With respect to each Adjustable Rate Mortgage Loan, on each Interest Adjustment Date, the Mortgage Interest Rate shall be adjusted to equal the Index plus the Gross Margin (rounded up or down to the nearest 0.125%), subject to the Periodic Mortgage Interest Rate Cap and the Lifetime Mortgage Interest Rate Cap as set forth in the respective Mortgage Note and the Mortgage Loan Schedule. Unless indicated in the Mortgage Loan Schedule otherwise, none of the Adjustable Rate Mortgage Loans contain a provision allowing the Mortgagor to convert the Mortgage Note from an adjustable rate mortgage loan to a Fixed Rate Mortgage Loan. With respect to any Mortgage Loan which has been converted from an Adjustable Rate Mortgage Loan into a Fixed Rate Mortgage Loan, such conversion was done in strict accordance with the terms of the related Mortgage Note.   The principal and interest due on each Mortgage Loan is calculated pursuant to the standard amortization (30/360 day interest accrual) method;

(pp)    Each Mortgage Loan conforms to, and at the time of origination was underwritten in accordance with, the credit underwriting guidelines as indicated in the Trade Confirmation and/or Purchase Confirmation;

(qq)    As of the related Closing Date, the Seller shall have received neither actual nor constructive notice that either a Mortgage Loan will be paid in full (whether by virtue of a demand statement or otherwise) or that any Mortgagor has elected to convert the related Convertible Mortgage Loan into a Fixed Rate Mortgage Loan in accordance with the terms of the related Mortgage Note;

(rr)    None of the Mortgage Loans are (a) subject to, covered by or in violation of the Home Ownership and Equity Protection Act of 1994 ("HOEPA"), (b) classified as "high cost," "covered," "high risk home", "threshold," or "predatory" loans under any other applicable state, federal or local law, including any predatory or abusive lending laws (or similarly classified loans using different terminology under a law imposing heightened scrutiny or additional legal liability for residential mortgage loans having high interest rates, points and/or fees) or (c) in violation of any state or local law or ordinance similar to HOEPA;

(ss)     No Mortgage Loan contains provisions pursuant to which Monthly Payments are (a) paid or partially paid with funds deposited in any separate account established by the Seller, the Mortgagor, or anyone on behalf of the Mortgagor or (b) paid by any source other than the Mortgagor or contains any other similar provisions which may constitute a "buydown" provision.  The Mortgage Loan is not a graduated payment mortgage loan and the Mortgage Loan does not have a shared appreciation or other contingent interest feature; none of the Mortgage Loans is currently subject to a completion escrow and with respect to each Mortgage Loan which was subject to a completion escrow, all appropriate forms were delivered and are contained in the Mortgage File, including, without limitation, Agency Form 442;

(tt)     Each Mortgage Loan which is an "equity loan" within the meaning of Section 50(a)(6), Article XVI of the Texas Constitution complies with all applicable Texas state laws and regulations;

(uu)     No error, omission, misrepresentation, identity theft, any incident or action which would give rise to a claim or alleged claim of identity theft, negligence, fraud or similar occurrence with respect to a Mortgage Loan has taken place on the part of the Mortgagor, Seller or any other person, including, without limitation, any appraiser, any builder or developer, or any other party involved in the origination of the Mortgage Loan or in the application of any insurance in relation to such Mortgage Loan; no predatory or deceptive lending practices, including, without limitation, the extension of credit without regard to the ability of the borrower to repay and the extension of credit which has no apparent benefit to the borrower, were employed in the origination of the Mortgage Loan;

(vv)     Any agreement with any servicer of the Mortgage Loans provides for the termination of the servicer on or prior to the related Servicing Transfer Date without the payment of any termination fee or other expense by the Purchaser;

(ww)     No Mortgage Loan which is a "home loan" as defined in the Georgia Fair Lending Act (the "Act") was originated, brokered, solicited, processed, placed, negotiated, or offered on or after October 1, 2002 and prior to March 7, 2003, and no Mortgage Loan is a "high-cost home loan" as defined in the Act;

(xx)     No Mortgage Loan is a "high-cost home loan" as defined in i.) Part 41 of the General Regulations Banking Board of New York and Section 6-L of the New York State Banking Law, or ii.) Chapter 360.100 of the Kentucky Revised Statutes, or iii.) the New Jersey Home Ownership Security Act of 2002, or iv.) the Arkansas Home Loan Protection Act, or v.) the Utah High Cost Home Loan Act, or vi.) the Massachusetts Regulations (Mass. Regs. Code tit. 209, §§ 32.01 et. seq. and §§40.01 et. seq.);

(yy)     No Mortgage Loan is a "high cost home mortgage loan" as defined in the Massachusetts Predatory Home Loan Practices Act of 2004;

(zz)     Each Mortgage Loan constitutes a qualified mortgage under with Section 860G(a)(3)(A) of the Code and the REMIC Provisions;

(aaa)     There is no pending action or proceeding directly involving the Mortgaged Property in which compliance with any environmental law, rule or regulation is an issue; there is no violation of any environmental law, rule or regulation with respect to the Mortgage Property; and nothing further remains to be done to satisfy in full all requirements of each such law, rule or regulation constituting a prerequisite to use and enjoyment of said property;

(bbb)     The Mortgaged Property is free of contamination from Hazardous Substances, and no amount of any Hazardous Substance has been disposed of or identified on, under or at the Mortgaged Property in violation of any federal, state or municipal law, regulation or standard, and at the time of origination, the Mortgage Loans satisfied the Fannie Mae guidelines regarding environmental hazards as set forth in Part XI, Chapter 3, Section 307 of the Fannie Mae Sellers' Guide;

(ccc)    None of the proceeds of the Mortgage Loan were used to finance single-premium credit insurance policies by the Seller;

(ddd)    With respect to each Mortgage Loan that has a prepayment penalty feature, each such prepayment penalty is enforceable and each prepayment penalty is permitted pursuant to federal, state and local law.  No Mortgage Loan will impose a prepayment penalty for a term in excess of five years from the date such Mortgage Loan was originated;

(eee)    The Mortgagor is one or more natural persons and/or trustees for an Illinois land trust or a trustee under a "living trust" and such "living trust" is in compliance with Fannie Mae guidelines for such trusts.  Either the Mortgagor is a natural person or the related co-borrower or guarantor is a natural person;

(fff)    With respect to any ground lease to which a Mortgaged Property may be subject: (A) the Mortgagor is the owner of a valid and subsisting leasehold interest under such ground lease; (B) such ground lease is in full force and effect, unmodified and not supplemented by any writing or otherwise; (C) all rent, additional rent and other charges reserved therein have been fully paid to the extent payable as of the related Closing Date; (D) the Mortgagor enjoys the quiet and peaceful possession of the leasehold estate; (E) the Mortgagor is not in default under any of the terms of such ground lease, and there are no circumstances which, with the passage of time or the giving of notice, or both, would result in a default under such ground lease; (F) the lessor under such ground lease is not in default under any of the terms or provisions of such ground lease on the part of the lessor to be observed or performed; (G) the lessor under such ground lease has satisfied any repair or construction obligations due as of the related Closing Date pursuant to the terms of such ground lease; (H) the execution, delivery and performance of the Mortgage do not require the consent (other than those consents which have been obtained and are in full force and effect) under, and will not contravene any provision of or cause a default under, such ground lease; (I) the term of such lease does not terminate earlier than the maturity date of the Mortgage Note; (J) the ground lease term extends, or is automatically renewable, for at least ten years beyond the maturity date of the related Mortgage Loan; (K) the Purchaser has the right to cure defaults on the ground lease; (L) the mortgagee is given at least thirty (30) days' notice of any default and an opportunity to cure the defaults under the ground lease or to take over the Mortgagor's rights under the ground lease; (M) the ground lease does not contain any default provisions that could give rise to forfeiture or termination of the ground lease except for the non-payment of the ground lease rents; and (N) the ground lease provides that the leasehold can be transferred, mortgaged and sublet an unlimited number of times either without restriction or on payment of a reasonable fee and delivery of reasonable documentation to the lessor; and

(ggg)    As of the related Closing Date, the sale or transfer of the Mortgage Loan by the Seller complies with all applicable federal, state, and local laws, rules, and regulations governing such sale or transfer, including, without limitation, the Fair and Accurate Credit Transactions Act ("FACT Act") and the Fair Credit Reporting Act, each as may be amended from time to time, and the Seller has not received any actual or constructive notice of any identity theft, fraud, or other misrepresentation in connection with such Mortgage Loan or any party thereto.

**Section 3.3**    **Remedies for Breach of Representations and Warranties**.  The representations and warranties set forth in <u>Sections 3.1</u> and <u>3.2</u> shall survive the sale of the Mortgage Loans to the Purchaser and shall inure to the benefit of the Purchaser, notwithstanding any restrictive or qualified endorsement on any Mortgage Note or Assignment of Mortgage or the examination or failure to examine any Mortgage File.  Furthermore, the absence of the Seller in either the chain of title or endorsement shall in no way limit the Purchaser's recourse against the Seller as provided in this <u>Section 3.3</u> for a breach of one or more of the Seller's representations and warranties made herein.  With respect to the representations and warranties contained in this <u>Article III</u> that are made to the best of the Seller's knowledge, if it is discovered by either the Seller or the Purchaser that the substance of such representation and warranty is inaccurate and/or incomplete and such inaccuracy and/or incompleteness materially and adversely affects the value of the related Mortgage Loan, the Purchaser shall be entitled to all the remedies to which it would be entitled for a breach of representation or warranty, including, without



limitation, the repurchase requirements contained herein, notwithstanding the Seller's lack of knowledge with respect to the inaccuracy and/or incompleteness at the time the representation or warranty was made. For purposes of this Agreement, the term "to the best of the Seller's knowledge" means that the Seller reasonably believes such representation and warranty to be true, and has no knowledge or notice that such representation or warranty is inaccurate or incomplete, and, consistent with the standard of care exercised by prudent lending institutions, the Seller has conducted a reasonable inquiry to assure the accuracy and completeness of the applicable representation and warranty. Without in any way limiting the generality of the foregoing, any repurchase request made upon the Initial Purchaser by a subsequent purchaser of the Mortgage Loans or a prospective purchaser's refusal to purchase any such Mortgage Loan from the Initial Purchaser, which repurchase request or refusal, as applicable, relates to a breach of any of the representations and warranties contained in Section 3.2, then such repurchase request or refusal, as applicable, shall be deemed to be conclusive evidence of the Seller's breach of one or more of its representations and warranties made by it hereunder and shall further be deemed to materially and adversely affect the value of any such Mortgage Loan.

Upon discovery by either the Seller or the Purchaser of a breach of any of the foregoing representations and warranties which materially and adversely affects the value, the marketability or enforceability of one or more of the Mortgage Loans or the Purchaser's interest therein, the party discovering such breach shall give prompt written notice to the other. The Seller shall have a period of sixty (60) days from the earlier of the discovery of a breach by the Seller or the receipt by the Seller of notice of a breach within which to correct or cure such breach. If any such breach cannot be corrected or cured within such sixty (60) day period, the Seller shall, at the Purchaser's option and not later than sixty (60) days after its discovery or its receipt of notice of such breach, repurchase such Mortgage Loan at the Repurchase Price. In the event that a breach shall involve any representation or warranty set forth in Section 3.1 and such breach cannot be cured within sixty (60) days of the earlier of either discovery by or notice to the Seller of such breach, all of the Mortgage Loans shall, at the Purchaser's option, be repurchased by the Seller at the Repurchase Price. Any repurchase of a Mortgage Loan(s) pursuant to the foregoing provisions of this Section 3.3 shall be accomplished by wire transfer of immediately available funds on the repurchase date to an account designated by the Purchaser.



At the time of repurchase, the Purchaser and the Seller shall arrange for the reassignment of the repurchased Mortgage Loan to the Seller and the delivery to the Seller of any documents held by the Purchaser or its custodian relating to such Mortgage Loan. The Seller shall, simultaneously with such reassignment, give written notice to the Purchaser that such repurchase has taken place.

Any cause of action against the Seller relating to or arising out of the breach of any representations and warranties made in Sections 3.1 or 3.2 shall accrue as to any Mortgage Loan upon (i) discovery of such breach by the Purchaser or notice thereof by the Purchaser to the Seller, or by the Seller to the Purchaser, (ii) failure by the Seller to cure such breach or repurchase such Mortgage Loan as specified above, and (iii) demand upon the Seller by the Purchaser for compliance with the relevant provisions of this Agreement.

**Section 3.4      Indemnification of the Purchaser.**   In addition to the repurchase obligations set forth in Section 3.3, the Seller shall defend and indemnify the Purchaser and hold it harmless against any losses, damages, penalties, fines, forfeitures, judgments and any related costs including, without limitation, reasonable and necessary legal fees, resulting from any claim, demand, defense or liability based upon or arising out of the origination, purchase, receiving, processing, funding or servicing any Mortgage Loan, or from any assertion based on, grounded upon or resulting from a breach or alleged breach of any of the Seller's representations and warranties contained in this Article III. Without limiting in any way the repurchase obligations of the Seller set forth in Section 3.3 and indemnification obligations of the Seller set forth in this Section 3.4, the Purchaser shall have the right to offset from any amount it owes or is otherwise required to pay to the Seller hereunder or under any other agreement with the Seller any amount that the Seller owes or is otherwise required to pay to the Purchaser hereunder or under any other agreement with the Purchaser. In addition to the obligations of

19

the Seller set forth in this Article III, the Purchaser may pursue any and all remedies otherwise available at law or in equity, including, but not limited to, the right to seek damages.

        **Section 3.5    Prepayment and Conversion Protection.** In the event that any of the Mortgage Loans are (i) paid in full or (ii) converted to a Fixed Rate Mortgage Loan, in either case, within sixty (60) days from the related Closing Date, or (iii) subject to a breach of the representation set forth in Section 3.2(qq), the Seller shall, with respect to each such Mortgage Loan, pay to the Purchaser the product of (a) the positive difference, if any, between the Purchase Price Percentage (subject to any adjustments as contemplated in the Transaction Documents) and 100%, times (b) the unpaid principal balance of such Mortgage Loan at the time such Mortgage Loan is paid in full or converted, as applicable (the "Premium Recapture Amount"); provided, however, that such Premium Recapture Amount shall be subject to reduction (the maximum amount of such reduction limited to the Premium Recapture Amount) to the extent of any legally enforceable prepayment penalty received by the Purchaser in connection with such Mortgage Loan.  In the event any Mortgage Loan is paid in full after the related Cut-off Date and on or prior to the related Closing Date, the Seller shall, in addition to the Premium Recapture Amount, pay the Purchaser the accrued interest paid by the Purchaser for such Mortgage Loan.  Nothing contained in this Section 3.5 shall in any way limit the rights of the Purchaser to all collections and recoveries of principal and interest received or applied to any Mortgagor's account and the Seller's obligation to remit such recoveries of principal and interest to the Purchaser as provided in Section 2.3.

        **Section 3.6    Payment Default Protection.** If the first Monthly Payment with a Due Date subsequent to the related Closing Date is not received by the Purchaser, whether from the Mortgagor directly or forwarded by the Seller if the Mortgagor has submitted the payment to the Seller, within thirty (30) days of its related Due Date, the Seller shall, at the Purchaser's option and not later than five (5) Business Days after receipt of notice from the Purchaser, repurchase such Mortgage Loan at the Repurchase Price.  The rights conferred to the Purchaser under this Section 3.6 shall be in addition to those rights conferred to the Purchaser under Section 3.2(b), the related Trade Confirmation and/or the related Purchase Confirmation.

## ARTICLE IV

## INTERIM SERVICING OF THE MORTGAGE LOANS

        **Section 4.1    General.** The Mortgage Loans will be purchased by the Purchaser and sold by the Seller on a servicing-released basis and the purchase of the Mortgage Loans by the Purchaser shall, for all purposes, include all Servicing Rights relating thereto. From the related Closing Date to the Servicing Transfer Date, the Seller shall interim service the Mortgage Loans in strict accordance with all federal, state and local laws, the terms of this Agreement and, to the extent not inconsistent herewith, the servicing standards of the Agencies.  Without limiting the generality of the foregoing, the Seller shall not take, or fail to take, any action which would result in the Purchaser's interest in the Mortgage Loans being adversely affected.  It is expressly understood by the Seller that, during the Interim Servicing Period, the Purchaser may either securitize the Mortgage Loans (whether into one or more mortgage backed securities) with such securities to be issued during the Interim Servicing Period or market the Mortgage Loans for sale to a whole loan investor and, as such, the Seller agrees to comply with all reasonable requests of the Purchaser made prior to the related Servicing Transfer Date in order to effectuate the foregoing including, without limitation, any request for information or documentation in connection with any Mortgage Loan which the Purchaser deems is necessary to carry out the foregoing including, without limitation, all HMDA data required by the Agencies.

        **Section 4.2    Reporting and Remittance.** Within five (5) Business Days following the conclusion of each calendar month reporting and remittance cycle occurring during the Interim Servicing Period (each, a "Reporting Cycle"), if any, the Seller shall forward to the Purchaser with respect to the Mortgage Loans a full set of tapes and a trial balance as of the end of each such Reporting Cycle, which tapes and trial balance shall include information relating to all payment and other activity on the Mortgage Loans.  With respect to any payments of principal or interest (including all prepayments) received, or

applied to any Mortgagor's account, by the Seller during the Interim Servicing Period (or prior to the Closing Date, if any such payments were not reflected in the calculation of the Purchase Proceeds), the Seller shall remit to the Purchaser all such payments of principal and interest on the Mortgage Loans no later than the fifth (5th) day of the month following the conclusion of each Reporting Cycle and, with respect to the month in which the related Servicing Transfer Date occurs, no later than the fifth (5th) Business Day thereafter.

Section 4.3   **Whole Loan Transfers or Pass-Through Transfers**. The Seller and the Purchaser agree that with respect to some or all of the Mortgage Loans, the Purchaser may effect either one or more Whole Loan Transfers, and/or one or more Pass-Through Transfers.

(a)   Whole Loan Transfers.  With respect to each Whole Loan Transfer entered into by the Purchaser, the Seller agrees:

(i)   to cooperate reasonably with the Purchaser and any prospective purchaser with respect to all reasonable requests;

(ii)   to execute or acknowledge, at the Purchaser's discretion, an assignment by the Purchaser to a successor purchaser of some or all of the Mortgage Loans, which Mortgage Loans will be assigned subject to the representations and warranties set forth in this Agreement; and

(iii)   to restate on the Reconstitution Date, all representations and warranties made by the Seller pursuant to this Agreement with respect to the Mortgage Loans and with respect to the Seller itself.

(b)   Pass Through Transfers.  The Purchaser and the Seller agree that in connection with the completion of a Pass-Through Transfer, the Seller shall:

(i)   provide the Purchaser with a certificate of a duly appointed officer of Seller that restates as of the Reconstitution Date all representations and warranties made by the Seller pursuant to this Agreement with respect to the Mortgage Loans and with respect to the Seller itself, together with any additional representations and warranties which may be required to be made by it in connection with the Pass-Through Transfer;

(ii)   if the Seller is required to be a party to any of the Reconstitution Agreements, to execute any Reconstitution Agreement required to effectuate the foregoing;

(iii)   provide to any master servicer or trustee, as applicable, and/or the Purchaser any and all publicly available information and appropriate verification of information which may be reasonably available to the Seller, whether through letters of its auditors and counsel or otherwise, as the Purchaser, trustee or a master servicer shall reasonable request as to the related Mortgage Loans; and

(iv)   provide all other assistance reasonably requested by the Purchaser in connection with completion of the Pass-Through Transfer.

With respect to any Pass-Through Transfer, the Purchaser shall be entitled to include in any disclosure document any information provided by the Seller, and the Seller acknowledges and agrees that the related investors will be permitted to rely on such information.  In addition, the Seller shall indemnify the Purchaser and its affiliates for any untrue or alleged untrue statement of any material fact contained in such information, or the omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein, in the light of the circumstances in which they were made, not misleading.  If the Purchaser determines that the Seller is required to be a party to any Reconstitution Agreement, the Seller shall execute such Reconstitution Agreement within a

reasonable period of time, but in no event shall such time exceed ten (10) Business Days after mutual agreement between the Purchaser and the Seller as to the terms thereof. In addition to the foregoing, the Seller acknowledges that the Purchaser may complete a Pass-Through Transfer on or prior to the Servicing Transfer Date. In such event, the Seller agrees to undertake all additional obligations as may become necessary to facilitate the Pass-Through Transfer, including, without limitation, the assumption of the obligation to act as "master servicer" for the period starting on the closing of the Pass-Through Transfer through and including the Servicing Transfer Date and the preparation, execution and approval of all documents and disclosures incident thereto.

(c)   <u>Continuing Liabilities</u>.   All of the Mortgage Loans, including those Mortgage Loans that are subject to a Pass-Through Transfer or a Whole Loan Transfer, shall continue to be subject to this Agreement, and with respect thereto, this Agreement shall remain in full force and effect. In no event shall the Seller be relieved of its obligations set forth in <u>Article III</u> hereof.

## ARTICLE V

### <u>TRANSFER OF SERVICING RIGHTS</u>

**Section 5.1     <u>Transfer of Servicing</u>**.   The Seller agrees to act reasonably, in good faith and in accordance with all applicable laws and regulations and to do all things necessary to effect the transfer of the Servicing Rights to the Purchaser on the related Servicing Transfer Date including, without limitation, complying with all instructions provided by the Purchaser relating to the transfer of the Servicing Rights. With respect to each Mortgage Loan registered with the MERS® System, the Seller shall, by the Servicing Transfer Date, cause the MERS® System to reflect the Purchaser as the sole owner of the Servicing Rights related to such Mortgage Loans and shall designate the Custodian as the new document custodian of the Mortgage Loan Documents with respect to such Mortgage Loans.

**Section 5.2     <u>Obligations of the Seller Prior to the Servicing Transfer Date</u>**. Without limiting the generality of <u>Section 5.1</u>, the Seller shall take, or cause to be taken, the following actions with respect to the Mortgage Loans prior to the related Servicing Transfer Date (or within such time as may otherwise be specified below) in order to effect the transfer of the Servicing Rights to the Purchaser on the related Servicing Transfer Date:

(a)     <u>Preliminary Test Tape</u>.   On or prior to the related Closing Date, the Seller shall forward to the Purchaser a preliminary test tape (including master file, escrow file, payee file, ARM master file, ARM history, all HMDA data required by the Agencies, name, address, and telephone number of first lien holder and loan number of first lien with respect to any second lien Mortgage Loans, etc.) containing all of the Mortgage Loans as of the date mutually agreed upon by the Seller and the Purchaser. The preliminary test tape shall include all field descriptions and record layouts;

(b)     <u>Notice to Hazard Insurers</u>.   The Seller shall inform by written notice all hazard insurance companies and/or their agents of the transfer and request a change in the loss payee mortgage endorsement clause to the Purchaser's name. The Seller shall provide the Purchaser with a copy of the notification letter and an officer's written certification that all hazard insurance companies have been notified by an identical letter;

(c)     <u>Notice to Mortgage Insurance Companies</u>.   The Seller shall inform by written notice all mortgage insurance companies providing any Primary Mortgage Insurance Policy of the change in insured's name on each such policy to the Purchaser's name. The Seller shall provide the Purchaser with a copy of one notification letter and an officer's written certification that all such mortgage insurance companies have been notified by an identical letter;

(d)     <u>Tax Service Contracts</u>.   The Seller shall have obtained a life of loan, transferable real estate tax service contract with a tax service company reasonably acceptable to the Purchaser on all of the Mortgage Loans and shall assign all such contracts to the Purchaser <u>or</u>, in the alternative, the



Seller shall notify the Purchaser as to any Mortgage Loans for which it has not procured the requisite contract and shall pay to the Purchaser a fee for each such Mortgage Loan equal to the fee or premium that is customarily charged for each such contract, as determined by the Purchaser in its reasonable discretion;

(e)      Flood Certifications.  The Seller shall have obtained a life of loan, transferable flood certification contract for each Mortgage Loan and shall assign all such contracts to the Purchaser or, in the alternative, the Seller shall notify the Purchaser as to any Mortgage Loans for which it has not procured the flood certification referenced above and shall pay to the Purchaser a fee for each such Mortgage Loan equal to the fee that is customarily charged for each such contract, as determined by the Purchaser in its reasonable discretion;

(f)      Notice to Mortgagors.  The Seller shall, no later than fifteen (15) days prior to the related Servicing Transfer Date, inform in writing all Mortgagors of the change in servicer from the Seller to the Purchaser, all in accordance with applicable law.  The Seller shall obtain the Purchaser's approval of the form of such notifications prior to their mailing.  The Seller acknowledges that the Purchaser's review of this notice shall not be a review for statutory or regulatory compliance purposes, and that the Seller shall have the sole responsibility for such compliance.  The Seller shall provide the Purchaser with a copy of one notification letter and an officer's written certification that all Mortgagors have been notified by an identical letter;

(g)      Payment of Real Estate Taxes.  The Seller shall make or cause to be made all payments of all real estate taxes on the Mortgage Loans which (i) will be delinquent on or prior to the related Servicing Transfer Date, (ii) are required to be paid within thirty (30) days after the related Servicing Transfer Date to receive a discount, or (iii) will be delinquent within thirty (30) days after the related Servicing Transfer Date.  If tax bills have not been received by the Seller by the related Servicing Transfer Date on any Mortgage Loans subject to this subsection, the Seller shall obtain and pay all tax bills subsequent to the related Servicing Transfer Date and the Purchaser will promptly reimburse the Seller upon receipt from the Seller of documentation evidencing such payment.  On non-impounded accounts, the Seller shall ensure that all taxes which would otherwise be delinquent by the related Servicing Transfer Date, if not paid by such date, have been paid.  With respect to each of the Mortgage Loans which do not have an impound or escrow account maintained for the payment of taxes and insurance, the Seller shall hold harmless and indemnify the Purchaser against any and all costs, expenses, penalties, fines, damages and judgments of whatever kind arising from the Seller's failure to pay, or cause to be paid, any delinquent taxes or tax penalties outstanding as of the related Servicing Transfer Date;

(h)      Payment of Insurance Premiums.  The Seller shall pay all hazard and flood insurance and Primary Mortgage Insurance Policy premiums required to be paid prior to the Servicing Transfer Date or within thirty (30) days after the Servicing Transfer Date on all impounded accounts relating to the Mortgage Loans and shall ensure that all premiums required to be paid prior to the Servicing Transfer Date by the Mortgagors on non-impounded accounts have been paid.  With respect to any Mortgage Loan subject to force-placed insurance, the Seller shall maintain such insurance, which shall be in full force and effect through thirty (30) days after the Servicing Transfer Date.  With respect to each of the Mortgage Loans which do not have an impound or escrow account maintained for the payment of taxes and insurance, the Seller shall hold harmless and indemnify the Purchaser against any and all costs, expenses, penalties, fines, damages and judgments of whatever kind arising from the Seller's failure to ensure that the related Mortgagor is maintaining adequate insurance coverage on the Mortgaged Property at all times prior to the Servicing Transfer Date in accordance with the terms of the any document contained in the Mortgage File or any applicable law or regulation including, without limitation, adequate flood insurance coverage for all Mortgaged Properties located within an "A" or "V" flood hazard area;

(i)      ARM Adjustments.  With respect to each Adjustable Rate Mortgage Loan whose index value for any Interest Adjustment Date is available on or prior to the related Servicing Transfer

Date, the Seller shall make all such adjustments and shall inform the related Mortgagors of such adjustments;

(j)     Notice to Sub-servicers. On or prior to the related Closing Date, the Seller shall inform by written notice all sub-servicers who perform servicing obligations with respect to the Mortgage Loans of the sale of the Mortgage Loans to the Purchaser and of the transfer of the Servicing Rights to the Purchaser on the related Servicing Transfer Date. The Seller shall provide the Purchaser with a copy of the notification letter and an officer's certification that all sub-servicers have been notified by an identical letter; and

(k)     Mortgage Loans in Litigation. On or prior to the related Servicing Transfer Date, the Seller shall (i) deliver written notification to the Purchaser of any Mortgage Loan in litigation (including, without limitation, bankruptcy and foreclosure proceedings) as of the Servicing Transfer Date, including in such written notification the names and addresses of all parties involved in such litigation and all documents related to such litigation, (ii) if requested by the Purchaser, notify the clerk of the court and all counsel of record involved in such litigation that ownership of such Mortgage Loan has been transferred to the Purchaser, and (iii) if requested by the Purchaser, cooperate with the Purchaser and cause the filing of appropriate court documents to substitute the Purchaser's attorney for the Seller's attorney and remove the Seller as a party to the litigation and substitute the Purchaser as the real party in interest.

**Section 5.3     Obligations of the Seller after the Servicing Transfer Date.** Without limiting the generality of Section 5.1, the Seller shall take, or cause to be taken, the following actions with respect to the Mortgage Loans within three (3) Business Days following the related Servicing Transfer Date (or within such time as may otherwise be specified below):

(a)     Tape. The Seller shall furnish to the Purchaser all available computer or like records requested by the Purchaser reflecting the status of payments, balances and other pertinent information with respect to the Mortgage Loans as of the related Servicing Transfer Date (including, without limitation, (i) master file, (ii) escrow file, (iii) payee file, which includes comprehensive tax and insurance information identifying payee, payee address, next payment due date, next amount payable and policy number/parcel number, (iv) ARM master file, (v) ARM history, (vi) name, address, and telephone number of first lien holder and loan number of first lien with respect to any second lien Mortgage Loans, and (vii) all HMDA data required by the Agencies). Such records shall include magnetic tapes reflecting all computer files maintained on the Mortgage Loans and shall include hard copy trial balance reports as specifically requested by the Purchaser;

(b)     Mortgage File. If the Seller has not already done so, the Seller shall have forwarded a complete Mortgage File with respect to each Mortgage Loan;

(c)     Accounting Reports. The Seller shall furnish to the Purchaser copies of all accounting reports relating to the Mortgage Loans as of the related Servicing Transfer Date including, without limitation, a trial balance and reports of collections, delinquencies, prepaids, curtailments, escrow payments, escrow balances, partial payments, partial payment balances and other like information with respect to the Mortgage Loans;

(d)     Other Documentation. The Seller shall provide the Purchaser any and all further documents reasonably required by the Purchaser in order to fully transfer to the Purchaser possession of all tangible evidence of the Servicing Rights and escrow, impound and trust funds transferred hereunder;

(e)     Transfer of Escrow Funds and Other Proceeds. The Seller shall transfer to the Purchaser, by wire transfer to the account designated by the Purchaser, an amount equal to the sum of (i) the Net Escrow Payments, (ii) all undistributed insurance loss draft funds, (iii) all unapplied funds received by the Seller, (iv) all unapplied interest on escrow balances accrued through the related Servicing Transfer Date, (v) all buydown funds held by the Seller as of the related Servicing Transfer Date, and (vi) all other amounts held by the Seller with respect to the Mortgage Loans as of the related Servicing Transfer Date for which the Seller is not entitled to retain (collectively, the "Escrow Proceeds"). Within

24



five (5) Business Days following the Purchaser's receipt of the Escrow Proceeds, the Seller and the Purchaser shall resolve any discrepancies between the Seller's accounting statement and the Purchaser's reconciliation with respect thereto. No later than ten (10) Business Days following the related Servicing Transfer Date, the Seller or the Purchaser, as the case may be, shall transfer to the other, by wire transfer to the designated account, any amounts to which the other party is entitled; and

(f)    <u>Mortgage Payments Received After Servicing Transfer Date</u>.  The Seller shall promptly forward to the Purchaser any payment received by it after the related Servicing Transfer Date with respect to any of the Mortgage Loans, whether such payment is in the form of principal, interest, taxes, insurance, loss drafts, insurance refunds, etc., in the original form received, unless such payment has been received in cash or by the Seller's lock box facility, in which case the Seller shall forward such payment in a form acceptable to the Purchaser. The Seller shall notify the Purchaser of the particulars of the payment, which notification shall set forth sufficient information to permit timely and appropriate processing of the payment by the Purchaser.

## ARTICLE VI

### <u>MISCELLANEOUS</u>

**Section 6.1      Notices**.  All demands, notices and communications required to be provided hereunder shall be in writing and shall be deemed to have been duly given if mailed, by registered or certified mail, postage prepaid, and return receipt requested, or, if by other means, when received by the other party at the address as follows:

(i)     if to the Seller:

To the address and contact set forth in the related Purchase Confirmation.

(ii)     if to the Purchaser:

Countrywide Home Loans, Inc.
4500 Park Granada
Calabasas, California  91302
Attn:  Mr. Michael W. Schloessmann, Vice President

With copy to:  General Counsel

or such other address as may hereafter be furnished to the other party by like notice.  Any such demand, notice or communication hereunder shall be deemed to have been received on the date delivered to or received at the premises of the addressee (as evidenced, in the case of registered or certified mail, by the date noted on the return receipt).

**Section 6.2      Intention of the Parties**.  Pursuant to this Agreement, the Purchaser is purchasing, and the Seller is selling the Mortgage Loans and not a debt instrument of the Seller or any other security. Accordingly, the Seller and the Purchaser shall each treat the transaction for federal income tax purposes as a sale by the Seller, and a purchase by the Purchaser, of the Mortgage Loans and the Servicing Rights.  The Purchaser shall have the right to review the Mortgage Loans and the related Mortgage Loan Files to determine the characteristics of the Mortgage Loans which shall affect the federal income tax consequences of owning the Mortgage Loans and the Servicing Rights and the Seller shall cooperate with all reasonable requests made by the Purchaser in the course of such review.

**Section 6.3      Exhibits**.  The exhibits to this Agreement are hereby incorporated and made a part hereof and are an integral part of this Agreement.

**Section 6.4    General Interpretive Principles.**  For purposes of this Agreement, except as otherwise expressly provided or unless the context otherwise requires:

(a)  the terms defined in this Agreement have the meanings assigned to them in this Agreement and include the plural as well as the singular, and the use of any gender herein shall be deemed to include the other gender;

(b)  accounting terms not otherwise defined herein have the meanings assigned to them in accordance with generally accepted accounting principles;

(c)  references herein to "Sections," "Subsections," "Paragraphs," and other Subdivisions without reference to a document are to designated Sections, Subsections, Paragraphs and other subdivisions of this Agreement;

(d)  reference to a Subsection without further reference to a Section is a reference to such Subsection as contained in the same Section in which the reference appears, and this rule shall also apply to Paragraphs and other subdivisions;

(e)  the words "herein," "hereof," "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular provision; and

(f)  the term "include" or "including" shall mean without limitation by reason of enumeration.

**Section 6.5    Reproduction of Documents.**  This Agreement and all documents relating thereto, including, without limitation, (a) consents, waivers and modifications which may hereafter be executed, (b) documents received by any party at the closing, and (c) financial statements, certificates and other information previously or hereafter furnished, may be reproduced by any photographic, photostatic, microfilm, micro-card, miniature photographic or other similar process. The parties agree that any such reproduction shall be admissible in evidence as the original itself in any judicial or administrative proceeding, whether or not the original is in existence and whether or not such reproduction was made by a party in the regular course of business, and that any enlargement, facsimile or further reproduction of such reproduction shall likewise be admissible in evidence.

**Section 6.6    Further Agreements.**  The Seller shall execute and deliver to the Purchaser and the Purchaser shall execute and deliver to the Seller such reasonable and appropriate additional documents, instruments or agreements as may be necessary or appropriate to effectuate the purposes of this Agreement.

**Section 6.7    Execution of Agreement.**  This Agreement may be executed simultaneously in any number of counterparts. Each counterpart shall be deemed to be an original, and all such counterparts shall constitute one and the same instrument. This Agreement shall be deemed binding when executed by both the Purchaser and the Seller. Telecopy signatures shall be deemed valid and binding to the same extent as the original.

**Section 6.8    Successors and Assigns.**  This Agreement shall bind and inure to the benefit of and be enforceable by the Seller and the Purchaser and the respective permitted successors and assigns of the Seller and the successors and assigns of the Purchaser. This Agreement shall not be assigned, pledged or hypothecated by the Seller without the consent of the Purchaser. This Agreement may be assigned, pledged or hypothecated or otherwise transferred or encumbered by the Purchaser, in whole or part, without the consent of the Seller. If the Purchaser assigns some or all of its rights as the Purchaser hereunder relating to some or all of the Mortgage Loans, the assignee of the Purchaser, upon notification to the Seller, will become the "Purchaser" hereunder with respect to such rights and Mortgage Loans assigned hereby.

**Section 6.9    Severability Clause**. Any part, provision, representation or warranty of this Agreement which is prohibited or which is held to be void or unenforceable shall be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof. Any part, provision, representation or warranty of this Agreement which is prohibited or unenforceable or is held to be void or unenforceable in any relevant jurisdiction shall be ineffective, as to such jurisdiction, to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction as to any Mortgage Loan shall not invalidate or render unenforceable such provision in any other jurisdiction. To the extent permitted by applicable law, the parties hereto waive any provision of law which prohibits or renders void or unenforceable any provision hereof.

**Section 6.10    Costs**. The Purchaser shall pay any commissions due its salesmen and the legal fees and expenses of its attorneys and expenses of its custodian. All other costs and expenses incurred in connection with the transfer and delivery of the Mortgage Loans, including recording fees, fees for title policy endorsements and continuations and the Seller's attorney's fees, shall be paid by the Seller.

**Section 6.11    Attorneys' Fees**. If any claim, legal action or any arbitration or other proceeding is brought for the enforcement of this Agreement or because of a dispute, breach, default or misrepresentation in connection with any of the provisions of this Agreement, the successful or prevailing party shall be entitled to recover reasonable attorneys' fees and other costs incurred in that claim, action or proceeding, in addition to any other relief to which such party may be entitled.

**Section 6.12    Governing Law**. This Agreement shall be governed by and interpreted in accordance with the laws of the State of California applicable to agreements entered into and wholly performed within said jurisdiction.

**Section 6.13    Survival**. All covenants, agreements, representations and warranties made herein shall survive the execution and delivery of this Agreement and the Seller hereby waives the benefit of the applicable statutes of limitations with respect to any of the covenants, agreements, representations and warranties set forth herein. It shall not be a defense in any action by the Purchaser against the Seller arising out of a breach of the Seller's covenants, agreements, representations and warranties made herein that the Purchaser knew or should have known of the existence of the related breach of such covenants, agreements, representations and warranties.

**Section 6.14    Conflicts between Transaction Documents**. In the event of any conflict, inconsistency or ambiguity between the terms and conditions of this Agreement and either the Trade Confirmation or Purchase Confirmation, the terms of the Trade Confirmation or Purchase Confirmation, as the case may be, shall control. In the event of any conflict, inconsistency or ambiguity between the terms and conditions of the Trade Confirmation and the Purchase Confirmation, the terms of the Purchase Confirmation shall control.

**Section 6.15    Entire Agreement**. This Agreement and the related Trade Confirmation and Purchase Confirmation constitute the entire understanding between the parties hereto with respect to each Mortgage Loan Package and supersede all prior or contemporaneous oral or written communications regarding same. The Seller and the Purchaser understand and agree that no employee, agent or other representative of the Seller or the Purchaser has any authority to bind such party with regard to any statement, representation, warranty or other expression unless said statement, representation, warranty or other expression is specifically included within the express terms of this Agreement or the related Trade Confirmation or Purchaser Confirmation. Neither this Agreement nor the Trade Confirmation nor the Purchase Confirmation shall be modified, amended or in any way altered except by an instrument in writing signed by both parties.

**Section 6.16    Confidentiality**. The Seller and the Purchaser hereby acknowledge and agree that this Agreement shall be kept confidential and its contents will not be divulged to any party

without the other party's consent except to the extent that it is appropriate for the Seller or the Purchaser to do so in working with legal counsel, auditors, taxing authorities or other governmental agencies.

Notwithstanding any other express or implied agreement to the contrary, the parties agree and acknowledge that each of them and each of their employees, representatives, and other agents may disclose to any and all persons, without limitation of any kind, the tax treatment and tax structure of the transaction and all materials of any kind (including opinions or other tax analyses) that are provided to any of them relating to such tax treatment and tax structure, except to the extent that confidentiality is reasonably necessary to comply with U.S. federal or state securities laws. For purposes of this paragraph, the terms "tax treatment" and "tax structure" have the meanings specified in Treasury Regulation section 1.6011-4(c).

**Section 6.17    No Solicitation**.  From and after the related Closing Date, the Seller agrees that it will not take any action or cause any action to be taken by any of its employees, agents or affiliates, or by any independent contractors acting on the Seller's behalf, to solicit in any manner whatsoever any Mortgagor for any purpose, including, without limitation, to prepay or refinance a Mortgage Loan. It is understood and agreed by the Seller and the Purchaser that all rights and benefits relating to the solicitation of any Mortgagors shall be transferred to the Purchaser pursuant hereto on the Closing Date and the Seller shall take no action to undermine these rights and benefits. The Seller shall use its best efforts to prevent the sale of the name of any Mortgagor to any person or entity.

**Section 6.18    Non-Circumvention**.  The Seller and the Purchaser understand and agree that the Purchaser may introduce prospective buyers of the Mortgage Loans to the Seller, that such buyers are customers of the Purchaser and that relationships of the Purchaser to such buyers are confidential. The Seller agrees with respect to a particular buyer of the Mortgage Loans, the Seller will not, for the purpose of buying and selling other mortgage loans communicate with or sell such other mortgage loans to such buyer unless such buyer is or has been independently introduced to the Seller or the Seller has had previous dealings (other than any transactions involving the Purchaser) with such buyer.

(SIGNATURE PAGE FOLLOWS)



IN WITNESS WHEREOF, the Seller and the Purchaser have caused their names to be signed hereto by their respective officers thereunto duly authorized as of the date first above written.

**COUNTRYWIDE HOME LOANS, INC.,**
the Purchaser

By: _____
     Jordan Cohen
     Vice President

**ALLIANCE BANCORP,**
the Seller

By: _____
     Name:
     Title:

**EXHIBIT A**

RESERVED

**EXHIBIT B**

FORM OF FUNDING SCHEDULE

**COUNTRYWIDE HOME LOANS, INC.**

**Funding Schedule**

_____

**Closing Date [_____]**

The Purchase Proceeds due to the Seller for the Mortgage Loans is calculated as follows:

| | | |
|---|---|---|
| 1) | Aggregate Principal Balance of Mortgage Loans as of [CUT-OFF DATE]: | $[AMOUNT] |
| 2) | Purchase Price Percentage: | [PERCENTAGE]% |
| 3) | Purchase Price Proceeds: | $[AMOUNT] |
| 4) | Accrued Interest @ [xxx]%: | $[AMOUNT] |
| 5) | Total Purchase Proceeds (Item 3 + Item 4): | $[AMOUNT] |

The Seller hereby instructs the Purchaser to wire the Purchase Proceeds to the account designated below on the date hereof:

[WIRE INSTRUCTIONS]

Agreed to and Accepted by:

_____          COUNTRYWIDE HOME LOANS, INC.

By: _____          By: _____
        Name:                                              Name
        Title:                                             Title:

CHL Internal        _____

                    _____

                    _____

                    _____

**EXHIBIT C**

FORM OF OFFICER'S CERTIFICATE

I, _____, hereby certify that I am a duly elected _____ of _____, a _____ corporation (the "Seller"), and further certify on behalf of the Seller as follows:

1. Attached hereto are true and correct copies of the Certificate of Incorporation and Bylaws of the Seller as in full force and effect on the date hereof.

2. Each person who, as an officer or attorney-in-fact of the Seller, signed (a) the Mortgage Loan Purchase and Interim Servicing Agreement (the "Purchase Agreement") dated as of _____, by and between the Seller and Countrywide Home Loans, Inc., (b) the Purchase Confirmation (the "Purchase Confirmation") dated as of _____, by and between the Seller and Countrywide Home Loans, Inc., and (c) any other document delivered prior hereto or on the date hereof in connection with the sale and servicing of Mortgage Loans in accordance with the Purchase Agreement and/or Purchase Confirmation was, at the respective times of such signing and delivery, and is as of the date hereof, duly elected or appointed, qualified and acting as such officer or attorney-in-fact.

3. Set forth below is the name, title and specimen signature of the person who has been duly elected and qualified to serve in the capacity set forth opposite his or her name:

| Name | Title | Signature |
|------|-------|-----------|
| _____  ____ | _____ | _____ |
| | _____ | _____ |
| _____ | _____ | _____ |

, and the signatures of such persons appearing on such documents are their genuine signatures.

_____tations and warranties of the Seller contained in Article III of the Purchase Agreement and/or the ____ Confirmation were true and correct in all material respects as of the related Closing Date of the Purchase Agreement and Purchase Confirmation.

5____ ____ler has performed all of its duties and has satisfied all of the material conditions on its part to be performed ____ satisfied prior to the Closing Date pursuant to the Purchase Agreement and/or Purchase Confirmation.

All capitalized terms used herein and not otherwise defined shall have the meanings assigned to them in the Purchase Agreement.

IN WITNESS WHEREOF, I have hereunto signed my name and affixed the seal of the Seller.

Dated: _____, 200_

By: _____

Its: _____

I, _____, Secretary of _____, hereby certify that _____ is a duly elected, qualified and acting _____ of _____ and that the signature appearing above is his or her genuine signature.

IN WITNESS WHEREOF, I have hereunto signed my name.

Dated: _____, 200_

By: _____

Its: _____

32

**EXHIBIT D**

FORM OF AUTHORIZED SIGNATORIES AGREEMENT

This Authorized Signatories Agreement is dated and effective as of _____, 200_, between [SELLER], (the "Seller"), and Countrywide Home Loans, Inc. (the "Purchaser").

RECITALS

A.  The Seller has sold, or proposes to sell from time to time, to the Purchaser certain mortgage loans including the servicing rights related thereto (the "Mortgage Loans") in accordance with terms and conditions of that certain Mortgage Loan Purchase and Interim Servicing Agreement dated [INSERT] by and between the Seller and the Purchaser (the "Purchase Agreement").

B.  To facilitate the transfer and assignment of the Mortgage Loans from the Seller to the Purchaser under the Purchase Agreement, the Seller has agreed to appoint specific individuals employed by the Purchaser as authorized signatories (collectively, the "Authorized Signatories") pursuant to a certain Appointment of Authorized Signatories, the form of which is attached as Exhibit A hereto, for the sole and exclusive purposes of preparing and executing allonge note endorsements ("Endorsements") and/or preparing and executing mortgage assignments or beneficial interests in deeds of trust or similar instruments ("Assignments"), as applicable, with respect to the Mortgage Loans.

In consideration of the promises and the mutual agreements and undertakings set forth herein, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.  The Seller hereby authorizes the Authorized Signatories to prepare and execute Endorsements and/or Assignments, as applicable, relating to the Mortgage Loans sold by the Seller to the Purchaser under the Purchase Agreement. Such authority shall include the authority to record and/or file such Endorsements and Assignments with all applicable governmental recording agencies and any private electronic systems, including, without limitation, the MERS® System.

2.  The Purchaser agrees that the preparation and execution of the Endorsements and/or Assignments by the Authorized Signatories will be performed with due care.

3.  Other than the authorization granted herein, the Purchaser agrees that the Authorized Signatories will take no other action in the name of the Seller.

4.  The authority granted by the Seller to the Purchaser herein shall be in full force and effect and shall apply with respect to any Mortgage Loan sold by the Seller to the Purchaser under the Purchase Agreement.

5.  The Seller will provide Purchaser with a Secretary's Certificate that authenticates that the Seller's Board of Directors has taken the necessary corporate action to allow the appointment of and grant the authorizations to the Authorized Signatories as permitted herein, which such corporate action shall be in the form of board resolution substantially in the form of Exhibit B attached hereto.

IN WITNESS WHEREOF, the parties have duly executed this Authorized Signatories Agreement as of the date first above written.

**[SELLER],**
the Seller

By: _____
        Name:

33

Title:

**COUNTRYWIDE HOME LOANS, INC.,**
the Purchaser

By: _____

Jordan Cohen
Vice President

**Exhibit A**
**To**
**Authorized Signatories Agreement**

FORM OF APPOINTMENT OF AUTHORIZED SIGNATORIES

Pursuant to the authority granted me by a vote of the Board of Directors of [SELLER] dated as of [DATE], I hereby appoint the individuals listed below for the sole and exclusive purpose of executing allonge note endorsements and/or executing mortgage assignments or beneficial interests in deeds of trust or similar instruments, as applicable, relating to mortgage loans sold, or to be sold, by [SELLER], as identified on Exhibit A of that certain Authorized Signatories Agreement dated as of [DATE], by and between [SELLER] and Countrywide Home Loans, Inc.

[SELLER],

By: _____
     Name:
     Title:

Dated: _____, 200_.

**AUTHORIZED SIGNATORIES:**

| | | | |
|---|---|---|---|
| Adele Tharpe | Allen Kalust | Amy Hamlin | Amy Millett |
| Angeles Medina | Cherie Hagen | Christine Armendariz | Craig Anderson |
| Deanna Burns | Edward Gerovian | Heidi Smalley | Icela Lopez |
| Jacqui Prey | Janet Palomino | Jill Manderfield | Jordan Cohen |
| Judith Moore | Kevin Meyers | Laura Villasenor | Mark Acosta |
| Mark Wong | Mary Beth Pitstick | Mercedes Judilla | Mike Vestal |
| Nicole Walden | Paul Lindemann | Pauline Casillas | Richard L. Wilson |
| Robin Dolatowski | Ron Pisapia | Sandra Fennell | Sheri Solum |
| Sophie Hooper | Susan Hahn | Terry Stallings | Tony Meschyan |
| Tracy Schreiner | Yolanda Diaz | Lynn Sumner | Michael K. Henderson |
| Michael W. Schloessmann | | | |

**Exhibit B**
**To**
**Authorized Signatories Agreement**

FORM OF UNANIMOUS WRITTEN CONSENT OF DIRECTORS

We the undersigned, being all of the directors currently in office of _____ (the "Company"), do hereby consent, pursuant to the provisions of the Company's articles of incorporation, by-laws and all other governing documents, to the taking of and adopting the following actions for and on behalf of the Company:

APPROVED: that each of the following persons, acting singly, be, and each hereby is, authorized and empowered to appoint assistant secretaries, assistant mortgage officers, assistant vice presidents, vice presidents or other authorized signatories, and their successors, on behalf of the Company for the sole and exclusive purposes of, and with authority expressly limited to, executing mortgage assignments of beneficial interests in deeds of trust or similar instruments, note endorsements or allonges and any other documents necessary to effect the sales of loans to Countrywide Home Loans, Inc. or its nominee or assignee:

_____ [Insert name of Company officer who is to sign Appointment of Authorized Signatories]

IN WITNESS WHEREOF, the undersigned have executed this unanimous written consent as of the _____ day of _____, 200__.

_____ [Insert signature line for each board member]

36

**EXHIBIT E**

FORM OF PURCHASE CONFIRMATION

[COUNTRYWIDE LETTERHEAD]

[DATE]

**[SELLER]**
[STREET ADDRESS]
[CITY, STATE AND ZIP]
Attn: [CONTACT, TITLE]

Re:     Purchase Confirmation

Gentlemen and Ladies:

This purchase confirmation (the "Purchase Confirmation") between Countrywide Home Loans, Inc. (the "Purchaser") and [SELLER] (the "Seller") sets forth our agreement pursuant to which the Purchaser is purchasing, and the Seller is selling, on a servicing-released basis, those certain mortgage loans identified in <u>Exhibit A</u> hereto and more particularly described herein (the "Mortgage Loans").

The purchase, sale and servicing of the Mortgage Loans as contemplated herein shall be governed by that certain Mortgage Loan Purchase and Interim Servicing Agreement dated as of [DATE], between the Purchaser and the Seller (as amended herein and otherwise, the "Agreement").  By executing this Purchase Confirmation, each of the Purchaser and the Seller again makes, with respect to itself and each Mortgage Loan as of the related Closing Date or such other date as indicated in the Agreement, as applicable, all of the covenants, representations and warranties made by each such party in the Agreement, except as the same may be amended by this Purchase Confirmation.

All exhibits hereto are incorporated herein in their entirety.  In the event there exists any inconsistency between the Agreement and this Purchase Confirmation, the latter shall be controlling notwithstanding anything contained in the Agreement to the contrary.  All capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the Agreement.

1.  <u>Assignment and Conveyance of Mortgage Loans</u>. Upon the Purchaser's payment of the Purchase Proceeds in accordance with Section 2.2 of the Agreement, the Seller shall sell, transfer, assign and convey to the Purchaser all of the right, title and interest of the Seller in and to the Mortgage Loans, including the Servicing Rights relating thereto.

2.  <u>Defined Terms</u>. As used in the Agreement, the following defined terms shall have meanings set forth below.

    a.  <u>Closing Date</u>:  [DATE].

    b.  <u>Cut-off Date</u>: [DATE].

    c.  <u>Purchase Proceeds</u>: With respect to [the Mortgage Loans] [each Mortgage Loan] [the Mortgage Loans in each Segment], and as set forth in <u>Exhibit A</u> hereto, the sum of (a) the product of (i) the Cut-off Date Balance of [such Mortgage Loan] [such Mortgage Loans] [such Segment], and (ii) the purchase price percentage set forth in <u>Exhibit A</u> hereto for such [Mortgage Loan] [Mortgage Loans] [Segment], and (b) [accrued interest owing to the Seller on the Stated Principal Balance of the Mortgage Loans at a rate equal to the weighted average Mortgage Interest Rate of such Mortgage Loans, from the Cut-off Date through the day prior to the Closing Date, inclusive.] [accrued interest owing to the Seller on the Stated Principal Balance of each Mortgage Loan at a

rate equal to the Mortgage Interest Rate of each such Mortgage Loan, from the date through which interest has last been paid (as of the Cut-off Date) through the day prior to the Closing Date, inclusive; provided, however, with respect to those Mortgage Loans for which interest has been paid through a date beyond the Closing Date, such accrued interest owing to Seller shall be reduced by the amount of interest accruing on the Stated Principal Balance of each such Mortgage Loan at a rate equal to the Mortgage Interest Rate of such Mortgage Loan, from the Closing Date to the day prior to the interest paid through date for such Mortgage Loan, inclusive.] [accrued interest owing to the Purchaser on the Mortgage Loans based on the scheduled principal balance as of the first day of the month preceding the Cut-off Date at a rate equal to the weighted average Mortgage Interest Rate of such Mortgage Loans, from the Closing Date through the thirtieth (30th) day of the month in which the Closing Date occurs, inclusive.]

    d.  Servicing Transfer Date: [DATE].

3.  Description of Mortgage Loans: Each Mortgage Loan complies with the specifications set forth below in all material respects.

    a.  Loan Type: Each Mortgage Loan is a [Conventional] [Government] Mortgage Loan and a [Adjustable Rate] [Balloon] [Convertible] [Fixed Rate] Mortgage Loan.

    [b.  Index: On each Interest Adjustment Date, the applicable index rate shall be a rate per annum equal to [the weekly average yield on U.S. Treasury securities adjusted to a constant maturity of one year, as published by the Board of Governors of the Federal Reserve System in Statistical Release No. H.15] [the average of interbank offered rates for six-month U.S. dollar denominated deposits in the London market (LIBOR), as published [in the Wall Street Journal] [by Fannie Mae] [the 11th District Cost of Funds as made available by the Federal Home Loan Bank] [the weekly average yield on certificates of deposit adjusted to a constant maturity of six months as published by the Board of Governors of the Federal Reserve System in Statistical Release No. H.15 or a similar publication].

    c.  Lien Position: Each Mortgage Loan is secured by a perfected [first] [second] lien Mortgage.

    d.  Underwriting Criteria: Each Mortgage Loan [was underwritten generally in accordance with the Seller's credit underwriting guidelines in effect at the time such Mortgage Loan was originated] [conforms to the Fannie Mae or Freddie Mac mortgage eligibility criteria and is eligible for sale to, and securitization by, Fannie Mae or Freddie Mac] [conforms in all material respects to the GNMA mortgage eligibility criteria and is eligible for sale and securitization into a GNMA mortgage-backed security] [at the time of origination was underwritten to guidelines which are consistent with an institutional investor-quality mortgage loan].

4.  Additional Stipulations Regarding Mortgage Loan Package.

    [a.  Prepayment [and Conversion] Protection. In addition to the any rights afforded the Purchaser in the Agreement, in the event that any of the Mortgage Loans are (i) paid in full [or (ii) converted to a fixed-rate mortgage loan, in either case,] on or prior to [DATE], or [(iii)] subject to a breach of the representation set forth in Section 3.2(qq) of the Agreement, the Seller shall, with respect to each such Mortgage Loan, pay to the Purchaser the product of (a) the positive difference, if any, between the Purchase Price Percentage (subject to any buyup or buydown adjustments as contemplated [in the Trade Confirmation]) and 100%, times (b) the unpaid principal balance of such Mortgage Loan at the time such Mortgage Loan is paid in full [or converted, as applicable] (the "Premium Recapture Amount"). In the event any Mortgage Loan is paid in full after the Cut-off Date and on or prior to the Closing Date, the Seller shall, in addition to the Premium Recapture Amount, pay the Purchaser the Accrued Interest paid by the Purchaser for such Mortgage Loan. Nothing contained in this Section 3.5 shall in any way limit the rights of the Purchaser to all collections and recoveries of principal and interest received or applied to any Mortgagor's account and the Seller's obligation to remit the such recoveries of principal and

interest to the Purchaser as provided in <u>Section 2.3</u>.]

[b. <u>Payment Default Protection</u>.  In addition to any rights afforded the Purchaser in the Agreement, if the [first Monthly Payment with a Due Date subsequent to the Closing Date][first Monthly Payment due under the Mortgage Note] is not received by the Purchaser, whether from the Mortgagor directly or forwarded by the Seller if the Mortgagor has submitted the payment to the Seller, [by the last day of the month in which such payment is due][within [INSERT] ([INSERT) days of its related Due Date], the Seller shall, at the Purchaser's option and not later than five (5) Business Days after receipt of notice from the Purchaser, repurchase such Mortgage Loan at the Repurchase Price.  The rights conferred to the Purchaser under this <u>Section 3.6</u> shall be in addition to those rights conferred to the Purchaser under <u>Section 3.2(b)</u>.]

[c. <u>Post-Closing Appraisal Review</u>.  In addition to any rights afforded the Purchaser in the Agreement, the Purchaser shall have the right, within [thirty (30) days][twelve (12) months] after the Closing Date, or the date on which the appraisal in the Mortgage File relating to the Mortgaged Property is received by the Purchaser from the Seller, whichever is later, to obtain an appraisal, broker's price opinion, drive-by appraisal or any other comparable valuation measure with respect to any Mortgaged Property (collectively, the "Review Appraisal"). If the value of a Mortgaged Property, as determined by the Review Appraisal, is less than the value of the appraisal in the Mortgage File by (i) ten percent (10%) or more for a Mortgage Loan with an original LTV of less than or equal to eighty percent (80%) or (ii) five percent (5%) or more for a Mortgage Loan with an original LTV of greater than eighty percent (80%), the Seller shall, at the Purchaser's sole option, repurchase the related Mortgage Loan at the Repurchase Price not later than five (5) Business Days after the Seller's receipt of notice requesting same from the Purchaser.]

[d. <u>Missing and Deficient Documents</u>.  Pursuant to Section 2.5 of the Agreement, the Seller is required to deliver to the Purchaser the Mortgage Loan Documents at least two (2) Business Days prior to the Closing Date.  The Seller and the Purchaser acknowledge that as of the Closing Date, with respect to the Mortgage Loans identified in <u>Exhibit E</u> hereto, the Seller has not delivered the related Mortgage Loan Documents in accordance with Section 2.5 (the "Missing Documents") or, with respect to certain other Mortgage Loans also identified in <u>Exhibit E</u> hereto, certain Mortgage Loan Documents and/or Mortgage Files are deficient and/or incomplete for reasons detailed in <u>Exhibit E</u> (the "Deficient Documents").  [Pursuant to Section 2.4 of the Agreement, the Purchaser has the right, prior to the Closing Date, to review the Mortgage File and, based on its review, decline to purchase any Mortgage Loan which the Purchaser, in its sole discretion, determines not to be in compliance with each of the representations and warranties contained in the Agreement or which is otherwise unsatisfactory to the Purchaser in its reasonable discretion.  The Seller and the Purchaser acknowledge that as of the Closing Date, with respect to the Mortgage Loans identified in <u>Exhibit E</u> hereto, the Seller has not delivered the related Mortgage Files in accordance with Section 2.4 (the "Missing Mortgage Files"), and as a result, the Purchaser has been unable to complete its review of the affected Mortgage Loans prior to the Closing Date.

In consideration of the Purchaser's agreement to purchase the Mortgage Loans identified in <u>Exhibit E</u> hereto on the Closing Date notwithstanding the foregoing, the Seller shall, with respect to Mortgage Loans with Missing Documents, deliver such Missing Documents to the Purchaser [no later than [DATE]][within thirty (30) days of the Closing Date], and, with respect to Mortgage Loans with Deficient Documents, cure such Deficient Documents to the satisfaction of the Purchaser [no later than [DATE]][within thirty (30) days of the Closing Date][and, with respect to Missing Mortgage Files, deliver such Missing Mortgage Files to the Purchaser no later than [DATE]][within thirty (30) days of the Closing Date].  In the event that the Seller fails to comply with the requirements of the foregoing sentence, the Seller shall, upon written notice from the Purchaser, repurchase any such Mortgage Loan at the Repurchase Price within one (1) Business Day after the Seller's receipt of such written notice.  [In addition, with respect to Missing Mortgage Files that are delivered to the Purchaser within the time frame required herein, the Purchaser shall have the right to complete its review of the related Mortgage Loan as contemplated under

39

Section 2.4 of the Agreement, and, if as a result of such review, the Purchaser determines that it would have declined to purchase such Mortgage Loan, the Seller shall, upon written notice from the Purchaser, repurchase such Mortgage Loan at the Repurchase Price within one (1) Business Day after the Seller's receipt of such written notice.] The fact that the Purchaser decides not to require the Seller to repurchase any such Mortgage Loan where the Seller may otherwise be required to repurchase such Mortgage Loan hereunder shall not affect the Purchaser's right to demand repurchase of such Mortgage Loan or to avail itself of any other rights and remedies available to it under the Agreement. Nothing contained herein shall be deemed to waive any rights, remedies or privileges of the Purchaser including, without limitation, the remedies accorded the Purchaser under Sections 3.3 and 3.4.]

Kindly acknowledge your agreement to the terms of this Purchase Confirmation by signing in the appropriate space below and returning this Purchase Confirmation to the undersigned. Telecopy signatures shall be deemed valid and binding to the same extent as the original.

**COUNTRYWIDE HOME LOANS, INC.**          **[SELLER]**

By: _____          By: _____

    Jordan Cohen                              Name: _____
    Vice President                            Title: _____

**Exhibit A to Purchase Confirmation**

Mortgage Loans

(attached)